```
               IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF FLORIDA
                        MIAMI DIVISION
                  CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,            NOVEMBER 17, 2014
                                     2:49 P.M.
                 Plaintiff,



       vs.



ROGER ROUSSEAU, et al.,

                 Defendants.       PAGES 1 THROUGH 35
_____

                           DAY 9
                EXCERPT OF CRIMINAL JURY TRIAL
           (CROSS-EXAMINATION BY MR. LEVIN OF JOEL COX)
          BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:    Mr. Allan J. Medina, AUSA
                      Mr. A. Brendan Stewart, AUSA
                      Mr. Justin Goodyear, AUSA
                      U.S. DEPARTMENT OF JUSTICE
                      Criminal Division
                      Fraud Section
                      1400 New York Avenue NW
                      Washington, DC  20530



FOR THE DEFENDANT:    Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)      LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                      800 Brickell Avenue
                      Suite 1400
                      Miami, Florida  33131



FOR THE DEFENDANT:    Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)      LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                      1221 Brickell Avenue # 900
                      Miami, Florida  33131
```

```
APPEARANCES (continued):


FOR THE DEFENDANT:        Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)          LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                          55 Merrick Way
                          Suite 212
                          Coral Gables, Florida  33134


FOR THE DEFENDANT:        Mr. Frank A. Prieto, Esq.
(Liliana Marks)           LAW OFFICE OF FRANK A. PRIETO, P.A.
                          One Northeast 2nd Avenue
                          Suite 200
                          Miami, Florida  33132


FOR THE DEFENDANT:        Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)             LAW OFFICES OF JUAN DE JESUS GONZALEZ
                          10631 N. Kendall Drive
                          Suite 150
                          Miami, Florida  33176


FOR THE DEFENDANT:        Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)             LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                          Courthouse Tower
                          40 NW 3rd Street
                          Suite 200
                          Miami, Florida  33128


COURT REPORTER:           Carly L. Horenkamp, RMR, CRR
                          U.S. DISTRICT COURT
                          400 N. Miami Avenue, Room 12-3
                          Miami, Florida  33128
                          (305) 523-5138
```

1           **I  N  D  E  X**

2      *Certificate* ----------------------------------------------- 35

3

4

5                 **W I T N E S S**
       ON BEHALF OF THE GOVERNMENT:                          PAGE
6      JOEL COX
       CROSS-EXAMINATION BY MR. LEVIN                           4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
1        (Before Jury, 2:49 p.m.)
2            THE COURT:  All right.  Mr. Levin.
3            MR. LEVIN:  May it please the Court.
4            Ladies and gentlemen, good afternoon.
5                     CROSS-EXAMINATION
6   BY MR. LEVIN:
7   Q.  How are you today, Special Agent Cox?
8   A.  Good, sir.  How are you?
9   Q.  I'm well.  Thank you.
10      Now, you apparently took a statement from my client, Blanca
11  Ruiz, correct?
12  A.  Yes, sir.
13  Q.  And that was back in May of 2013?
14  A.  Yes, sir.
15  Q.  And that was at a time when all, Ms. Gonzalez and
16  Ms. Pampin and Mr. Armando Gonzalez, they had all been
17  arrested, correct?
18  A.  Yes, sir.
19  Q.  They'd all been indicted, correct?
20  A.  Yes, sir.
21  Q.  And it was common knowledge, right, about this arrest?  It
22  got publicity in the newspaper, right?
23  A.  That's correct.
24  Q.  The U.S. Attorney's Office issues a press release
25  announcing the arrest of these individuals, correct?
```

1   A.  I believe that's correct, yes.

2   Q.  Okay.  So it was probably very well understood throughout

3   the community, especially in the health field, that those

4   individuals had been arrested and indicted, correct?

5   A.  It was publicized.

6   Q.  Now, in May of 2013, you went over to see Blanca Ruiz,

7   right?

8   A.  Yes.

9   Q.  All right.  And you got to her house at about 7:00, 7:30 in

10  the morning?

11  A.  I don't remember the exact time.

12  Q.  Well, to use Mr. Rabin's words, when you arrived at her

13  door, was she in her jammies?

14  A.  She was in non-business clothes.

15  Q.  Okay.  Well, was she getting ready to go jog?  I mean, she

16  was wearing her PJs, right?

17  A.  It wasn't as memorable as Mr. Rousseau's PJs.

18  Q.  Did his have like bunny rabbits on them?

19  A.  She was not dressed for business, no.

20  Q.  Well, was she dressed for slumber?

21  A.  Possibly, yes.

22  Q.  Okay.  So we're narrowing in on what she's wearing.  It was

23  sleep attire, right?

24  A.  I'm not sure what type of attire it was.

25  Q.  All right.  You don't know what time you got there.

1  A.  It was in the morning hours, yes.

2  Q.  Can you narrow it down?  I think you said you started your

3  day at about 5:00 a.m., right, generally speaking?

4  A.  That's not every day.

5  Q.  I understand.  But on that day, you don't have a specific

6  recollection as to the time you got there.

7  A.  No, sir.

8  Q.  But obviously, based on her attire, which was not business

9  attire, and now you agree with me that it was slumber attire,

10  you would reasonably conclude that she probably had been

11  sleeping.  Would you agree with that?

12  A.  I don't know if she'd been sleeping or not.

13  Q.  Now, you got to the door.  You knocked on the door.

14  Correct?

15  A.  I knocked on her door, yes.

16  Q.  Okay.  She opens the door, correct?

17  A.  Yes.

18  Q.  You identify yourself as the FBI, right?

19  A.  Yes, sir.

20  Q.  She doesn't say to you, "Sorry, call my lawyer," right?

21  A.  No.

22  Q.  She invited you into her home, right?

23  A.  Yes.

24  Q.  And you would describe that home, would you agree with me

25  that that was a modest duplex in Homestead?

1    A.  I would agree.

2    Q.  And she let you in.  You tell her why you're there, right?

3    A.  Yes, sir.

4    Q.  You said you wanted to talk about Health Care Solutions

5    Network, right?

6    A.  Yes, sir.

7    Q.  She appeared to be normal with that, didn't have any

8    problem with that, right?

9    A.  Not that I can recall.

10   Q.  She didn't start to shake, like when Mr. Rabin is up here

11   questioning, she wasn't like dancing around her table or

12   anything, right?

13   A.  Not initially.

14   Q.  Excuse me?

15   A.  Not initially.

16   Q.  Not initially, okay.  So you asked the questions and

17   Special Agent Reilly is taking the notes; is that accurate?

18   A.  For the most part, yes.

19   Q.  Now, these notes, these are handwritten notes?

20   A.  Yes, sir.

21   Q.  Are they taken like on a legal pad or something along those

22   lines?  Are they looseleaf note paper?

23   A.  Some form of paper.

24   Q.  Right.  Now, I've never seen those notes, correct?

25   A.  Not to my knowledge.

1  Q.  Those notes have never been shared with me, right?

2  A.  Correct.

3  Q.  Now, in fact, during the course of this trial --

4        MR. LEVIN:  One moment, Your Honor.

5  BY MR. LEVIN:

6  Q.  -- when you were getting prepared to testify in connection

7  with this case, you reviewed Special Agent Reilly's notes, did

8  you not?

9  A.  Yes, sir.

10 Q.  You also reviewed the FD302 report that was prepared by

11 Special Agent Reilly, right?

12 A.  Yes, sir.

13 Q.  And you realized that in the notes -- there was something

14 in the 302, the typewritten report, that was not contained in

15 the notes, correct?

16 A.  There was, yes.  There was something, yes.

17 Q.  Okay.  So just so it's clear, there was a statement in the

18 302, and that statement just happened to be about whether or

19 not Blanca Ruiz made a statement about her knowledge concerning

20 kickbacks being paid at the ALF, right?

21 A.  Yes, sir.

22 Q.  Initially, when you were preparing for this trial, the

23 notes never reflected such a statement, correct?

24 A.  That's correct.

25 Q.  There was never a note initially that said Blanca Ruiz was

1  aware that kickbacks were being paid to the ALF owners,

2  correct?

3  A.  Well, no, that's not correct.  The note did exist, we just

4  did not have it in our file here.

5  Q.  I'm getting to that.

6  A.  Okay.

7  Q.  I'm getting to that, Special Agent Cox.  Initially, you

8  didn't see a note that said that Blanca Ruiz made a statement

9  about her awareness of kickbacks being paid, correct?

10  Initially.

11  A.  That's correct.

12  Q.  Okay.  Then approximately eight days later, the note that

13  reflected that she was aware kickbacks were being paid turned

14  up?

15  A.  Yes, that is correct.

16  Q.  So you had a separate note.  This note was like floating

17  around somewhere out there separated from the rest of the notes

18  concerning this interview, right?

19  A.  It was in a file back at our office.

20  Q.  Just this one note was in a file back at your office,

21  right?

22  A.  No, there was other things in the file.

23  Q.  Did you see the file?

24  A.  Yes, I did.

25  Q.  Did you see Special Agent Reilly's notes in that file?

```
 1   A.   Yes.

 2   Q.   Did you see Special Agent Reilly's note concerning his

 3   interview with Blanca Ruiz in that file?

 4   A.   Yes.

 5   Q.   Did that note -- was that note simply one page?

 6   A.   That note you're referring to was one piece of paper, yes.

 7   Q.   Yes.  The note that purportedly said -- and again, I

 8   haven't had the opportunity to see that note.  The note that

 9   purportedly said Blanca Ruiz was aware of kickbacks at HCSN,

10   that one-page note was in a file back at your office, right?

11   A.   Yes, sir.

12   Q.   And the rest of the notes were where?

13   A.   At an office we have here.

14   Q.   So for some reason that note got separated out from the

15   notes that you have back here in this building in your office

16   preparing for this trial.  Is that your testimony, in essence?

17   A.   Yes.

18   Q.   Without that note, would you have had an independent

19   recollection of the specifics of your conversation with Blanca

20   Ruiz?

21   A.   Yes.

22   Q.   And you've interviewed probably thousands of individuals,

23   correct?

24   A.   No.

25   Q.   Okay.  You've interviewed, in connection with this
```

1  investigation alone, at least a hundred to 200 people.  Would
2  you agree with that?
3  A.  In this investigation there were that many -- probably that
4  many interviews conducted, yes.
5  Q.  Right.
6  A.  Me personally, probably not that many.
7  Q.  You personally conducted how many interviews in connection
8  with this investigation?
9  A.  Any number I'd give you would be a speculation, but
10  several.
11  Q.  Okay.  Dana Gonzalez, she got interviewed how many times in
12  connection with this case, eight times?
13  A.  I'm not sure.
14  Q.  Okay.  Alexandra Haynes, she got interviewed approximately
15  ten times in connection with this investigation.  Did you
16  participate in any of those interviews?
17  A.  I'm sure I did, yes.
18  Q.  John Thoen, he got interviewed at least seven or eight
19  times in connection with this investigation.  Did you
20  prepare -- did you participate in any of those investigations?
21  A.  Yes.
22  Q.  Okay.  So if you had participated in at least half of
23  those, that's about 15 right there, right?
24  A.  That would be safe to say.
25  Q.  Okay.  Now, you say that you, regardless of the note, have

1   a specific recollection that that's what she said to you.

2   A.   Yes.

3   Q.   Okay.  Now, there's been the concept of -- which is an

4   interesting one, about recording the interviews of at least

5   people that are in custody, right?

6   A.   Yes, that's right.

7   Q.   And just this past July, the Department of Justice created

8   a new policy wherein anyone arrested and taken into custody,

9   their statement, if any, had to be recorded, right?

10  A.   Yes.

11  Q.   And I believe you had indicated previously that you didn't

12  know why the department had made such a change.

13  A.   I'm not sure of the exact reasons, no.

14  Q.   You did not get a memo in your office from the Attorney

15  General himself, Eric Holder, advising as to why there would be

16  a change in policy?

17  A.   I don't recall why.

18  Q.   Would you agree with me that having a recording makes the

19  issue clear and undisputable?

20  A.   I would agree with that.

21  Q.   Would you agree with me that having a recording would make

22  it easier for the trier of fact, the jury, to be able to hear

23  the circumstances surrounding the questioning and the specific

24  words and tones used by you and the person being interviewed?

25  A.   And what's -- I'm sorry, what was your question regarding

1    that statement?

2    Q.   My question was:  Would you agree with me that having a

3    recording would make it easier for jurors, or people deciding

4    important issues in a criminal case, to be able to hear the

5    circumstances surrounding the questioning?

6    A.   Yes.

7    Q.   That it would make it easier for the jurors to hear the

8    specific words spoken by the person purportedly making a

9    statement?

10   A.   Yes, it would -- there would be a verbatim transcript.

11   Q.   And the tones used by the questioner or interrogator.

12   A.   If they heard an audio version of it, they could pick up on

13   the tones.

14   Q.   Right.  And that became a policy of your agency in July at

15   least for people that are in custody, right?

16   A.   Yes, sir.

17   Q.   Now, when you went to Blanca's house you didn't read her

18   her Miranda rights, right?

19   A.   That's correct.

20   Q.   You didn't tell her that she had the right to remain

21   silent.  You didn't even tell her that she didn't have to talk

22   to you.

23   A.   It was a voluntary interview.

24   Q.   Exactly.  She came in, she saw you.  First she thought you

25   might have been FP&L as opposed to the FBI.  Quite a difference

1    there, right?

2    A.  Yes.

3    Q.  And you come in and you stay at her house for two hours; is

4    that about right?

5    A.  I don't remember the exact elapsed time that went by.

6    Q.  Again, like when Mr. Rabin was asking you before, you know,

7    time in an interview is very important, especially one that's

8    in an in-custody setting, correct?

9    A.  Yes.

10   Q.  I mean, it's important because those types of statements

11   can get legally challenged in a court of law based on whether

12   or not they were freely and voluntarily made, right?

13   A.  Are we talking custodial or noncustodial?

14   Q.  We're talking a custodial statement.

15   A.  I don't know that there's any time limit or any constraints

16   that we're required to be under in a custodial statement.  I

17   mean, we allow breaks and I'm not aware of a time constraint.

18   Q.  Is this your first job in law enforcement?

19   A.  Yes.

20   Q.  Where did you start your career?

21   A.  Where?

22   Q.  Right.

23   A.  For --

24   Q.  Is this your first job out of college?

25   A.  No, sir.

```
1   Q.  What was your first career?

2   A.  I worked in manufacturing.

3   Q.  Manufacturing of --

4   A.  In supply chain and in logistics.  Several different

5   things:  Plastics, glass, automotive.

6   Q.  Where was that?

7   A.  Alabama.

8   Q.  Okay.  You were doing a whole different line of work than

9   what you're doing now, right?

10  A.  Yes, sir.

11  Q.  And then you decided to join the bureau, right?

12  A.  That's correct.

13  Q.  And you went to the academy, I assume?

14  A.  Yes, sir.

15  Q.  And you received training in methods and proper police

16  practices, correct?

17  A.  Yes.

18  Q.  And that would be, what, in Quantico?

19  A.  Yes.

20  Q.  And at Quantico, they teach you about the proper way to

21  take at least post-arrest statements, correct?

22  A.  Yes.

23  Q.  They talk to you, do they not, about timing and your

24  concern for making sure that the statement is freely and

25  voluntarily made as opposed to one that's the product of duress
```

1    or coercion or time, right?

2    A.  I'm not aware -- I don't recall any topics of a time

3    constraint.

4    Q.  Well, you would agree with me, sir, would you not, that a

5    person that's held in custody for 16 hours without a glass of

6    water, if that person confessed to a crime, it's probably more

7    likely than not that that statement would not be allowed to

8    come into their case?  Would you agree with that?

9    A.  I really have no knowledge to speak on that, but that

10   wasn't the case here.

11   Q.  I understand that.  We're not talking about her statement

12   not being freely and voluntarily made.  Do you agree with that?

13   Her statement was freely and voluntarily made, correct?

14   A.  That is correct.

15   Q.  Okay.  And she would have given you more than the time that

16   you -- that you asked for, correct?

17   A.  No, she terminated the interview.

18   Q.  Okay.  But did she not say to you that she would give you

19   her computer?

20   A.  I don't recall.

21   Q.  Did she not say to you that she would give you some papers

22   from when she was working at Health Care Solutions Network?

23   A.  I'd have to review the 302 to be sure of that.

24   Q.  So you don't have an independent recollection as to whether

25   or not she would have given you papers that she had accumulated

1    from her time at Health Care Solutions Network?

2    A.  I would just need to refresh my memory.

3    Q.  Right.  But you didn't necessarily need to refresh your

4    memory of her purported statement about her awareness of

5    kickbacks.  You said you had an independent recollection of

6    that.

7    A.  That is correct.

8    Q.  So you have independent recollections of some things, but

9    not other things.

10   A.  Yes.

11   Q.  And that's because the brain can only handle so much,

12   right?

13   A.  I don't -- I'm not sure.

14   Q.  But you would agree -- well, your memory is only as good as

15   your brain will allow it to be, right?

16   A.  That sounds like a true statement.

17   Q.  Okay.  So when you met with her, she told you that she came

18   to the United States from Ecuador in 1970?

19   A.  That sounds correct, yes, sir.

20   Q.  And that she became a United States citizen in 1986,

21   correct?

22   A.  Yes, sir, I believe that is correct.

23   Q.  She told you she had resided in New York for a period of

24   time?

25   A.  I believe that is correct, yes, sir.

1    Q.   And she told you that she was a registered mental health

2    counselor intern, correct?

3    A.   Yes.

4    Q.   Did she tell you that she had problems working with Dana

5    Gonzalez?

6    A.   Yes, along with Alina Faes.

7         THE COURT:   Is that Dana Gonzalez or Donna Gonzalez?

8         MR. LEVIN:   It's Dana Gonzalez.   Sorry.

9         THE COURT:   I just wanted to make sure it was the same

10   person.

11        MR. LEVIN:   Yes, it's the same person.   My bad.   Dana

12   Gonzalez.

13   A.   Yeah, I believe her statement in that was regarding her --

14   with Ms. Gonzalez showing up late for work.   I believe that's

15   what that was in reference to.

16   BY MR. LEVIN:

17   Q.   Right.   That she was -- Dana Gonzalez would show up late to

18   work when Blanca Ruiz was always on time.   Is that accurate?

19   A.   I don't know if that was completely accurate.   I don't know

20   that she said that she was always on time, but...

21   Q.   Would you like to refresh your recollection?

22   A.   Please.

23        MR. LEVIN:   If I may approach, Your Honor?

24        THE COURT:   Yes.

25        MR. LEVIN:   Thank you.

 1    BY MR. LEVIN:

 2    Q.  (Hands witness document.)

 3    A.  Thank you.  Okay.  It doesn't say "always."

 4    Q.  Okay.  It doesn't say "always," but it does say that she

 5    would show up on time, right?

 6    A.  Yes, that's correct.

 7    Q.  But not always necessarily.  Okay.  We're clear on that.

 8        She talked to you freely about her compensation, did she

 9    not?  She said she was paid by check?

10    A.  Yes, sir.

11    Q.  Payable initially to Blanca Ruiz, correct?

12    A.  Yes, I believe that is correct.

13    Q.  And then she told you about a company that she had formed,

14    Healthcare Professional Services?

15    A.  Yes.

16    Q.  And she said that the reason she did that was based on

17    advice that she had received from her accountant?

18    A.  Yes, I believe that is correct.

19    Q.  And to save her money on her taxes; is that correct?

20    A.  Yes.

21    Q.  And it was also a suggestion from Mr. Gonzalez so that he

22    would have to pay less taxes as well, correct?

23    A.  I'd have to review to be sure if that was the case, of him

24    paying less taxes, or if it was Ms. Ruiz.

25    Q.  Okay.  So you're not sure about that.

A.  I would have to look at the report again to be exactly sure.

Q.  Okay.  Something along those lines?  Does that sound vaguely familiar?

A.  It sounds vaguely familiar, but I'm just not sure about the fact that it was Mr. Gonzalez who was having to pay less taxes. Just need to be sure.

Q.  Okay.  (Hands witness document.)

A.  It's not -- so it doesn't say that so Mr. Gonzalez has to pay less taxes.  It says that so that less money in taxes would be taken from her 1099.  It had nothing to do with his taxes.

Q.  Okay.  I stand corrected.

THE COURT:  Do you have more than a minute or two?

MR. LEVIN:  Yes, I do.

THE COURT:  All right.  So we started actually a little bit early after lunch, so we've been here for an hour and a half, so let's take a 15-minute break, come back at 3:25.

(Jury not present.)

THE COURT:  All right.  See everybody in 15 minutes.

(Recess, 3:08 p.m. to 3:25 p.m.)

THE COURT:  All right.  Let's bring in the jury, please.

(Jury Present.)

THE COURT:  All right.  Welcome back, everyone. Please be seated.  Making sure everybody's here.

1           Okay.  All right.  Everybody is here.  Go ahead,

2     Mr. Levin.

3           MR. LEVIN:  Thank you, Your Honor.

4     BY MR. LEVIN:

5     Q.  Special Agent Cox, I just wanted to digress for one second.

6     There's been a lot of testimony from you with regard to the

7     signatures, that you knew that there were people forging

8     signatures at HCSN, right?

9     A.  Yes.

10    Q.  And just so I have this straight, there was no handwriting

11    expert or any handwriting analysis done at all?

12    A.  That is correct.

13    Q.  Okay.  Now, the FBI prides itself on being probably the

14    greatest law enforcement organization in the world.  Would you

15    agree with that?

16    A.  I believe that's an accurate representation that is

17    believed by the community.

18    Q.  I mean, you are working for the crème de la crème of law

19    enforcement agencies, are you not?

20    A.  Those are your words.

21    Q.  Well, of course they're my words, I'm asking the questions.

22    A.  Yeah, I mean, it's -- I believe it's a respected law

23    enforcement agency, yes.

24    Q.  Okay.  I mean, it's a great agency, right?  You're proud to

25    be an agent, right?

1    A.   Yes.

2    Q.   And the community is grateful for your service, correct?

3    A.   Yes, I would like to think so.

4    Q.   Okay.  Now, the FBI, of course -- there's been this talk

5    about the CSI and TV and stuff like that from Mr. Gonzalez.

6    Now, this CSI that the FBI has is also probably the greatest

7    CSI in the entire world.  Would you agree with that?

8    A.   I really don't know.

9    Q.   Okay.  One of the lawyers asked a question, did you go out

10   and hire a handwriting expert?  Do you recall that question?

11   A.   Yes.

12   Q.   The FBI doesn't have to hire handwriting experts, do they?

13   A.   I've never had any personal experience with my employment

14   with handwriting experts, so I'm not quite sure.

15   Q.   The FBI has a rather extensive laboratory in Quantico,

16   Virginia, do they not?

17   A.   Yes.

18   Q.   They have a massive building housing criminologists, do

19   they not?  Do you know what a criminologist is?

20   A.   Yes.

21   Q.   Okay.  They have a building, people working on a constant

22   basis, probably 24 hours a day, seven days a week, correct?

23   A.   I'm not sure of their schedule, but there's a laboratory in

24   Quantico, Virginia.

25   Q.   And inside that building in Quantico are people who are

1  trained in recognizing what is known in the field as questioned

2  documents, correct?

3  A.  I can't personally speak to it.  I've never used any.  I

4  think we do have that at our disposal, though.  But I'm not

5  sure because I've never used it.

6  Q.  And to break that into English so that we can all

7  understand it, disposal level, what that means is, yes, we have

8  handwriting experts in Quantico, Virginia, who analyze

9  signatures that are purported to be fake signatures, right?

10 A.  I have no personal knowledge of that.  I've never used that

11 as part of one of my cases before.

12 Q.  Now, you went to the academy, right?

13 A.  Correct.

14 Q.  You were taught about what the resources were of the FBI,

15 were you not?

16 A.  Correct, but I --

17 Q.  You were told -- sorry, did I cut you off?

18 A.  Yes.

19 Q.  Sorry, go ahead.

20 A.  I don't want to misspeak, like it came up earlier regarding

21 contract employees and employees, I'm not sure if a handwriting

22 expert that we may have would be a contract employee or what.

23 I know that that could be available if we chose to use it, yes.

24 Q.  So you don't know whether or not the FBI has people that

25 are on staff that do handwriting analysis?

```
1    A.   I personally have never used them in a case.

2    Q.   You have colleagues that have, do you not?

3    A.   I'm not aware of any.

4    Q.   You're not aware of any of your colleagues --

5    A.   That I personally work with, that's correct.

6    Q.   What about people that you haven't personally worked with.

7    A.   Possibly.

8    Q.   Possibly.

9    A.   I don't have any personal experience to speak on this.

10   Q.   But you wouldn't be surprised if in fact the FBI in

11   Quantico, probably the greatest CSI organization in the world,

12   you wouldn't be surprised if there was a handwriting person

13   that is trained to evaluate questioned documents or signatures

14   on those documents.

15   A.   That would be correct.  I wouldn't be surprised.

16   Q.   Okay.  Now, getting back to your interview with Blanca

17   Ruiz.  You indicated that you were not -- you didn't recall how

18   long the interview lasted?

19   A.   That's correct.

20   Q.   Could you say whether it was 30 minutes, 60 minutes, 90

21   minutes, 120 minutes?

22   A.   If I had to estimate, I'd say it was around an hour.

23   Q.   An hour?

24   A.   That's an estimate.

25   Q.   And that's an estimate.
```

1  A.  Yes.

2  Q.  Is that estimate based on a specific recollection or

3  something that was noted in a 302?

4  A.  Just my recollection.

5  Q.  In fact, there's no time reference in the FBI -- or rather,

6  FD302, correct?

7  A.  Yes, sir, that's correct.

8  Q.  Now, let's talk about how that document actually gets

9  prepared.  You're conducting the interview.  That means that

10  you're asking the questions.  And there's different ways to ask

11  a question, correct?

12  A.  Yes, sir.

13  Q.  Like when I ask you questions, I tell you the answer and

14  you either say yes or no, right?

15  A.  Or explain my answer --

16  Q.  Right.

17  A.  -- further.

18  Q.  I ask you what they call in the legal world as a leading

19  question, right?

20  A.  That sounds right, yes.

21  Q.  And you conduct interviews in a similar fashion, do you

22  not?

23  A.  No.

24  Q.  You tell -- you say that you don't tell the person what you

25  already know and then you have them respond to that?

1   A.   Not always, no.

2   Q.   Okay.  But sometimes you do, right?

3   A.   Yes, sometimes.

4   Q.   And when you're telling them what you already know, you may

5   even be speaking in a tone as elevated as mine is right now,

6   correct?  It's not like you ask the question, let me see,

7   ma'am, do I have this straight, you're telling me that you

8   worked at Health Care Solutions Network and you didn't know dot

9   dot dot?  Do you use that kind of tone when you conduct an

10  interview all the time?

11  A.   I can't recall using a tone other than a speaking voice in

12  an interview personally.

13  Q.   But again, you would agree with me that if in fact a

14  recording was utilized, we wouldn't be having this conversation

15  right now, would we?

16  A.   That would probably be correct.  We'd have some other

17  conversation.

18  Q.   Because the surrounding circumstances, how the interview

19  was conducted, would be clear to the listener of a recording,

20  correct?

21  A.   Are you talking videotaped or just audio recorded.

22  Q.   I'm talking audiotaped.  Sound.

23  A.   Well, there are some gestures that aren't always

24  verbalized.

25  Q.   I understand gestures.  I'm talking sound.  The jury would

1  be able to hear the tone of voice used by the questioner,

2  correct?

3  A.  Yes.

4  Q.  The jury would be able to hear the way the interviewee

5  responded to the question, correct?

6  A.  Correct.

7  Q.  The jury would be able to hear whether or not the person

8  was being evasive or not being evasive, correct?

9  A.  Correct.

10  Q.  The jury would be able to make an irrefutable decision if

11  they had that opportunity to hear the question and the answer,

12  correct?

13  A.  Correct.

14  Q.  But under these circumstances, the jury relies on your

15  independent recollection, correct?

16  A.  Correct.

17  Q.  It relies on the review of your -- or not even your --

18  Special Agent Reilly's FD302, right?

19  A.  That's correct.

20  Q.  That report was prepared by Special Agent Reilly, correct?

21  A.  With my collaboration.

22  Q.  With your collaboration.  And that collaboration consisted

23  of, what, driving away from Blanca Ruiz's house and discussing

24  it?

25  A.  That's part of it, and in reviewing the draft of the report

 1    and him having my input.

 2    Q.   And he has his notes that he's written down during this

 3    interview, and he's writing down on a loose -- I guess on loose

 4    notebook-type paper?

 5        I guess the question really is:  Was it loose notebook-type

 6    paper that he was writing the notes on?

 7    A.   I don't recall.

 8    Q.   Did you see him taking notes?

 9    A.   Yes.

10    Q.   Was he writing notes?

11    A.   Yes, he was writing notes.

12    Q.   He didn't have a laptop with him where he would be typing?

13    A.   He was writing notes.

14    Q.   With his hand.

15    A.   Correct.

16    Q.   On paper.

17    A.   Yes.

18    Q.   Okay.  And so then he takes those notes and, in

19    collaboration with you, types up a report.  Is that accurate?

20    A.   Yes, sir.

21    Q.   And it's a computer-generated report?

22    A.   Yes.

23    Q.   And if it says on the 302 that the investigation occurred

24    on May 23rd, 2013, that would be the date that the interview

25    was conducted, correct?

1    A.  Yes, sir.

2    Q.  If it said on the report that the date the report was

3    drafted was May 23rd, 2013, that would be the very same day of

4    the interview, right?

5    A.  Yes, sir.

6    Q.  And if it says on the report, date of entry, May 23rd,

7    2013, that would mean that it was entered into the system on

8    that date?

9    A.  It was finalized as an official document into the system,

10   yes.

11   Q.  Do you remember what you did after you met with Ms. Ruiz?

12   A.  We drove back to our office and -- I don't remember

13   anything further than that really.  Were you specifically

14   talking about anything else, or asking me?

15   Q.  Did you see him type up the report?

16   A.  I don't recall actually seeing him type it up.

17   Q.  Does he actually type it up or does a clerical staff type

18   it up?

19   A.  From my experience with Agent Reilly, he types it up.

20   Q.  Well, what about your experience with regard to this

21   matter?

22   A.  Yes.

23   Q.  Did you see him typing this report?

24   A.  No, not that I can recall.

25   Q.  Not that you recall.  Is there anything in this report that

1    would suggest that you saw him write the report?

2    A.  That I actually saw him typing the report?

3    Q.  Right.

4    A.  Is there anything -- no, there's nothing in the report.

5    Q.  Right.  So you didn't collaborate with him while he typed

6    this report, right?

7    A.  Not as he typed it.  But once he finished typing it, he

8    would print it off to me, I would review it, we would have

9    whatever changes would need to be made, and then he would go

10   back, if he agreed with the changes, would make them, and the

11   report would be finalized.

12   Q.  Any changes made to this report?

13   A.  I don't recall.

14   Q.  And I believe there was some indication that some

15   supervisor signs off on this as well?

16   A.  Yes.

17   Q.  But there's no reference to that on this report, is there?

18   A.  No, but any report generated is signed off by a supervisor.

19   Q.  Can you point out to me any signature on this report by a

20   supervisor?

21   A.  No.

22   Q.  Because there is none, right?

23   A.  Not physically on the report, that's correct.

24   Q.  And you don't remember him typing this up.

25   A.  I don't recall him -- watching him type it up, but I know

1    he typed it up.

2    Q.  Well, you know he typed it up because his name is on it,

3    right?

4    A.  Correct.

5    Q.  And you know he typed it up because that was going to be

6    his role with regard to the investigation on May 23rd, right?

7    A.  Correct.

8    Q.  You were going to ask the questions and he was going to

9    take the notes, right?

10   A.  And assist with the interview.

11   Q.  Right.  And assist with the interview.

12   A.  Yes.

13   Q.  Right?

14   A.  Yes.

15   Q.  And the notes afterwards, you testified earlier, one page

16   was in your office and three pages were over here, right?

17   A.  I don't remember the exact number of pages.

18   Q.  Well, you did say that one page was at the FBI office,

19   right?

20   A.  Yes, sir.

21   Q.  Or the Miramar health care facility?

22   A.  Yes, sir.

23   Q.  Okay.  And that's in Miramar?

24   A.  Yes, sir.

25   Q.  Now, with regard to this purported statement, Ms. Ruiz

1  stated that she was hired by Armando Gonzalez?

2  A.  Yes, sir.

3  Q.  This is what you said that she said?

4  A.  That she was interviewed by Armando Gonzalez, yes.

5  Q.  Okay.  And that she was hired to run group therapy and also

6  worked on intake assessments, right?

7  A.  Yes.

8  Q.  And she said that she was a registered mental health

9  counselor intern, right?

10 A.  Yes.

11 Q.  Said she first worked at the East location?

12 A.  That's correct.

13 Q.  Okay.  And she said that she did groups, but wasn't

14 supervised, right?

15 A.  She was supervised only on paper.

16 Q.  And on the paper it said that she was supervised.

17 A.  That's correct.

18 Q.  Now, of the therapy sessions that you say she said she ran,

19 do you know whether or not bills were generated for that work?

20 A.  I'm not sure.

21 Q.  You don't know whether or not those so-called sessions that

22 you say she said she ran, you don't know whether or not HCSN

23 billed for that, right?

24 A.  I can't recall at this moment.

25 Q.  And you don't know whether or not the patients that were

1   purportedly in this group that she said to you, according to

2   you, she ran, you don't know if they were necessarily proper

3   patients for PHP therapy, right?

4   A.  Correct.

5   Q.  Now, you would agree with me, sir, that with regard to

6   forged signatures that, again, probably for the sixth time that

7   this has been asked -- and I apologize to the Court for being

8   repetitive -- there were signatures being forged right and left

9   at HCSN, correct?

10  A.  We were aware through our investigation of forged

11  signatures.

12  Q.  Okay.  And you know that -- you can -- if an expert --

13  well, I guess you don't know.

14      Would you agree with me, sir, that if an expert evaluates a

15  person's known signature against what purports to be their

16  signature, that expert can tell whether or not it's that

17  person's signature?

18  A.  Again, I have no personal experience in that, but I believe

19  that would be the nature of their job.

20  Q.  And that would lend itself to more of a clear and

21  indisputable record, would it not?

22  A.  Possibly, yes.

23  Q.  Because when you don't have that type of evaluation, you're

24  left with doubt as to who actually signed the document.

25  A.  Is that a question?

1   Q.  Yes, that's a question.

2   A.  Could you please repeat that question?

3   Q.  When you don't have an evaluation of a signature, knowing

4   that forgeries had been occurring at HCSN, when that signature

5   is not evaluated by an expert, you're left with doubt as to who

6   actually signed that document, correct?

7   A.  Possibly, but that was only one portion of this case.

8   Q.  The question was simply the question.  There are other

9   parts to this case.  I'm asking you about forged documents.

10  When you don't have a signature compared by an expert, you

11  can't tell whether or not that is actually the person's

12  signature or whether it's a forgery, correct?

13  A.  That's why we asked people if it was their signature or

14  not.

15  Q.  In cases where you haven't asked people whether it was

16  their signature or not, and you don't have that type of

17  evidence, if credited, you're left with doubt if you don't have

18  an expert, correct?

19  A.  Possibly.

20  Q.  Possibly?

21  A.  Yes.

22          MR. LEVIN:  Thank you.

23                  *   *   *   *   *

24

25

1    UNITED STATES OF AMERICA                    )
                                                 ) ss:
2    SOUTHERN DISTRICT OF FLORIDA                )

3

4                    C E R T I F I C A T E

5        I, Carly L. Horenkamp, Certified Shorthand

6    Reporter in and for the United States District Court for the

7    Southern District of Florida, do hereby certify that I was

8    present at and reported in machine shorthand the proceedings

9    had the 17th day of November, 2014, in the above-mentioned

10   court; and that the foregoing transcript is a true, correct,

11   and complete transcript of my stenographic notes.

12       I further certify that this transcript contains

13   pages 1 - 35.

14       IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15   Florida, this 21st day of January, 2015.

16

17

18                     /s/ Carly Horenkamp

19                     Carly L. Horenkamp, RMR, CRR
                       Certified Shorthand Reporter

20

21

22

23

24

25