```
                 IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF FLORIDA
                          MIAMI DIVISION
                   CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,                NOVEMBER 7, 2014
                                         3:45 P.M.
                    Plaintiff,


        vs.



ROGER ROUSSEAU, et al.,

                    Defendants.       PAGES 1 THROUGH 30
```
_____

```
                            DAY 5
                EXCERPT OF CRIMINAL JURY TRIAL
                 (TESTIMONY OF FRANCISCO PABON)
           BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
                UNITED STATES DISTRICT JUDGE
                          and a Jury

APPEARANCES:

FOR THE PLAINTIFF:      Mr. Allan J. Medina, AUSA
                        Mr. A. Brendan Stewart, AUSA
                        Mr. Justin Goodyear, AUSA
                        U.S. DEPARTMENT OF JUSTICE
                        Criminal Division
                        Fraud Section
                        1400 New York Avenue NW
                        Washington, DC 20530


FOR THE DEFENDANT:      Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)        LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                        800 Brickell Avenue
                        Suite 1400
                        Miami, Florida  33131


FOR THE DEFENDANT:      Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)        LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                        1221 Brickell Avenue # 900
                        Miami, Florida  33131
```

APPEARANCES (continued):

```
FOR THE DEFENDANT:     Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)       LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                       55 Merrick Way
                       Suite 212
                       Coral Gables, Florida  33134


FOR THE DEFENDANT:     Mr. Frank A. Prieto, Esq.
(Liliana Marks)        LAW OFFICE OF FRANK A. PRIETO, P.A.
                       One Northeast 2nd Avenue
                       Suite 200
                       Miami, Florida  33132


FOR THE DEFENDANT:     Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)          LAW OFFICES OF JUAN DE JESUS GONZALEZ
                       10631 N. Kendall Drive
                       Suite 150
                       Miami, Florida  33176


FOR THE DEFENDANT:     Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)          LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                       Courthouse Tower
                       40 NW 3rd Street
                       Suite 200
                       Miami, Florida  33128


COURT REPORTER:        Carly L. Horenkamp, RMR, CRR
                       U.S. DISTRICT COURT
                       400 N. Miami Avenue, Room 12-3
                       Miami, Florida  33128
                       (305) 523-5147
```

3

1            I  N  D  E  X

2   *Certificate* ----------------------------------------------- 30

3

4

5                  W I T N E S S
    ON BEHALF OF THE GOVERNMENT:                          PAGE
6   FRANCISCO PABON
    DIRECT EXAMINATION BY MR. GOODYEAR                       4
7   CROSS-EXAMINATION BY MR. RABIN                          21
    CROSS-EXAMINATION BY MR. PALOMINO                       27
8

9

10

11

12
                    E X H I B I T S
13  GOVERNMENT EX. NO.:                      OFFERED ADMITTED
    206  -                                      5        5
14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (Before Jury, 3:45 p.m.)

 2             THE COURT:  Who is your next witness?

 3             MR. GOODYEAR:  Your Honor, the government calls Frank

 4   Pabon.

 5          FRANCISCO PABON, GOVERNMENT WITNESS, SWORN

 6             THE WITNESS:  Francisco Pabon.  Last name is

 7   P-A-B-O-N.

 8             THE COURT:  All right.  Can you move a little bit

 9   closer to the microphone, please?  Thank you.

10             All right.  Go ahead, Mr. Goodyear.

11                         DIRECT EXAMINATION

12   BY MR. GOODYEAR:

13   Q.  Mr. Pabon, have you pled guilty to a crime related to

14   Health Care Solutions Network?

15   A.  Yes, sir.

16   Q.  What crime?

17   A.  Kickback.

18   Q.  Have you entered into a plea agreement with the government

19   related to your participation in kickbacks?

20   A.  Yes, sir.

21             MR. GOODYEAR:  Could we call up Government's Exhibit

22   206, which is not yet admitted?

23   BY MR. GOODYEAR:

24   Q.  Mr. Pabon, is this -- one second here.  Mr. Pabon, is this

25   a copy of your plea agreement?
```

1    A.  Yes, sir.

2              MR. GOODYEAR:  The government moves Exhibit 206 into

3    evidence and asks that it be published to the jury.

4              THE COURT:  All right.

5    BY MR. GOODYEAR:

6    Q.  Mr. Pabon, what did you promise to do as part of your plea

7    agreement?

8    A.  I promised to tell the truth.

9              MR. GOODYEAR:  Could we go to page 4 of 206, please.

10   BY MR. GOODYEAR:

11   Q.  Do you see at the beginning of paragraph 7, could you just

12   read the first sentence to the jury, please?

13   A.  The defendant shall cooperate with law enforcement

14   officials, attorneys with the United States Department of

15   Justice, and the United States Attorney's Office for the

16   Southern District of Florida, and with federal regulatory

17   officials charged with regulating or overseeing the Medicare

18   program by providing full, complete, and truthful information

19   regarding him knowledge, conduct, and actions while involved in

20   the health care and by providing active cooperation in ongoing

21   investigation, if requested to do so.

22   Q.  Is that consistent with your understanding of your

23   obligation under the agreement?

24   A.  Yes, sir.

25   Q.  Now, what do you hope to gain by testifying here today?

1    A.   A reduce in my sentence.

2    Q.   Have you already been sentenced for your crime?

3    A.   Yes, sir.

4    Q.   What was your sentence?

5    A.   57 months.

6    Q.   And who would decide any reduction in your sentence?

7    A.   The judge.

8    Q.   Okay.  Did you ever work at Jackson South hospital?

9    A.   Yes, sir.

10   Q.   Starting about when?

11   A.   Jackson South hospital was born in 2001, but I've been

12   there since it was Coral Reef hospital back in 1990.

13   Q.   And what were you doing at Jackson South hospital, at its

14   predecessors, what was your job there?

15   A.   Beginning in 1990, I was a mental health technician, and

16   then after the Hurricane Andrew, I became an assessment

17   specialist in the intake department.

18   Q.   And what did you do as an assessment specialist in the

19   intake department?

20   A.   Basically what we do is we get referrals from the emergency

21   room and we assess patient to determine if they need inpatient

22   treatment or outpatient treatment.

23   Q.   Would you get referrals from anywhere else other than the

24   emergency room?

25   A.   We would get referrals from the Baker Act police department

1  and from the private doctors.

2  Q.  Okay.  At Jackson South hospital, did you ever meet Roger

3  Rousseau?

4  A.  Yes, sir.

5  Q.  And when was that?

6  A.  That was back when I started as a tech in 1990.

7  Q.  What was Dr. Rousseau doing at Jackson South hospital?

8  A.  He was one of our psychiatrists.

9  Q.  Now, you said that the patients would come to you as

10  referrals from the ER, from other places, right?

11  A.  Yes, sir.

12  Q.  In your job doing intake, if a patient came to you and that

13  patient wasn't actually going to be admitted to Jackson South

14  hospital, did you have the ability to refer that patient

15  somewhere else instead?

16  A.  Yes, sir.

17  Q.  Where are the kinds of places that you could refer a

18  patient who wasn't appropriate for hospitalization at Jackson

19  South?

20  A.  A PHP program, which is the partial hospitalization

21  program, community stabilization unit, a CHI, mental health

22  departments.

23  Q.  Okay.  At some point, did Rousseau become the director --

24  at some point, did you become aware that Rousseau had become

25  the medical director at Health Care Solutions?

1   A.   That's when I -- when I first met the director of the

2   Health Care Solution.

3   Q.   Okay.  When did Roger Rousseau become medical director of

4   Health Care Solutions?

5   A.   I believe it was back in 2006 when the program started.

6   Q.   And around that time, did Rousseau introduce you to the

7   owner of Health Care Solutions?

8   A.   Yes, sir.

9   Q.   Who was the owner?

10  A.   Armando Manny Gonzalez.

11  Q.   And how did Rousseau introduce you to him?

12  A.   Well, he -- Dr. Rousseau and Manny were at the hospital

13  promoting -- basically, Manny was promoting his program, and he

14  brought him over to the intake department and introduced me to

15  him.  They had brochures -- well, Manny, Armando, he had

16  brochures and business cards that he left there for possible

17  referrals.

18  Q.   Okay.  Did Rousseau suggest anything about your referring

19  patients to Health Care Solutions --

20  A.   Yes, he did.

21  Q.   -- in exchange for anything else?

22  A.   He told me that if I help out Manny in referrals, that

23  Manny will give me what they call an incentive.

24  Q.   An incentive?

25  A.   Yeah, that he will take care of me.  At that point, I said

1  you don't need to do that, that's what we do here.

2  Q.  At that point you said, I don't need an incentive, that's

3  just -- I make referrals?

4  A.  That's what we do here.

5  Q.  And that conversation that you just described, who else was

6  present for that besides you and Rousseau?

7  A.  No, there was Manny, Rousseau, and myself.

8  Q.  Gonzalez, Rousseau, and yourself?

9      MR. RABIN:  Judge, as a matter of etiquette, I thought

10  we were using titles, Dr. Rousseau as opposed to Rousseau.  I

11  mean, I thought that was something you had requested we do.

12      THE COURT:  Okay.

13      MR. RABIN:  Thank you.

14  BY MR. GOODYEAR:

15  Q.  Did anyone ever say anything else to you to encourage you

16  to make referrals to Health Care Solutions?

17  A.  It was Armando.

18  Q.  What did Armando say?

19  A.  He said, this is my brochures.  Please, we could use as

20  many referrals as we can.

21  Q.  And did you begin making referrals to Health Care Solutions

22  in exchange for kickbacks?

23  A.  Not at the beginning, no.

24  Q.  Not at the beginning, no?

25  A.  No.

1    Q.   Did there come a point later in time where you did?

2    A.   Later in time, then we made referrals and Armando started

3    bringing in baskets of cookies, sandwiches.

4    Q.   When did you start making those referrals?

5    A.   Oh, about three or four weeks after that.

6    Q.   Three or four weeks after that?

7    A.   Uh-huh.

8    Q.   And you said you did start to receive things of value in

9    exchange for the referrals?

10   A.   Yes, sir.

11   Q.   What types of things?

12   A.   As I mentioned before, gift baskets, gift cards.

13   Q.   Who would provide you with those?

14   A.   Armando Gonzalez.

15   Q.   And would he deliver them to you in person?

16   A.   He would have it delivered by his chauffeur.

17   Q.   As time went on, did what you were receiving in exchange

18   for your referrals change?

19   A.   Yes, sir.

20   Q.   What happened?

21   A.   Well, he -- he said -- he gave me $50 and he says, take out

22   your family to dinner.

23   Q.   Was that cash or was that a restaurant gift card?

24   A.   At the beginning it was gift cards, and then after that it

25   was cash.

1    Q.  So at some point, he just started giving you cash for your

2    referrals?

3    A.  Right.  He stopped the gift cards, started giving me cash.

4    Q.  Now, were you receiving these forms of compensation for

5    every patient you referred or was it only the ones that Health

6    Care Solutions succeeded in enrolling in Medicare?

7    A.  No.  The patients that were actually attending the program

8    and that he actually billed for them, that's when he would give

9    me the kickbacks.

10   Q.  And what's your basis for knowing that that's what he was

11   paying you for?

12   A.  I'm sorry?

13   Q.  How did you know that that was what he was paying you for?

14   A.  Because Armando will tell me.

15   Q.  Now, once you were being paid cash, about how much were you

16   paid for each patient you referred to them and they

17   successfully enrolled?

18   A.  It depended.  It was 50, 75.  The max one day was 125.

19   Q.  Okay.  And who would give you that cash?

20   A.  Armando or he would have his wife or his father-in-law.

21   Q.  And when you said before 50 to 75, the max was 125, was

22   that an amount per patient enrolled?

23   A.  Per patient, yes.

24   Q.  And where would you be paid the money for these referrals?

25   A.  Well, we'd meet different places around town, in a gas

1    station, in front of the PHP program, outskirts of the Jackson

2    South hospital.

3    Q.   Ever inside Health Care Solutions?

4    A.   I'm sorry?

5    Q.   Did you ever get paid inside the offices of Health Care

6    Solutions?

7    A.   No, no, no.

8    Q.   Did you ever get paid inside the hospital?

9    A.   No, sir.

10   Q.   Did Manny Gonzalez ever suggest paying you in checks

11   instead of cash?

12   A.   Yeah, once.

13   Q.   Tell me about that conversation.

14   A.   He told me, listen, I need to pay you in cash because I

15   just can't keep on getting -- taking money out of the bank

16   unless I approved.  I said, I'm not going to take any cash.

17   Q.   Was he suggesting paying you by checks or cash during this

18   conversation?

19   A.   By check.

20   Q.   And did he say it was difficult to keep withdrawing so much

21   money out of the bank?

22   A.   That's correct.

23   Q.   And what did you say in response to his suggestion that he

24   pay you by check?

25   A.   No, I didn't want no check.

1   Q.   Why didn't you want a check?

2   A.   Because he could prove that he was paying me.  Because I

3   knew what I was doing was wrong.

4   Q.   How many patients did you generally refer to Health Care

5   Solutions Network, say on a per month basis?

6   A.   Per month, it was about 10 to 12.

7   Q.   And per month, based on the payments you were receiving,

8   about how many were you finding would be enrolled in Medicare?

9   A.   Well, he would tell me two or three.

10  Q.   He would tell you two or three?

11  A.   Uh-huh.

12  Q.   How exactly did you communicate the information to Health

13  Care Solutions about a referral?

14  A.   What information?  I'm sorry.

15  Q.   How exactly would you make the referral to Health Care

16  Solutions?  What would you do to make that happen?

17  A.   We would fax a list of referred patients.

18  Q.   To whom at Health Care Solutions were you faxing that

19  information?

20  A.   At the beginning, there was a lady by the name of Martha,

21  last name unknown.  Then after that, she went to another job

22  and there was another person, another lady by the name of

23  Jenny.  Again, I don't remember her last name.

24  Q.   Okay.  Did Armando Gonzalez ever tell you there was someone

25  else at Health Care Solutions to whom you could talk about your

1    referrals if Jenny wasn't around?

2    A.   Yes.

3    Q.   Who was that person?

4    A.   It was a lady by the name of Alina.

5    Q.   Do you remember the last name?

6    A.   No, I don't.

7    Q.   So if you would call Jenny or you would call Alina, what

8    were you calling to talk about?

9    A.   To see if the patients were actually attending the program.

10   Q.   Now, as this was going on, did Rousseau -- did

11   Dr. Rousseau -- excuse me, did Dr. Rousseau ever check in with

12   you about the referrals you were making?

13   A.   No.  I would contact him and let him know that I'd refer

14   such patients.  Then he said he will keep an eye on me, they

15   would find out if they were attending or not.

16   Q.   Did he ever express any appreciation for the referrals you

17   were making?

18   A.   Oh, yes.

19   Q.   What would he say?

20   A.   Thank you for the referrals.

21   Q.   Did he check in with you to see whether or not you were

22   being compensated for the referrals?

23   A.   Yes, sir.

24   Q.   What did he say about that?

25   A.   Has Manny been taking care of you?

1    Q.   Now, did there come a time when you had to stop referring

2    patients to Health Care Solutions?

3    A.   Yes, sir.

4    Q.   Why did you have to stop?

5    A.   Because the director of the program said that we were no

6    longer referring patients to the PHP programs due to what was

7    going on with the Medicare frauds and PHPs.  Only to crisis

8    stabilization unit.

9    Q.   Okay.  And so what did you do when you heard that from the

10   director?

11   A.   I told Manny, I said, listen, you're not getting any more

12   referrals from me.  He was upset about it.  He said, why?  I

13   said, my director gave us a directive not to refer patients to

14   PHP anymore.  He said, well, you can still do it.  She's not

15   going to know.  And I said, no, I'm not going to do that, and I

16   stopped.

17   Q.   Did you also inform Dr. Rousseau that the referrals were

18   going to be stopping?

19   A.   No.

20   Q.   And did you then stop referring Jackson South patients to

21   Health Care Solutions?

22   A.   Definitely.

23   Q.   And when was that, that that stopped?

24   A.   That was about the beginning of 2008.

25   Q.   Okay.  Now, did there come a time when Dr. Rousseau

1  suggested to you that you should refer patients to a different

2  PHP?

3  A.  Yes.

4  Q.  Which PHP was that?

5  A.  It was a PHP on Tamiami Road or Avenue, it was called New

6  Era.

7  Q.  Did Dr. Rousseau have a position at New Era as well?

8  A.  Yeah.  He was one of the psychiatrists there.

9  Q.  And when was this that Dr. Rousseau suggested you make

10  referrals to New Era?

11  A.  It was about 2007.

12  Q.  And what did Dr. Rousseau tell you about this?

13  A.  Well, he asked me if we could meet with the director of

14  that program.

15  Q.  Did he make clear that you would also be compensated for

16  these referrals?

17  A.  That I would be compensated, right.

18  Q.  Did he describe it -- did he compare it to how things were

19  working at Health Care Solutions?

20        MR. RABIN:  Objection, leading.

21        THE COURT:  Sustained.

22  BY MR. GOODYEAR:

23  Q.  Who was the man he wanted you to meet with?

24  A.  It was a man by the name of Enrique.

25  Q.  Do you recall Enrique's last name?

1    A.  No, I don't.

2    Q.  What was Enrique's position at New Era?

3    A.  He was the owner and director of the New Era.

4    Q.  So did there come a time when you met Enrique?

5    A.  Yes.

6    Q.  Where and when did that take place?

7    A.  It took place in the New Era.  He told me how to get there.

8    It was one evening towards -- towards the night.

9    Q.  So this was at New Era's offices?

10   A.  Yes.

11   Q.  And who was present for this meeting?

12   A.  It was Enrique and Dr. Rousseau.

13   Q.  And what happened at the meeting?

14   A.  At the meeting, he was explaining again what they do, he

15   showed me the program, the whole facility, gave me brochures of

16   the therapy that they give to patients there.

17   Q.  And did anyone say anything about compensation or taking

18   care of you at this meeting?

19   A.  Oh, yes, Enrique did.

20   Q.  Enrique did?  Was Dr. Rousseau present when Enrique said

21   that?

22   A.  Yes, sir.

23   Q.  And did you refer any patients to New Era?

24   A.  One.

25   Q.  One patient?  Did Enrique give you anything in return for

1    that one patient?

2    A.   He gave me a gift card for a restaurant.

3    Q.   Did Dr. Rousseau ever follow up to see if you had made a

4    referral to New Era?

5    A.   Called me to say yeah, yes.

6    Q.   And what did you tell him?

7    A.   Told him that basically the patients that came to Jackson

8    South were in that community.  Very rare that we get patients

9    that were out by Tamiami.

10   Q.   So were you saying that it was rare that you'd get patients

11   that were --

12   A.   Very rare.

13   Q.   -- close enough to New Era --

14   A.   Very rare.

15   Q.   -- to make sense to refer there?

16   A.   Yes.

17   Q.   And you explained that to Dr. Rousseau?

18   A.   Uh-huh.

19   Q.   So did you make any other referrals to New Era?

20   A.   No.

21   Q.   When you told him that you'd made the one referral to New

22   Era, did it seem like that was news to him or did it seem like

23   he already knew that there had been a referral to New Era?

24   A.   No, he already knew because I had told him.

25   Q.   He already knew at the time you told him?

1    A.  Yeah.

2    Q.  Did you ever receive anything of value for making a

3    referral anywhere else?

4    A.  One Christmas, we had a gift card from the host at

5    Behavioral Health.  I wasn't the only one.  Other people in my

6    intake department, for Christmas, we got a gift card for a

7    restaurant, but that was it.

8    Q.  Was that a situation where you had talked to somebody at

9    Homestead Behavioral Health before you made --

10    A.  No.

11    Q.  Let me just finish.  Was that a situation where you talked

12    to somebody at Homestead before you made the referral about

13    getting an incentive?

14    A.  No.

15    Q.  Did Dr. Rousseau contact you after Manny Gonzalez was

16    arrested?

17    A.  Yes, we had a phone call conversation.

18          THE COURT:  May I see the lawyers at sidebar for one

19    second?

20       (Sidebar Conference:)

21          THE COURT:  Wasn't the testimony about New Era the

22    404(b) that --

23          MR. RABIN:  Yes, it was.

24          THE COURT:  Do you want me to read the 404(b)

25    instruction?

```
 1              MR. RABIN:  Not now.  It's already been given and I
 2   don't want it to come after the fact, so no.
 3              THE COURT:  What's already been given?
 4              MR. RABIN:  The testimony.
 5              THE COURT:  I know.  Then the instruction says, "You
 6   have just heard testimony" --
 7              MR. RABIN:  I'm withdrawing the request.
 8              THE COURT:  Okay.
 9        (Before the Jury.)
10              THE COURT:  All right.  Sorry to interrupt.  Go ahead,
11   Mr. Goodyear.
12              MR. GOODYEAR:  Thank you, Your Honor.
13   BY MR. GOODYEAR:
14   Q.  Sir, we were talking about a conversation that took place
15   between you and Dr. Rousseau after Manny Gonzalez was arrested.
16   Do you recall that?
17   A.  Yes, sir.
18   Q.  What was said in that conversation?
19   A.  The conversation was, did you hear about Armando's arrest?
20   And I said yes, because it was in the news.  Everybody knew
21   about that arrest.
22   Q.  Did Dr. Rousseau say anything else?
23   A.  Well, there might be some problems -- I mean, some trouble.
24   Q.  That's what he said to you?
25   A.  Yes.
```

1  Q.  Did you say anything in response?

2  A.  I says, no, I didn't.

3  Q.  I'm sorry, I couldn't hear that.

4  A.  No.

5        MR. GOODYEAR:  Nothing further, Your Honor.

6        THE COURT:  All right.  Mr. Rabin.

7        MR. RABIN:  Thank you, Judge.  It's a thin notebook,

8  so...

9                    CROSS-EXAMINATION

10  BY MR. RABIN:

11  Q.  Good afternoon.  Good afternoon, Mr. Pabon.

12  A.  Good afternoon.

13  Q.  I'm going to ask you some questions about your testimony

14  here today.

15  A.  Yes, sir.

16  Q.  Did I understand you to say that you had received one gift

17  card from somebody at New Era, correct?

18  A.  Uh-huh.

19  Q.  Is that a yes?

20  A.  Yes, sir.

21  Q.  Okay.  And that you had also received a basket, some gift

22  cards, and some cash from Armando Gonzalez at Health Care

23  Solutions.

24  A.  Yes, sir.

25  Q.  You had referred other patients to other PHPs as well,

1  correct?

2  A.  Yes.

3  Q.  Okay.  How many other PHPs?

4  A.  A lot of PHPs.

5  Q.  Okay.

6  A.  Seven or eight of them.

7  Q.  All right.  Did any of those PHPs ever call you and thank

8  you or did they send you anything at all?

9  A.  No, sir.

10  Q.  Okay.  So the seven or eight, the only ones that gave you

11  anything or sent you anything was the one Health Care

12  Solutions, two New Era, and a third one I think you said was

13  Homestead Behavioral?

14  A.  That is correct.

15  Q.  Homestead Behavioral, who was the doctor there, do you

16  know?

17  A.  No.

18  Q.  Okay.  Dr. Daniel Mandri, does that ring a bell?

19  A.  It does ring a bell, yeah.

20  Q.  He was a doctor there?

21  A.  He was a doctor there and he used to see patients over in

22  Jackson South.

23  Q.  Okay.  So that we're clear, Dr. Rousseau never gave you any

24  kickbacks or anything of value, correct?

25  A.  That's correct.

23

1   Q.   Okay.  What Dr. Rousseau did was he made an introduction

2   for you to Armando Gonzalez.

3   A.   That's correct.

4   Q.   Who was the owner of Health Care Solutions.

5   A.   Yes.

6   Q.   Right?  And he also made an introduction to somebody that

7   worked at New Era, correct?

8   A.   Yes.

9   Q.   Did you ever tell Dr. Rousseau that you wanted money or

10  kickbacks or items of value?

11  A.   That if I wanted?

12  Q.   Right.

13  A.   No.

14  Q.   You never asked for it, right?

15  A.   No.

16  Q.   So this was something that was volunteered to you by Manny,

17  correct?

18  A.   That's correct.

19  Q.   And by the gentleman at New Era, correct?

20  A.   That's correct.

21  Q.   And what about the doctor at Homestead Behavioral, did he

22  offer it or did it just come out of the blue?

23  A.   No, it's a she, and she just came by and was thankful for

24  all the referrals that they were getting from Jackson South.

25  And Christmas, like I said, she brought gift cards too.

24

1    Q.   Now, Dr. Rousseau never said anything to you about wanting

2    you to refer these patients in exchange for you getting money.

3    He never tried to negotiate that kind of a deal for you,

4    correct?

5    A.   Not money.

6    Q.   Or anything.  He just said --

7    A.   Incentive.

8    Q.   He was looking for you to refer people to the places that

9    he worked, correct?

10   A.   That's correct.

11   Q.   It was the people at those places that were the ones that

12   were paying you the kickbacks.

13   A.   That's correct.

14   Q.   Okay.  Did you ever have any discussion with Dr. Rousseau

15   about what you had received from any of these people?  In other

16   words, did you ever say, I got a gift card or I got a basket?

17   You didn't have any conversations like that with him, did you?

18   A.   No.  I told him there was a gift card that I got from New

19   Era.

20   Q.   Okay.  Any other discussions?

21   A.   And that Manny was taking care of me.

22   Q.   Okay.  Beyond that, no other conversations with him about

23   it?

24   A.   No.

25   Q.   Okay.  Now, when you were first contacted by agents, they

1    came to see you, right?

2    A.  Yes.

3    Q.  And when you first were contacted by them, you -- they

4    asked you about your job, right?

5    A.  Yes, sir.

6    Q.  And you said that you don't ever -- you have nothing to do

7    with referring patients to PHPs.  Do you remember telling them

8    that?

9    A.  No, I don't.

10   Q.  Okay.  If you did, that wouldn't have been exactly correct,

11   right?

12   A.  Exactly.

13   Q.  Okay.  Do you remember telling them that you knew who Manny

14   was, but barely?  Do you remember telling them that?

15   A.  Yes.

16   Q.  Okay.  And they asked you who Dr. Rousseau was and you said

17   he was one of the doctors on staff here.  This was at Jackson.

18   A.  Uh-huh, yes.

19   Q.  Is that a yes?

20   A.  Yes.

21   Q.  Okay.  What period of time was Dr. Rousseau on staff at

22   Jackson?

23   A.  I'm sorry.

24   Q.  What period of time was Dr. Rousseau on staff at Jackson

25   South?  You were there from the time it became -- from Coral

1    Reef and went to Jackson, right?

2    A.  He was there before I got there, right.

3    Q.  And then when did you get there?

4    A.  In 1990.

5    Q.  And he was there until when?

6    A.  I know he was there for a lot of years, but I don't recall

7    the year.

8    Q.  Is he still there?

9    A.  No.

10   Q.  Do you know when he stopped being there?

11   A.  No, I don't know when he stopped, but I knew he stopped.

12   Q.  So these agents that came to see you asked you about the --

13   Manny Gonzalez and they asked you about Dr. Rousseau and you

14   essentially denied knowing much about Manny Gonzalez and you

15   denied anything about kickbacks; fair to say?

16   A.  That's correct.

17   Q.  Okay.  And then they presented you with a piece of paper,

18   didn't they?

19   A.  Yes, sir.

20   Q.  A piece of paper in your handwriting that showed that you

21   had referred patients to Health Care Solutions.

22   A.  Yes, sir.

23   Q.  And then you were honest with them about what you had done.

24   A.  Yes.

25   Q.  Okay.  So that we're clear here, Dr. Rousseau never paid

1   you a kickback, correct?

2   A.  No.

3   Q.  Never solicited a kickback for you.

4   A.  No.

5   Q.  Correct?

6   A.  Correct.

7   Q.  Okay.  All -- the only thing that happened was, he knew

8   that -- he knew that it happened.  Is that fair to say?

9   A.  That's correct.

10          MR. RABIN:  Okay.  That's all I have.  Thank you.

11          THE COURT:  Mr. Palomino.

12          MR. PALOMINO:  May it please the Court.

13                        CROSS-EXAMINATION

14  BY MR. PALOMINO:

15  Q.  Good afternoon, Mr. Pabon.

16  A.  Good afternoon.

17  Q.  Who determined at Jackson South which patients were

18  eligible for PHP programs?

19  A.  The intake and assessment department and the social workers

20  in the inpatient department.

21  Q.  And they passed that information on to you?

22  A.  The intake department, yes, not the inpatient department.

23  Q.  Okay.  And then you would take that information and refer

24  these patients out to specific programs?

25  A.  That's correct.

1  Q.  Throughout the county.

2  A.  That's correct, yes.

3  Q.  So there was a determination made already by Jackson South

4  hospital that these amount of patients that you were

5  responsible for referring to did, in fact, qualify for PHP

6  programs.

7  A.  Possibly, yes.

8          MR. PALOMINO:  Thank you.  I've got nothing further,

9  Your Honor.

10         THE COURT:  All right.  Mr. Hermida?

11         MR. HERMIDA:  I have no questions of this witness,

12  Your Honor.

13         THE COURT:  Mr. Prieto?

14         MR. PRIETO:  Judge, I don't have any questions either

15  for this witness.

16         THE COURT:  Mr. Gonzalez?

17         MR. GONZALEZ:  I can't think of any questions to ask

18  him, Judge, so I don't have any questions either.

19         THE COURT:  All right.  Mr. Levin?

20         MR. LEVIN:  No questions, Your Honor.

21         THE COURT:  Do you have any redirect?

22         MR. GOODYEAR:  Nothing from the government, Your

23  Honor.

24         THE COURT:  All right, sir, you can step down.  Thank

25  you.

1           THE WITNESS:  Thank you.

2           THE COURT:  All right.  Since we're going to stop a

3    little bit early today, let's take our last quick recess of six

4    or seven minutes.  We'll come back and we'll go till around --

5    sometime between 5:00 and no later than 5:15, hopefully closer

6    to 5:00.

7        (Recess, 4:14 p.m. to 4:22 p.m.)

8                           *   *   *   *   *

1  UNITED STATES OF AMERICA                          )
                                                     ) ss:
2  SOUTHERN DISTRICT OF FLORIDA                      )

3

4                    C E R T I F I C A T E

5       I, Carly L. Horenkamp, Certified Shorthand

6  Reporter in and for the United States District Court for the

7  Southern District of Florida, do hereby certify that I was

8  present at and reported in machine shorthand the proceedings

9  had the 7th day of November, 2014, in the above-mentioned

10  court; and that the foregoing transcript is a true, correct,

11  and complete transcript of my stenographic notes.

12      I further certify that this transcript contains

13  pages 1 - 30.

14      IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15  Florida, this 12th day of January, 2014.

16

17

                    /s/ Carly Horenkamp
18
                    Carly L. Horenkamp, RMR, CRR
19                  Certified Shorthand Reporter

20

21

22

23

24

25