```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF FLORIDA
                    MIAMI DIVISION
              CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,           NOVEMBER 13, 2014
                                    9:24 A.M.
                  Plaintiff,



        vs.



ROGER ROUSSEAU, et al.,

                  Defendants.       PAGES 1 THROUGH 26
```
_____

```
                      DAY 8
           EXCERPT OF CRIMINAL JURY TRIAL
              (TESTIMONY OF JULIE RIVERA)
      BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
               UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:     Mr. Allan J. Medina, AUSA
                       Mr. A. Brendan Stewart, AUSA
                       Mr. Justin Goodyear, AUSA
                       U.S. DEPARTMENT OF JUSTICE
                       Criminal Division
                       Fraud Section
                       1400 New York Avenue NW
                       Washington, DC 20530


FOR THE DEFENDANT:     Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)       LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                       800 Brickell Avenue
                       Suite 1400
                       Miami, Florida  33131


FOR THE DEFENDANT:     Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)       LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                       1221 Brickell Avenue # 900
                       Miami, Florida  33131
```

```
APPEARANCES (continued):


FOR THE DEFENDANT:        Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)          LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                          55 Merrick Way
                          Suite 212
                          Coral Gables, Florida  33134


FOR THE DEFENDANT:        Mr. Frank A. Prieto, Esq.
(Liliana Marks)           LAW OFFICE OF FRANK A. PRIETO, P.A.
                          One Northeast 2nd Avenue
                          Suite 200
                          Miami, Florida  33132


FOR THE DEFENDANT:        Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)             LAW OFFICES OF JUAN DE JESUS GONZALEZ
                          10631 N. Kendall Drive
                          Suite 150
                          Miami, Florida  33176


FOR THE DEFENDANT:        Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)             LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                          Courthouse Tower
                          40 NW 3rd Street
                          Suite 200
                          Miami, Florida  33128


COURT REPORTER:           Carly L. Horenkamp, RMR, CRR
                          U.S. DISTRICT COURT
                          400 N. Miami Avenue, Room 12-3
                          Miami, Florida  33128
                          (305) 523-5138
```

```
 1                        I  N  D  E  X

 2       Certificate ----------------------------------- 26

 3


 4


 5                      W I T N E S S
         ON BEHALF OF THE GOVERNMENT:                    PAGE
 6       JULIE RIVERA
         DIRECT EXAMINATION BY MR. STEWART                  4
 7       CROSS-EXAMINATION BY MR. PALOMINO                  16
         CROSS-EXAMINATION BY MR. HERMIDA                   20
 8       REDIRECT EXAMINATION BY MR. STEWART                24

 9


10


11
                         E X H I B I T S
12       DEFENDANT SALAFIA EX. NO.:            OFFERED ADMITTED
         E-1 -                                   22       22
13       E-2 -                                   22       22

14


15


16


17


18


19


20


21


22


23


24


25
```

1    (Before Jury, 9:24 a.m.)

2              THE COURT:  All right.  And who is the next witness?

3              MR. STEWART:  The government calls Special Agent Julie

4    Rivera.

5              THE COURT:  Please raise your right hand to be sworn

6    before you sit down.

7                   JULIE RIVERA, GOVERNMENT WITNESS, SWORN

8              COURT REPORTER:  Please be seated.  Please state your

9    full name, spell your last name for the record, and please use

10   the microphone.

11             THE WITNESS:  Julie Rivera, R-I-V-E-R-A.

12             THE COURT:  All right.  Go ahead.

13             MR. STEWART:  Thank you, Your Honor.

14                          DIRECT EXAMINATION

15   BY MR. STEWART:

16   Q.  Special Agent Rivera, for whom are you currently employed?

17   A.  I'm employed with the Department of Health and Human

18   Services, Office of the Inspector General.

19   Q.  And what's your position there?

20   A.  I'm a special agent.

21   Q.  How long have you been employed by the Office of Inspector

22   General at the Department of Health and Human Services?

23   A.  Approximately ten years.

24   Q.  And where are you currently working?

25   A.  I'm currently assigned to the health care fraud task force.

```
 1    Q.  And what responsibilities -- job responsibilities do you
 2    have with the health care fraud task force?
 3    A.  I conduct interviews, I conduct arrests, I do surveillance,
 4    I do debriefs, I do search warrants, trial preparation.
 5    Q.  Were you part of an investigation into Health Care
 6    Solutions Network?
 7    A.  Yes, I was.
 8    Q.  When did you join that team?
 9    A.  In approximately the end of 2011.
10    Q.  So as part of that team, have you done some of the tasks
11    that you just outlined?
12    A.  Yes, I have.
13    Q.  What specific things do you recall doing as part of the
14    Health Care Solutions Network investigation?
15    A.  Interviews, debriefs, arrests, trial preparation.
16    Q.  Did you conduct interviews?
17    A.  Yes, I did.
18    Q.  Of any of the defendants?
19    A.  Yes, I did.
20    Q.  Which ones?
21    A.  Doris Crabtree and Angela Salafia.
22    Q.  Let's take them one at a time.  Starting with Ms. Crabtree,
23    when did you interview her?
24    A.  July 16, 2013.
25    Q.  Before this date, had Ms. Crabtree been separately
```

1    interviewed by agents from the FBI?

2    A.  Yes, she was.

3    Q.  Were you present at that interview that was conducted by

4    the FBI?

5    A.  No, I was not.

6    Q.  So let's focus on the interview that you conducted on

7    July 16th.  Was this interview conducted following her arrest?

8    A.  Yes, it was.

9    Q.  Where did it take place?

10   A.  It took place at the FBI facility.

11   Q.  Who else was there with you?

12   A.  Special Agent Roderick Landry from the FBI.

13   Q.  Did Ms. Crabtree agree to speak with you before you

14   interviewed her?

15   A.  Yes, she did.

16   Q.  Now, before agreeing to speak with you, did you provide her

17   with a warning and waiver form?

18   A.  Yes, I did.

19   Q.  And did the warning and waiver form set forth the rights

20   that she had to consider before agreeing to speak with you?

21   A.  Yes, it did.

22   Q.  Did she agree to waive those rights and proceed to speak

23   with you?

24   A.  Yes, she did.

25   Q.  Now, during the interview, was the defendant alert?

```
 1   A.  Yes, she was.

 2   Q.  Did she report that she was under the influence of alcohol,

 3   medication, drugs, anything like that?

 4   A.  No, she did not.

 5   Q.  Who took the lead in asking questions of Ms. Crabtree?

 6   A.  I did.

 7   Q.  Did you prepare a report, a summary of the statements that

 8   she made during that investigative interview?

 9   A.  Yes, I did.

10   Q.  At the Department of Health and Human Services, what are

11   these reports typically called?

12   A.  A report of investigative activity, which is an OI3A or a

13   report of interview, which is an OI3.

14   Q.  Now, when you spoke to Ms. Crabtree on July 16th, did she

15   say anything to you about the preparation of group therapy

16   notes at Health Care Solutions Network?

17   A.  Yes, she did.

18   Q.  What did she say?

19   A.  She stated that she did not fabricate notes, that she only

20   created notes for patients that she provided services to.

21   Q.  Now, at this point in time in the interview, when she made

22   those statements, what happened?

23   A.  The interview was terminated.

24   Q.  Terminated by whom?

25   A.  By me.
```

1   Q.   Let's switch gears and talk about Ms. Salafia.   When did

2   you interview her?

3   A.   July 2nd, 2013.

4   Q.   And where did this interview take place?

5   A.   At the Miramar health care fraud facility.

6   Q.   Who else was there with you?

7   A.   Special Agent Henry Luna with the Department of Health and

8   Human Services and Department of Justice trial attorney Allan

9   Medina.

10  Q.   Now, before speaking with her, did you introduce yourselves

11  as special agents from the Department of Health and Human

12  Services and as a representative of the DOJ?

13  A.   Yes, we did.

14  Q.   Did she agree to speak with you?

15  A.   Yes, she did.

16  Q.   Similar questions as to before:   During the interview, was

17  Ms. Salafia alert?

18  A.   Yes, she was.

19  Q.   Did she report to be under the influence of alcohol, drugs,

20  medication?

21  A.   No, she did not.

22  Q.   Who took the lead in asking questions of her?

23  A.   Department of Justice trial attorney Allan Medina.

24  Q.   Did someone prepare a report on the statements that she

25  made during the course of the interview?

1    A.  Yes, they did.

2    Q.  Who was that?  Who prepared that report?

3    A.  Special Agent Henry Luna.

4    Q.  I understand you aren't the author of the report, but did

5    you review it before it was finalized?

6    A.  Yes, I did.

7    Q.  During the interview, did Ms. Salafia discuss her work at

8    Health Care Solutions Network?

9    A.  Yes, she did.

10   Q.  What did she say?

11   A.  She said she provided group therapy.

12   Q.  Did she say whether she prepared group therapy notes for

13   the sessions that she conducted?

14   A.  Yes, she did.

15   Q.  During the course of the interview, did she say who her

16   supervisor was at Health Care Solutions Network?

17   A.  Yes, she did.

18   Q.  Who did she say was her supervisor?

19   A.  She stated that it was Gema Pampin, because at the time she

20   was not licensed, so she was an intern.

21   Q.  And because she wasn't licensed, did she say whether or not

22   Ms. Pampin signed the notes that she, Ms. Salafia, prepared?

23   A.  Yes.

24   Q.  And did she say that, in fact, Ms. Pampin did sign those

25   notes?

```
1    A.  Yes, she did.

2    Q.  Are you familiar with the term "cloned group therapy

3    notes"?

4    A.  Yes, I am.

5    Q.  So what is a cloned note?

6    A.  A cloned note is basically copying the same information

7    from one document to another.

8    Q.  Could a cloned note be copying information from one note to

9    another for the same patient?

10   A.  Yes.

11          MR. HERMIDA:  Objection, calls for speculation.

12          THE COURT:  Overruled.

13   A.  Yes.

14   BY MR. STEWART:

15   Q.  Could a cloned note be copying information from one note to

16   another for different patients?

17   A.  Yes.

18   Q.  Did Ms. Salafia tell you whether or not she had ever cloned

19   group therapy notes while at Health Care Solutions Network?

20   A.  Ms. Salafia stated that she never cloned group therapy

21   notes.

22   Q.  Did you actually review any notes with her from Health Care

23   Solutions during the course of this interview?

24   A.  Yes, we did.

25   Q.  For which patient?
```

1    A.   For patient Dulce de la Torre.

2    Q.   These group therapy notes, for what dates were the

3    sessions?

4    A.   The sessions were for 11-20-2007 and 11-27-2007.

5    Q.   Now, during the course of the interview, did you review

6    with her the signatures on those group therapy notes?

7    A.   Yes, we did.

8    Q.   Did she say that the group -- excuse me.  Did she say that

9    the signatures on the group therapy notes were, in fact, her

10   signatures?

11   A.   Yes, she did.

12   Q.   Did Ms. Salafia remember the patient, Dulce de la Torre?

13   A.   Yes, she did.

14   Q.   Did she say anything during the course of the interview

15   about Ms. de la Torre's medical conditions?

16   A.   Yes, she did.

17   Q.   What did she say?

18   A.   She stated that patient Dulce de la Torre suffered from

19   Alzheimer's and dementia.

20   Q.   Did Ms. Salafia say whether or not she provided therapy to

21   Ms. de la Torre?

22   A.   Yes, she did.

23   Q.   Did she say that she in fact had provided therapy to her?

24   A.   Yes, she did.

25   Q.   So let's go back to the group therapy notes that you

1  reviewed during the course of the interview.  Do you recall the

2  topics that the group therapy notes pertained to?

3  A.  Yes.

4  Q.  What were they?

5  A.  It was systems management, psychotherapy process, and

6  self-esteem.

7  Q.  Did you review with Ms. Salafia the quotations that

8  appeared in the patient response benefit sections of those

9  notes?

10  A.  Yes, we did.

11  Q.  Did those notes contain identical quotations?

12  A.  Yes, they did.

13  Q.  So let's break this down a little bit for the members of

14  the jury.  Did the note from the symptoms management session

15  from 11-20-2007 contain a quotation that was identical to the

16  symptoms management group session from 11-27-2007?

17  A.  Yes, it did.

18  Q.  And was the same thing true for the psychotherapy process

19  group note?

20  A.  Yes, it was.

21  Q.  And was the same thing true for the self-esteem group note?

22  A.  Yes, it was.

23  Q.  I'd like to show you what's been previously marked and

24  admitted as Government's Exhibit 174.  Do you recognize this

25  document?

1    A.  Yes, I do.

2    Q.  And what is it?

3    A.  It's the face sheet for Dulce de la Torre.

4    Q.  And is it part of the larger patient file for that patient?

5    A.  Yes, it is.

6    Q.  The group therapy notes that we've been discussing, are

7    they part of this larger patient file?

8    A.  Yes, they are.

9            MR. STEWART:  I'd like to turn over to page 114 of the

10   PDF, please.

11   BY MR. STEWART:

12   Q.  Is this one of the group therapy notes that you reviewed

13   with Ms. Salafia during her interview?

14   A.  Yes, we did.

15   Q.  For what date -- excuse me, what date does this note

16   pertain to?

17   A.  It's dated 11-20-2007.

18   Q.  And what therapy topic?

19   A.  Symptoms management.

20   Q.  So let's take a look together at the patient

21   response/benefit section.  If you would, would you please read

22   the quotation that appears in that section, beginning toward

23   the bottom.

24   A.  "I am afraid of spending more time at the hospital."

25            MR. STEWART:  So now let's pull up page 96 of the same

1   PDF, please.

2   BY MR. STEWART:

3   Q.  For what date is this group therapy note?

4   A.  11-27-2007.

5   Q.  And what topic?

6   A.  Symptoms management.

7   Q.  Let's again look at the patient response/benefit section.

8   Would you please again read the quotation that appears there

9   for the jury.

10  A.  "I am afraid of spending more time at the hospital."

11          MR. STEWART:  Okay.  Now, if possible, could we put

12  this paragraph together with the paragraph from the prior

13  document?

14  BY MR. STEWART:

15  Q.  Are those quotations identical?

16  A.  Yes, they are.

17  Q.  In fact, is the entire patient response/benefit section of

18  these two notes the same?

19  A.  Yes, they are.

20  Q.  Now, did you review similar portions of the psychotherapy

21  notes for 11-20 and 11-27 with Ms. Salafia?

22  A.  Yes, we did.

23  Q.  Did they contain identical quotations as well?

24  A.  Yes, they did.

25  Q.  And did you review similar portions of the self-esteem

```
1   notes from 11-20 and 11-27?
2   A.  Yes, we did.
3   Q.  Did those contain identical quotations as well?
4   A.  Yes, they did.
5   Q.  Now, did you ask Ms. Salafia about these quotations?
6   A.  Yes, we did.
7   Q.  How did she respond?
8   A.  She stayed silent.  She didn't explain anything.
9   Q.  Now, this interview, was it voluntary?
10  A.  Yes, it was.
11  Q.  Had you set a time and place for her to come in and speak
12  with you at the health care fraud strike force facility?
13  A.  Yes, we did.
14  Q.  Was she free to leave at any time?
15  A.  Yes, she was.
16  Q.  But did she offer any explanation for these quotations?
17  A.  No, she did not.
18  Q.  After reviewing these notes, did you continue the interview
19  with Ms. Salafia?
20  A.  Yes, we did.
21  Q.  Did you ask her whether or not she thought her actions at
22  Health Care Solutions Network were wrong?
23  A.  Yes, we did.
24  Q.  What did she say?
25  A.  She stated that she didn't do anything wrong because she
```

1   didn't steal any money.

2   Q.  Did she explain what she meant by that?

3   A.  No, she did not.

4   Q.  At that point, did you continue speaking with Ms. Salafia?

5   A.  Yes, we did.

6   Q.  Did you ask her about any meetings that she attended at

7   Health Care Solutions Network?

8   A.  Yes, we did.

9   Q.  What did she tell you about those meetings?

10  A.  Ms. Salafia stated that she was present during the

11  discussions of the fabrication of notes during meetings.

12  Q.  And these are meetings that she personally attended?

13  A.  Yes, she did.

14  Q.  And these are meetings that were held at the Health Care

15  Solutions Network offices.

16  A.  Yes, they were.

17  Q.  Who led these meetings?

18  A.  Alina Feas.

19          MR. STEWART:  No further questions.

20          THE COURT:  All right.  Mr. Rabin?

21          MR. RABIN:  I have no questions, Your Honor.

22          THE COURT:  Mr. Palomino.

23          MR. PALOMINO:  May it please the Court.

24                      CROSS-EXAMINATION

25  BY MR. PALOMINO:

1    Q.   Good morning, Agent Rivera.

2    A.   Good morning.

3    Q.   The day that you interviewed my client, Doris Crabtree, was

4    on July 16th, 2013?

5    A.   Correct.

6    Q.   That was the date of her arrest, correct?

7    A.   Yes, it was.

8    Q.   And were you present for the execution of that arrest

9    warrant?

10   A.   Yes, I was.

11   Q.   That was done very, very early in the morning, correct?

12   A.   Yes, it is.

13   Q.   In fact, it was still dark outside when you showed up at

14   her house?

15   A.   Yes, it was.

16   Q.   And Ms. Crabtree was in bed at the time that you knocked on

17   the door?

18   A.   I don't know if she was in bed.

19   Q.   Well, when you walked in, was she fully dressed, ready to

20   go to work?

21   A.   No, she was not.

22   Q.   In fact, you had to give her some time to get herself

23   together and get dressed, correct?

24   A.   Yes, we did.

25   Q.   And she was handcuffed and taken into custody.

1   A.  Yes, she was.

2   Q.  In front of her family.

3   A.  Yes, she was.

4   Q.  Her husband was there.

5   A.  Yes, he was.

6   Q.  Her daughter was also there, correct?

7   A.  Yes, she was.

8   Q.  And the nine-year-old granddaughter was also present,

9   correct?

10  A.  Yes, she was.

11  Q.  In fact, the granddaughter and the daughter got very

12  emotional when they saw the mother and the grandmother being

13  taken away in handcuffs.

14  A.  I can't recall that.

15  Q.  Now, she was taken to what office?

16  A.  The FBI facility.

17  Q.  Before that, how many units responded to take Ms. Crabtree

18  into custody?

19  A.  It was one marked unit.

20  Q.  And how many --

21  A.  A local police officer, and then I want to say it was maybe

22  four or five agents.

23  Q.  So about eight, ten officers?

24  A.  No.  It was a total of four or five agents and one local

25  marked unit outside.

1    Q.  Okay.  So a total of six officers in total.

2    A.  Yes.

3    Q.  And when she got to the location -- where was it again that

4    you took her?  I'm sorry.

5    A.  The FBI facility.

6    Q.  Okay.  And when she was taken to the FBI facility, you

7    requested to speak with her.

8    A.  Yes, we did.

9    Q.  At that point in time, she really didn't have to speak to

10   you, correct?

11   A.  Correct.

12   Q.  She could have invoked her rights and remained silent.

13   A.  Correct.

14   Q.  But regardless, she went ahead and decided to go ahead and

15   waive her rights and speak to you.

16   A.  Yes, she did.

17   Q.  And when she was questioned, she adamantly told you that

18   she did not fabricate any notes.

19   A.  Correct.

20   Q.  And she adamantly told you that the only notes that she

21   prepared were notes for services that she had provided.

22   A.  Correct.

23   Q.  And at that point in time, you went ahead and ended the

24   interview.

25   A.  Correct.

1        MR. PALOMINO:  I've got nothing further, Your Honor.

2        THE COURT:  All right.  Mr. Hermida?

3                        CROSS-EXAMINATION

4   BY MR. HERMIDA:

5   Q.  Agent Rivera, did you call my client for her to come in for

6   that meeting?

7   A.  No, I did not.

8   Q.  Do you know if my client was advised of the sum and

9   substance of that meeting before she came in?

10  A.  I can't recall if she was told what it was in reference to,

11  because I did not speak to her.

12  Q.  Isn't it true that she was told this was just a Department

13  of Health interview?

14  A.  Again, I did not speak to her.

15  Q.  And this is some three years after she had worked at Health

16  Care Solutions Network, right?

17  A.  Correct.

18  Q.  Because she left before it was shut down, right?

19  A.  Correct.

20  Q.  She left a full year before it was shut down.

21  A.  Correct.

22  Q.  She left before those meetings happened on a daily basis,

23  correct?

24  A.  That's not what she stated the day we interviewed her.

25  Q.  Now, you worked on the Health Care Solutions Network case,

1  East, West, North Carolina?

2  A.  Yes.

3  Q.  And part of your investigation involved sorting through all

4  the documents.

5  A.  Yes.

6  Q.  Including patient sign-in sheets, right?

7  A.  Yes.

8  Q.  So you're familiar with patient sign-in sheets.

9  A.  I'm familiar with them.  I don't know -- I didn't actually

10 like go through them, but I'm familiar with the patient sign-in

11 sheets.

12 Q.  When the government showed you --

13       MR. HERMIDA:  Could you pull up Exhibit 174, page 115?

14 BY MR. HERMIDA:

15 Q.  This is Dulce de la Torre's file?

16 A.  That's the face sheets that are located inside the patient

17 file, yes.

18 Q.  Okay.  And basically, the Government's Exhibit 174 is a

19 compilation of two sessions, right, 11-20-07 and 11-27-07?

20 A.  Correct.

21 Q.  And were you aware if --

22       MR. HERMIDA:  If I may approach the witness?

23       THE COURT:  Yes.

24 BY MR. HERMIDA:

25 Q.  I'm going to show you a document -- actually, two

```
1    documents.  What are those documents?

2    A.  Daily sign-in logs.

3    Q.  For what dates?

4    A.  11-27-2007, 11-20-2007.

5    Q.  And if you look on the patients listed, who is listed as a

6    patient there?

7    A.  Who's listed as a patient?

8    Q.  Well, there's many patients.

9    A.  There's many patients.

10   Q.  Can you find Ms. de la Torre?

11   A.  Yes, she's listed.

12   Q.  Did you review those documents?  Do they fairly and

13   accurately represent what a sign-in sheet would look like

14   there?

15   A.  Yes.

16         MR. HERMIDA:  Judge, I'd like to admit this into

17   evidence.  It would be Defense 2, I think, E-2 -- E-1 and 2.

18   They were previously provided by the government.

19         MR. STEWART:  No objection, Your Honor.

20         MR. HERMIDA:  May I publish to the jury with the ELMO?

21         THE COURT:  Give me one second.

22         MR. HERMIDA:  I have them labeled as E-1 and E-2.

23         THE COURT:  Okay.

24   BY MR. HERMIDA:

25   Q.  Agent, calling your attention to the sign-in sheet dated
```

1    11-20-07, can you tell the jury, who's the therapist that saw

2    Ms. de la Torre on that day?

3    A.   Doris.

4    Q.   And yet the Government's Exhibit 174 indicates that

5    Ms. Salafia saw Dulce de la Torre on that day.  You would agree

6    with me that either this sign-in sheet is fake or the notes are

7    fake, one or the other, or both.

8    A.   It's a possibility.

9    Q.   Did you ever show this to my client?

10   A.   No, we did not.

11   Q.   As part of the patient file?

12   A.   No, we did not.

13   Q.   I'm showing you Defense Exhibit E-2 and it's dated 11-27.

14   Again, who's the therapist that attended to Ms. de la Torre

15   that day?

16   A.   Doris.

17   Q.   And again, 174 would indicate that Ms. Salafia gave

18   treatment to Ms. de la Torre on that day.  So which is it?  Is

19   this fake or are the notes fake, or both?

20   A.   I don't know.

21   Q.   So you didn't give her the whole story when you interviewed

22   her, right?  You didn't give her the patient sign-in sheets?

23   A.   No, we did not.  We just showed her the therapy notes.

24   Q.   Now, just so the jury understands.  The day you called her

25   in for the voluntary interview, that wasn't the date of her

1   arrest, right?

2   A.  No, it was not.

3   Q.  And she denied cloning any notes, correct?

4   A.  Yes, she did.

5   Q.  Now, just one last question:  Did you record this meeting

6   on an audio or video?

7   A.  No, we did not.

8   Q.  So all we have is your testimony here today and the notes,

9   right?

10  A.  Correct.

11          MR. HERMIDA:  I have nothing further.

12          THE COURT:  Mr. Prieto?

13          MR. PRIETO:  I have no questions, Judge.

14          THE COURT:  Mr. Gonzalez?

15          MR. GONZALEZ:  No questions, Judge.

16          THE COURT:  Mr. Levin?

17          MR. LEVIN:  No questions, Your Honor.

18          THE COURT:  All right.  Redirect, Mr. Stewart?

19                  REDIRECT EXAMINATION

20  BY MR. STEWART:

21  Q.  Special Agent Rivera, did you show Ms. Salafia group

22  therapy notes that appeared to have her signature?

23  A.  Yes, we did.

24  Q.  Were those for patient Dulce de la Torre?

25  A.  Yes, they were.

1   Q.  Were they for 11-20-2007 and 11-27-2007?

2   A.  Yes, they were.

3   Q.  Did she recognize the patient?

4   A.  Yes, she did.

5   Q.  Did she recognize her signature?

6   A.  Yes, she did.

7   Q.  Did you separately discuss with her whether she had

8   attended any meetings where the fabrication of notes was

9   discussed at Health Care Solutions Network?

10          MR. HERMIDA:  This has been asked and answered, Your

11  Honor.

12          THE COURT:  Overruled.

13  A.  Yes, we did.

14  BY MR. STEWART:

15  Q.  She attended those meetings?

16  A.  Yes, she did.

17  Q.  And they were led by Alina Feas?

18  A.  Yes, they were.

19          MR. STEWART:  No further questions.

20          THE COURT:  All right.  Thank you.  You can step down.

21          THE WITNESS:  Thank you.

22                  *   *   *   *   *

23

24

25

 1   UNITED STATES OF AMERICA                    )
                                                 ) ss:
 2   SOUTHERN DISTRICT OF FLORIDA                )

 3

 4                    C E R T I F I C A T E

 5       I, Carly L. Horenkamp, Certified Shorthand

 6   Reporter in and for the United States District Court for the

 7   Southern District of Florida, do hereby certify that I was

 8   present at and reported in machine shorthand the proceedings

 9   had the 13th day of November, 2014, in the above-mentioned

10   court; and that the foregoing transcript is a true, correct,

11   and complete transcript of my stenographic notes.

12       I further certify that this transcript contains

13   pages 1 - 26.

14       IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15   Florida, this 6th day of February, 2015.

16

17

                      /s/ Carly Horenkamp
18
                      Carly L. Horenkamp, RMR, CRR
19                    Certified Shorthand Reporter

20

21

22

23

24

25