```
                 IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF FLORIDA
                         MIAMI DIVISION
                  CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,            NOVEMBER 17, 2014
                                     9:33 A.M.
                    Plaintiff,



         vs.



ROGER ROUSSEAU, et al.,

                    Defendants.        PAGES 1 THROUGH 68
_____

                            DAY 9
               EXCERPT OF CRIMINAL JURY TRIAL
         (DIRECT EXAMINATION OF JOEL COX BY MR. STEWART)
          BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:     Mr. Allan J. Medina, AUSA
                       Mr. A. Brendan Stewart, AUSA
                       Mr. Justin Goodyear, AUSA
                       U.S. DEPARTMENT OF JUSTICE
                       Criminal Division
                       Fraud Section
                       1400 New York Avenue NW
                       Washington, DC 20530


FOR THE DEFENDANT:     Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)       LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                       800 Brickell Avenue
                       Suite 1400
                       Miami, Florida  33131


FOR THE DEFENDANT:     Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)       LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                       1221 Brickell Avenue # 900
                       Miami, Florida  33131
```

APPEARANCES (continued):

FOR THE DEFENDANT:          Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)           LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                           55 Merrick Way
                           Suite 212
                           Coral Gables, Florida  33134


FOR THE DEFENDANT:          Mr. Frank A. Prieto, Esq.
(Liliana Marks)            LAW OFFICE OF FRANK A. PRIETO, P.A.
                           One Northeast 2nd Avenue
                           Suite 200
                           Miami, Florida  33132


FOR THE DEFENDANT:          Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)              LAW OFFICES OF JUAN DE JESUS GONZALEZ
                           10631 N. Kendall Drive
                           Suite 150
                           Miami, Florida  33176


FOR THE DEFENDANT:          Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)              LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                           Courthouse Tower
                           40 NW 3rd Street
                           Suite 200
                           Miami, Florida  33128


COURT REPORTER:             Carly L. Horenkamp, RMR, CRR
                           U.S. DISTRICT COURT
                           400 N. Miami Avenue, Room 12-3
                           Miami, Florida  33128
                           (305) 523-5138

```
 1                         I  N  D  E  X

 2   Certificate ----------------------------------------- 68

 3


 4


 5                       W I T N E S S
     ON BEHALF OF THE GOVERNMENT:                        PAGE
 6   JOEL COX
     DIRECT EXAMINATION BY MR. STEWART                      4
 7


 8


 9


10                       E X H I B I T S
11   GOVERNMENT EX. NO.:                      OFFERED ADMITTED
     1006 -                                     28       28
12   1007 -                                     29       29
     1008 -                                     48       48
13   1009 -                                     49       49
     1010 -                                     --       36
14   1011 -                                     --       36
     1020 -                                     14       14
15   1021 -                                     46       46
     1022 -                                     44       44
16


17


18


19


20


21


22


23


24


25
```

```
 1          (No Jury, Counsel and Defendants Present, 9:33 a.m.)
 2               THE COURT:  Good morning, everyone.  Welcome.
 3               COURT SECURITY OFFICER:  Mr. Rabin's outside.
 4               THE COURT:  Okay.  All right.  Everybody is here.
 5     Let's bring in the jury.  I'm sure he'll be back by the time
 6     they come in.
 7               MR. STEWART:  Your Honor, this morning, before we
 8     begin, we have one supplemental jury instruction we've shared
 9     with defense counsel.  We've passed it up for your
10     consideration.
11               THE COURT:  Okay.
12          (Jury Present.)
13               THE COURT:  All right.  Good morning, everyone.
14     Welcome back and please be seated.  Mr. Rabin is here, but he
15     just went outside for a second, so as soon as he comes back in,
16     we'll get started.
17               MR. STEWART:  Your Honor, would you like us to bring
18     in the first witness?
19               THE COURT:  Sure.
20               MR. STEWART:  So the United States calls at this time
21     Special Agent Joel Cox.
22               JOEL COX, GOVERNMENT WITNESS, SWORN
23               THE COURT:  All right.  Everybody is here.
24          Go ahead, Mr. Stewart.
25                         DIRECT EXAMINATION
```

```
 1    BY MR. STEWART:
 2    Q.   Good morning.
 3    A.   Good morning.
 4    Q.   Special Agent Cox, who is your current employer?
 5    A.   The Federal Bureau of Investigation.
 6    Q.   And what position do you have with the FBI?
 7    A.   I'm a special agent.
 8    Q.   And how long have you worked for the FBI?
 9    A.   Just over six and a half years.
10    Q.   Where do you currently work?
11    A.   For the -- at the Miami field office.
12    Q.   And what are your responsibilities there?
13    A.   Primarily I investigate health care fraud, but I'm also a
14    member of the Miami division SWAT team and a firearms
15    instructor.
16    Q.   How long have you been investigating health care fraud?
17    A.   Just over six years.
18    Q.   And were you part of an investigation into Health Care
19    Solutions Network?
20    A.   Yes, I was.
21    Q.   So I'd like to walk through some of the steps that you've
22    taken during the course of that investigation.  Did you conduct
23    interviews during that investigation?
24    A.   Yes, I did.
25    Q.   Did you review documents?
```

1    A.   Yes.

2    Q.   What kind of documents?

3    A.   Travel records, banking documents, patient files.

4    Q.   During the course of your investigation, did you interview

5    any of the defendants?

6    A.   Yes, I did.

7    Q.   Which ones?

8    A.   I interviewed Dr. Rousseau, Ms. Crabtree, Ms. Marks,

9    Ms. Fonts, and Ms. Ruiz.

10   Q.   Let's start by walking through how an investigative

11   interview works.  So typically when the FBI conducts an

12   interview, how many agents are present?

13   A.   Usually two.

14   Q.   And why is that?

15   A.   It's because it's a division of labor of sorts.  Usually

16   you have one person leading the interview and another person

17   taking notes and assisting with the interview.

18   Q.   After the interview, is a report prepared of the statements

19   that were made by the person being interviewed?

20   A.   Yes.

21   Q.   And which agent typically writes up such a report?

22   A.   Usually the person taking the notes writes the report, but

23   that's not always the case.

24   Q.   These reports, what do they -- what are they typically

25   called?

1  A.  For the FBI, they usually call it a 302.

2  Q.  The other agent, the one who did not actually write the

3  report, does he typically review the report before it's

4  finalized?

5  A.  Yes.

6  Q.  And is it also reviewed by a -- by a supervisor before it's

7  finalized?

8  A.  Yes, that's correct.

9  Q.  What's the purpose of the report?

10  A.  It's a summary of statements.  It's a tool that we can use

11  later to refer back to, to refresh our memory of the interview

12  that occurred.

13  Q.  Is the report -- excuse me, is the report a verbatim

14  translation of everything that was said during the interview?

15  A.  No.

16  Q.  When you write the report, do you rely just on your notes?

17  A.  No, that's -- no, you don't.

18  Q.  What else do you refer to when you prepare the report?

19  A.  Your recollection of the interview and then you can also --

20  you should also discuss with the other agent that was there to

21  see if they had any other memories as well.

22  Q.  Your testimony today about your interviews of the

23  defendants, is it based on your recollection of what they said

24  during those interviews?

25  A.  Yes.

1    Q.   Did you review your reports before coming here today?

2    A.   Yes.

3    Q.   And were those reports consistent with your recollections?

4    A.   Yes, they were.

5    Q.   We'll come back to the interviews you conducted of the

6    defendants.  First I want to ask you, did you review travel

7    records during the course of your investigation into Health

8    Care Solutions Network?

9    A.   Yes, I did.

10   Q.   How did you do that?

11   A.   Well, I requested a report known as a TECS report that's

12   maintained.  It's from a database that's maintained by

13   Customs & Border Protection and what it does is it tracks the

14   entries and exits of individuals either coming into the United

15   States or leaving the United States.

16   Q.   TECS, is that T-E-C-S?

17   A.   That's correct.

18   Q.   Does that stand for anything?

19   A.   Well, it used to stand for something, but from what my

20   understanding now is, it was an old acronym that stood for, I

21   think it was Treasury Enforcement Communications System, if I'm

22   not mistaken, but now it's just an acronym that stands for

23   nothing, so it's just letters.

24   Q.   The TECS database, is that something that you've consulted

25   in the past in other investigations?

1   A.   Yes.

2   Q.   Have you found the travel records that you've received from

3   that database to be reliable?

4   A.   Yes.

5   Q.   I'd like to look at what's been previously marked and

6   admitted into evidence as Government Exhibit 25.  Do you

7   recognize this document?

8   A.   Yes, I do.

9   Q.   Let's turn over to the second page of it, please.  The

10  information that we see here, is this the information that you

11  retrieved from the TECS database we were just discussing?

12  A.   Yes, it is.

13          MR. STEWART:  So I'd like to zoom in at the top

14  portion of the page.

15  BY MR. STEWART:

16  Q.   Do you see where it says "Rousseau" in the top left-hand

17  corner?

18  A.   Yes, I do.

19  Q.   And the date, July 2nd, 2010 below that.

20  A.   Yes.

21  Q.   And there's also a location, Santo Domingo?

22  A.   That's correct.

23  Q.   Is that in the Dominican Republic?

24  A.   Yes, it is.

25  Q.   Let's move down to the next entry.  Do you see where it

1    says "Rousseau" again and this time, July 11, 2010?

2    A.   Yes.

3    Q.   And below that, again, there's a location, Fort Lauderdale.

4    A.   Yes.

5    Q.   Based on the information contained here, where was

6    Dr. Rousseau between July 2nd, 2010, and July 11, 2010?

7    A.   According to this document, he was outside of the United

8    States.

9    Q.   Let's take a look next at Government Exhibit 102, which has

10   also been previously admitted.  Let's turn over here to the

11   third page of this document.

12       Special Agent Cox, do you recognize this?

13   A.   Yes, I do.  It's a -- it's part of a patient file for

14   Ms. Margarita de Armas.  What we're looking at now is the face

15   sheet of that file.

16   Q.   And this patient file -- this patient file, does it cover

17   the treatment of Ms. De Armas between her admission date,

18   July 1st, 2010, and her discharge date on August 27, 2010?

19   A.   Yes, it does.

20   Q.   Let's now turn over to the page 68 of the document, please.

21   Special Agent Cox, what is this?

22   A.   That is a physician weekly progress note out of that

23   patient file of Ms. De Armas.

24           MR. STEWART:  I'd like to zoom in on that top portion.

25   BY MR. STEWART:

1  Q.  The progress note, is it dated July 6, 2010?

2  A.  Yes, it is.

3  Q.  I'd like to now look at the first paragraph of that note at

4  the very top.  And if you would, would you please read the

5  first two lines for the members of the jury.

6  A.  Sure.  Patient was seen for follow-up today.  Individual

7  medication management with psychotherapy was provided.  Chart

8  was reviewed and case discussed with the treatment staff.

9  Q.  So now I'd like to turn to another portion of that same

10  page at the very bottom, the part that is bolded and

11  italicized.

12      Would you please read the first line of that bolded

13  portion, Special Agent Cox, for the jury.

14  A.  Certification For Continued PHP Services.

15  Q.  And the line after that as well.

16  A.  I certify and attest that this patient, Margarita de Armas,

17  would require inpatient psychiatric care if the Partial

18  Hospitalization program services were not provided.

19  Q.  And would you then read actually the last portion of that,

20  beginning "PHP is medically necessary."

21  A.  PHP is medically necessary, for in the absence of PHP, this

22  patient would require inpatient psychiatric hospitalization.

23  Q.  Is there a line on this document for Dr. Rousseau's

24  signature?

25  A.  Yes, there is.

1    Q.  Does it appear to be signed?

2    A.  Yes.

3    Q.  Let's take a look at the larger document one more time.

4        This document, is it dated July 6, 2010?

5    A.  Yes, it is.

6    Q.  Where was Dr. Rousseau on that date?

7    A.  He was traveling outside of the United States.

8    Q.  Let's take a look at Government Exhibit 103, also

9    previously admitted.

10       Special Agent Cox, do you recognize this document?

11   A.  Yes.  This is also a face sheet for a different patient,

12   Maria Rosario, which is part of a larger patient file.

13   Q.  And does this patient file cover Ms. Rosario's admission on

14   July 9, 2010, and through her discharge on August 25th, 2010?

15   A.  Yes, it does.

16   Q.  Let's turn over to page 39, please.  Special Agent Cox,

17   what is this?

18   A.  This is a physician admission order.

19   Q.  I'd like to highlight for you the portion at the bottom.

20   It includes the signature lines, as well as the italicized

21   text.  Would you please read the italicized portion for the

22   jury?

23   A.  Yes.  It says:  I certify that the beneficiary would

24   require Inpatient Psychiatric Care in the absence of Partial

25   Hospitalization Services, and services will be furnished under

```
 1  the care of a physician and under an Individualized Treatment

 2  Plan.

 3  Q.  Is there a line for Dr. Rousseau's signature?

 4  A.  Yes.

 5  Q.  Does it appear to be signed?

 6  A.  Yes.

 7  Q.  And is it dated July 9, 2010?

 8  A.  Yes, it is.

 9  Q.  Where was Dr. Rousseau on that date?

10  A.  Again, he was traveling outside of the United States.

11  Q.  Let's turn over next to Government Exhibit 1020, which has

12  not been previously admitted.

13      Special Agent Cox, what are we looking at here?

14  A.  This is a chart that was created based on the counts in the

15  indictment, and then the first two lines show the counts and

16  then the defendant and then the patients that we just referred

17  to in those patient charts, their dates of service, and the

18  location of Dr. Rousseau during those times.  And the second

19  portion of the chart below just shows where he was traveling

20  from and to and the dates he was traveling.

21  Q.  So did you prepare this chart?

22  A.  Yes.

23  Q.  And did you create it using the travel records that we were

24  discussing earlier?

25  A.  Yes.
```

1   Q.  Does it also include information -- Medicare information,

2   excuse me, on the two patients that you mentioned just a moment

3   ago that is also contained in Counts 2 and 3 of the indictment?

4   A.  Yes, that's correct.

5   Q.  Now, the information that you reviewed to prepare this

6   chart, was it voluminous?

7   A.  Yes, it was.

8           MR. STEWART:  So at this time we would move, Your

9   Honor, to admit this into evidence and publish it to the jury.

10          MR. RABIN:  Well, I object to a summary chart being

11  admitted into evidence.  So the evidence is the underlying

12  documents.

13          THE COURT:  Overruled.  That will be received in

14  evidence.  You can show it to the jury.

15          MR. STEWART:  Thank you.

16  BY MR. STEWART:

17  Q.  So Special Agent Cox, I know you described it a little bit

18  just a moment ago, but I want to walk through some of those

19  details again, now that the members of the jury can see it as

20  well.

21      So the two lines that's at the top of the chart, do those

22  relate to the two patients that we were just discussing,

23  Ms. De Armas and Ms. Rosario?

24  A.  Yes.

25  Q.  And the two claims there listed on the top of the charts,

1  do they relate to the two claims -- excuse me, the two counts

2  in the indictment, Counts 2 and Count 3?

3  A.  Yes, that's correct.

4  Q.  And did you match that information specifically for these

5  two claims, the date of service up with the information on the

6  chart below from the travel records for Dr. Rousseau?

7  A.  Yes, I did.

8  Q.  Where was Dr. Rousseau on the dates of service for these

9  two claims, July 6 and July 9, 2010?

10  A.  He was traveling outside of the United States.

11  Q.  Let's switch gears.  Let's get back to the interviews that

12  you conducted of the defendants.  Let's start with first

13  Ms. Crabtree.  Where were you when you interviewed her?

14  A.  We interviewed Ms. Crabtree at Larkin Hospital, which was

15  her place of employment.

16  Q.  And when did this interview take place?

17  A.  This was July of 2013.

18  Q.  Who was there with you?

19  A.  Special Agent Reilly, Terence Reilly.

20  Q.  Before beginning the interview, did you identify yourselves

21  as special agents from the FBI?

22  A.  Yes, we did.

23  Q.  And did she agree to speak with you?

24  A.  Yes.

25  Q.  Now, during the interview, was the defendant alert?

1  A.  Yes.

2  Q.  Did the defendant report being under the influence of

3  alcohol, drugs, medication, anything like that?

4  A.  No.

5  Q.  Now, we're going to walk through the other interviews that

6  you conducted with each of the defendants, but I want to ask

7  you the same sets of questions just here at the beginning.  Did

8  you follow, when you began each interview, the procedures that

9  you just outlined?

10  A.  Yes, we did.

11  Q.  Did you identify yourselves as special agents from the FBI?

12  A.  Yes.

13  Q.  And did all of the defendants agree to speak with you?

14  A.  Yes, they did.

15  Q.  Were all of the defendants alert during their interviews?

16  A.  Yes, they were.

17  Q.  Did any of the defendants report being under the influence

18  of alcohol, drugs, medication?

19  A.  No, they did not.

20  Q.  Let's get back then to the interview of Ms. Crabtree.  Who

21  took the lead in asking questions of Ms. Crabtree?

22  A.  Special Agent Reilly.

23  Q.  And who prepared a report on the statements that she made

24  during the interview?

25  A.  I did.

1  Q.  During the interview, did she say anything about how she

2  came to work at Health Care Solutions Network?

3  A.  Yes, she did.  Ms. Crabtree told us that she was

4  interviewed by Armando Gonzalez and also Alina Feas and was

5  hired to run PHP group therapy.

6  Q.  Did she say whether she was licensed at the time that she

7  was hired to work there?

8  A.  Yes, she told us that she was a licensed mental health

9  counselor.

10  Q.  And at which location did she say that she worked?

11  A.  The Health Care Solutions East location.

12  Q.  During your interview with her, did you review any patient

13  files from Health Care Solutions?

14  A.  Yes.

15  Q.  For which Health Care Solutions patient?

16  A.  For Ms. Crabtree, we reviewed a file for Ms. Ondina Duenas.

17  Q.  And did you review group therapy notes with her from that

18  patient file?

19  A.  Yes.

20  Q.  And those group therapy notes, were they for sessions

21  conducted on July 28, 2009 and August 4, 2009?

22  A.  That's correct.

23  Q.  When you were looking at these files with her, did she

24  review the signatures on those group therapy notes?

25  A.  Yes, she did.

1   Q.  And did she acknowledge that those signatures were hers?

2   A.  She told us those were her signatures.

3   Q.  I'd like to show you what's been previously admitted as

4   Government's Exhibit 106 and I'd like to turn over to the third

5   page of that document.

6       What is this, Special Agent Cox?

7   A.  This is another face sheet from a patient file for

8   Ms. Ondina Duenas.

9   Q.  And the dates of service here, do they cover May 18, 2009

10  through August, what appears to be 21st, 2009?

11  A.  That's correct.

12  Q.  Let's turn over now to the 106th page of this document.

13      Is this one of the group therapy notes that you reviewed

14  with Ms. Crabtree during the course of her interview?

15  A.  Yes, it is.

16  Q.  Is the date of this note July 28, 2009?

17  A.  It is, yes.

18  Q.  And is it for a group therapy session that was conducted on

19  that day concerning assertiveness?

20  A.  That's correct.

21          MR. STEWART:  I'd like to look now at the patient

22  response/benefit portion of this document.  Could we please

23  expand that for the jury?

24  BY MR. STEWART:

25  Q.  Did you review this portion of the document with

1    Ms. Crabtree?

2    A.  Yes.

3    Q.  Let's take a look at the quotation there.  Would you please

4    read it to the members of the jury?

5    A.  Sure.  The quote says:  It is not easy to be assertive.

6    Nevertheless, it is very effective.

7         MR. STEWART:  I'd like to pull up another group

8    therapy note, this time for August 4, 2009.  It's page 86.

9    BY MR. STEWART:

10   Q.  Is this group therapy note also for the assertiveness

11   session that was held on that date?

12   A.  That's correct.  This is a -- the same group for a

13   different date, August 4, 2009.

14   Q.  And let's take a look at the patient response/benefit

15   portion.  Again, would you take a look at the quote?  Is that

16   quote the same as the one we were just looking at from the

17   previous group therapy note?

18   A.  Yes, it is.

19        MR. STEWART:  Could we actually put these side by

20   side, the one from the prior document?

21   BY MR. STEWART:

22   Q.  Do these notes from different days contain identical

23   quotations?

24   A.  Yes, they do.

25   Q.  In fact, is the entire patient response/benefit section the

1    same for each of these two notes?

2    A.  Yes, it is.

3             MR. STEWART:  You can bring those down now.  And let's

4    turn next to a couple of other group therapy notes that you

5    reviewed with her.

6    BY MR. STEWART:

7    Q.  Did you also look at the group therapy notes for sessions

8    on psychotherapy, stress management, and coping skills with

9    Ms. Crabtree on that date?

10   A.  Yes, we did.

11   Q.  And were those group notes also from July 28 and August 4?

12   A.  That is correct, yes.

13   Q.  So let's turn next to page 105 of that same patient file.

14        Is this the group therapy note from July 28 for the

15   psychotherapy group session?

16   A.  Yes, it is.

17   Q.  Let's take a look again at the patient response/benefit

18   section.  Does it contain a quotation that reads:  "I remember

19   when I was living in Cuba.  I have a lot of positive memories"?

20   A.  Yes, it does.  That's correct.

21   Q.  Let's turn next to page 85.  Is this a group therapy note

22   for the same session, again psychotherapy, but this time from

23   August 4th, 2009?

24   A.  Yes.

25   Q.  And then let's again look at the patient response/benefit

1  section.  Again, does this say:  "I remember when I was living

2  in Cuba.  I have a lot of positive memories"?

3  A.  Yes.

4          MR. STEWART:  Let's put them side by side as we did

5  before for the prior documents.

6  BY MR. STEWART:

7  Q.  Do these group therapy notes contain identical quotations?

8  A.  Yes, they do.

9  Q.  Are the patient response/benefit sections also the same?

10  A.  Yes, they are.

11  Q.  So let's take a look now at the last of those three sets of

12  notes.

13          MR. STEWART:  Page 104 of the PDF, please.

14  BY MR. STEWART:

15  Q.  Is this a group therapy note, this time for stress

16  management, from July 28, 2009?

17  A.  Yes, it is.

18  Q.  Again, let's look at the patient response/benefit section.

19  Is there a quotation there that reads:  "When I am stressed, my

20  head hurts"?

21  A.  Yes, there is.

22  Q.  Let's look then at the -- page 84 of that same document.

23  Is this a group therapy note for August 4, 2009, again stress

24  management?

25  A.  Yes.

1    Q.  Let's take a look at the quote.  Does it read:  "When I am

2    stressed, my head hurts"?

3    A.  Yes, it does.

4    Q.  Again, did these notes contain identical quotations?

5    A.  Yes, they do.

6    Q.  And the patient response/benefit section, is it the same as

7    well?

8    A.  Yes, it is.  Even the typo after the sentence participate

9    where it's got two periods.

10   Q.  Are you referring there to the third line of the document

11   where it says "initiative to participate"?

12   A.  Yes.

13   Q.  And does it appear that there are, in fact, two periods, a

14   typo, rather than one?

15   A.  Yes, it does.

16   Q.  And that too is the same.

17   A.  Correct.

18   Q.  All right.  Let's turn over to one additional set, this

19   time starting with page 103.

20       Is this a group therapy note from July 28 for a session

21   conducted on coping skills?

22   A.  Yes, it is.

23   Q.  All right.  Let's turn then to the quote from this one.

24   Would you mind reading that one to the members of the jury?

25   A.  Sure.  It says:  "I worry about my sister and sometimes I

1  can't sleep, but since I make use of the relaxation exercises,

2  I am doing much better."

3  Q.  All right.  Let's take a look at the same session topic,

4  coping skills, again, but this time from July 4.

5      Is this the group therapy note from that session, coping

6  skills, from, excuse me, August 4?

7  A.  Yes, it is.

8  Q.  Let's take a look at the quotations.  Same quotation?

9  A.  Yes, it is.

10  Q.  But notes from different dates.

11  A.  That's correct.

12  Q.  We'll take a moment probably to blow it up, but I'll just

13  ask you, the patient response/benefit section, are you familiar

14  with it?

15  A.  Yes, I am.

16  Q.  Are the response/benefit sections from each of these notes

17  exactly the same?

18  A.  Yes, they are.

19  Q.  Now, did you review each of these notes with Ms. Crabtree

20  during your interview of her?

21  A.  Yes, I did.

22  Q.  And did she have any explanation for any of this?

23  A.  No, she didn't have an explanation, but she told us that it

24  was not excusable and that she messed up big time.

25  Q.  Now, do you recall her exact words?  Did she say, "I messed

1    up big time"?

2    A.  Yes.

3    Q.  Did she say that her actions were not excusable?

4    A.  Yes.

5    Q.  Did she acknowledge responsibility for this?

6    A.  Yes, she did.  She told us that she was responsible and she

7    would have to -- as to the way she said it, she would have to

8    eat it, meaning from what I took to mean, she would have to eat

9    the responsibility for the duplicated notes.

10   Q.  Did she actually use the word "responsible"?

11   A.  Yes.

12   Q.  Did she say she was responsible for this?

13   A.  Yes.

14   Q.  Did she say "have to eat"?

15   A.  Well, she said -- let me correct that.  She said "I was

16   responsible," not she.

17   Q.  Understood.  The next part of what she said, did she

18   actually use the words "have to eat"?

19   A.  Yes.

20   Q.  Okay.  And what did you take that to mean?

21   A.  Took it to mean that she would have to eat the

22   responsibility for creating notes that were in fact duplicates

23   of each other.

24   Q.  Did you discuss any other group therapy notes with

25   Ms. Crabtree during the interview?

1   A.  Yes, we did.

2   Q.  Did you discuss with her an incident where she found a

3   group therapy note on a copy machine?

4   A.  Yes.

5   Q.  What did she tell you about that?

6   A.  She told us that she had once found a group therapy note on

7   a copy machine that was signed and dated, and what she told us

8   was interesting about that note is the date on the note was for

9   a holiday in which Health Care Solutions was actually closed.

10  Q.  You said the note was signed and dated.  Who had signed

11  that note?

12  A.  Ms. Alina Feas.

13  Q.  And did she tell you if she did anything after finding this

14  note?

15  A.  She told us that she did not report it, but knew it was

16  wrong.

17  Q.  What, if anything, did Ms. Crabtree tell you about a

18  discussion that she could recall between Alina Feas and Ruben

19  Busquets?

20  A.  She recalled a conversation in which herself and

21  Mr. Busquets went to Ms. Feas regarding the quality of patients

22  at Health Care Solutions, and Ms. Feas told them not to worry,

23  that Armando Gonzalez was aware and that if anything would

24  happen, it would be nothing more than a slap on the hand.

25  Q.  What did you take her to mean when she said the quality of

1    the patients was what she was discussing with Ruben Busquets?

2    A.   We took that to mean as the quality, meaning the patients

3    didn't qualify or benefit from therapy.

4    Q.   Did you ask Ms. Crabtree whether she'd ever been asked by

5    Ms. Feas to write a group therapy note for an absent patient?

6    A.   Yes.

7    Q.   And what did she tell you?

8    A.   She said that Ms. Feas had in fact asked her to write notes

9    for absent patients, but that she refused to do so.

10   Q.   Now, did she say anything in addition to that regarding

11   writing notes for absent patients during the course of the

12   interview?

13   A.   Yes, she did.  She said later in her employment that she

14   possibly did write notes for absent patients.

15   Q.   And did she say why she had done this?

16   A.   She said it became overwhelming -- well, the groups became

17   large and it was hard to track if patients were in fact absent

18   or present, so when asked to write a note or missing note in a

19   file, she would write the note.

20   Q.   Did Ms. Crabtree discuss with you whether she had ever

21   tried to run two group therapy sessions at the exact same time?

22   A.   Yes, she did.

23   Q.   What did she say about that?

24   A.   She explained to us at one point she was responsible --

25   somehow she had two groups that were occurring at the same time

1    and the way she handled it was she would just have one group

2    draw pictures while she would go and tend to the other group,

3    and yet she reflected in group therapy notes that she provided

4    therapy to both groups.

5    Q.  Did she say anything further about writing -- excuse me,

6    about conducting group therapy sessions when patients were in

7    fact not receiving therapy?

8    A.  Yes.  She told us about one other incident in which

9    patients were eating breakfast, and that's all they were doing,

10   and yet she generated group therapy notes as if the patients

11   received therapy that day instead of just eating breakfast.

12   Q.  To be clear, were the patients eating breakfast elsewhere

13   in the Health Care Solutions facility rather than attending the

14   group therapy session that she was referring to?

15   A.  I don't think it was clear where they were eating

16   breakfast.  But it was clear that they were eating breakfast

17   and not receiving group therapy.

18   Q.  And did she write, nonetheless, notes for this session

19   showing that the patients were actually getting therapy?

20   A.  Yes.

21        MR. STEWART:  I'd like to pull up Government Exhibit

22   1006, which has not been previously admitted into evidence.

23   BY MR. STEWART:

24   Q.  Special Agent Cox, do you recognize this?

25   A.  Yes, I do.

1  Q.  What is it?

2  A.  This is a example of the patient files we just previously

3  went through and it's got the patient response/benefit section

4  blown out for the corresponding group therapy sessions that

5  occurred at the same time for the same topic, but different

6  dates, yet they had identical patient response/benefit sections

7  and also identical quotes.  And this particular one is for the

8  coping skills group, one on July 28, 2009 and one on

9  August 4th, 2009.

10 Q.  The information in this chart, does it accurately reflect

11 what's contained in the patient file?

12 A.  Yes.

13 Q.  And is everything that you find in this chart pulled

14 directly from the patient files that we were just discussing?

15 A.  Yes.

16       MR. STEWART:  At this time we'd move to admit this

17 into evidence and publish it for the jury.

18       THE COURT:  All right.  That will be received in

19 evidence.

20 BY MR. STEWART:

21 Q.  If you would, would you please read again the quotation

22 that is found in each of these group therapy notes?

23 A.  "I worry about my sister and sometimes I can't sleep, but

24 since I make use of the relaxation exercises, I am doing much

25 better."

```
 1              MR. STEWART:  All right.  Let's pull up Government
 2    Exhibit 1007 next, which has also not been previously admitted.
 3    BY MR. STEWART:
 4    Q.  Is this a chart similar to the last one we were just
 5    reviewing?
 6    A.  Yes, it is.
 7    Q.  Is it for the same patient?
 8    A.  Yes.
 9    Q.  Ms. Duenas?
10    A.  Yes.
11    Q.  Is it for assertiveness group sessions that were held on
12    July 28 and August 4 of 2009?
13    A.  Yes.
14    Q.  The information we're looking at here, does it accurately
15    reflect what was in those patient files?
16    A.  Yes, it does.
17    Q.  Okay.  And is everything that we're looking at here
18    contained in those patient files?
19    A.  Yes.
20              MR. STEWART:  So again, we'd like to move to admit
21    this into evidence and publish it for the jury.
22              THE COURT:  All right.  That will be received in
23    evidence.
24    BY MR. STEWART:
25    Q.  And again, briefly, Special Agent Cox, would you review --
```

1    or read the quotation that is contained in both of these group

2    therapy notes for the jury.

3    A.  Yes.  The quote is:  "It is not easy to be assertive.

4    Nevertheless, it is very effective."

5    Q.  All right.  Thank you.

6         So switching gears, Ms. Marks, where did you interview

7    Ms. Marks?

8    A.  We also interviewed Ms. Marks at Larkin Hospital.

9    Q.  And was that also on July 1st, 2013?

10   A.  Yes.

11   Q.  Was Special Agent Reilly there with you as well?

12   A.  Yes, he was.

13   Q.  So who took the lead in asking questions of Ms. Marks?

14   A.  I did.

15   Q.  And who wrote a report after your interview?

16   A.  Special Agent Reilly.

17   Q.  So what, if anything, did Ms. Marks tell you about how she

18   came to work at Health Care Solutions Network?

19   A.  Ms. Marks was interviewed by Armando Gonzalez and also

20   hired to run group therapy.

21   Q.  Did she say whether she was licensed at the time that she

22   was hired to work there?

23   A.  Yes.  She told us that she was -- I believe she said that

24   she was a licensed mental health counselor since 2006.

25   Q.  Did she say whether she had ever worked at another PHP

1   program?

2   A.   Yes.

3   Q.   Did she say whether or not she had worked at American

4   Therapeutic Corporation?

5   A.   Yes.

6   Q.   What did she say, if anything, about the patients that she

7   had seen at American Therapeutic Corporation and Health Care

8   Solutions Network?

9   A.   She told us that she recognized some of the patients that

10  she had previously seen at American Therapeutic were also being

11  admitted into Health Care Solutions.

12  Q.   Did you review any patient files with her during the course

13  of the interview?

14  A.   Yes.

15  Q.   Were these patient files for Steven Abbott?

16  A.   Yes, that's correct.

17  Q.   And did you also look at group therapy notes from these

18  patient files?

19  A.   Yes.

20  Q.   Were these group therapy notes for sessions that were

21  conducted on March 5th, 2010 and March 12 of 2010?

22  A.   Yes.

23  Q.   Now, when you were looking at these notes with Ms. Marks,

24  did she review the signatures on those documents?

25  A.   Yes, she did.

1    Q.   And did she acknowledge that those signatures were hers?

2    A.   Yes.

3         MR. STEWART:  Let's pull up Government Exhibit 110,

4    which has been previously admitted into evidence, and let's

5    turn over to the third page of that document.

6    BY MR. STEWART:

7    Q.   Special Agent Cox, do you recognize this?

8    A.   Yes, I do.

9    Q.   What is it?

10   A.   This is a face sheet for patient Steven Abbott.

11   Q.   Excuse me, go ahead.

12   A.   That's part of a larger patient file.

13   Q.   And the patient file, does that cover patient Abbott

14   through admission date February 8 of 2010 to March 24, 2010?

15   A.   Yes, that's correct.

16   Q.   All right.  Let's turn over to page 67 of that document.

17   Is this one of the group therapy notes that you reviewed with

18   Ms. Marks during this interview of her?

19   A.   Yes, it is.

20   Q.   And is this for a session held regarding treatment goals on

21   March 5th, 2010?

22   A.   Yes that is correct.

23   Q.   Okay.  Let's take a look again at the patient

24   response/benefit section.  Do you see the quote where it says:

25   "I want to be who I used to be"?

1    A.  Yes.

2    Q.  All right.  Let's look now at another group session topic.

3    This is on page 47 of the same document.  Same topic, treatment

4    goals?

5    A.  Yes.

6    Q.  But this time, March 12, 2010.

7    A.  Correct.

8    Q.  Let's take a look at the patient response/benefit.  Does it

9    say again:  "I want to be who I used to be"?

10   A.  Yes, it does.

11   Q.  So let's put them side by side and I'll ask you:  Does the

12   entire patient response/benefit section also appear to be

13   identical for these two patients -- excuse me, for these two

14   group therapy notes?

15   A.  Yes, it does.  Yes.

16   Q.  Did you review additional notes with Ms. Marks from both

17   March 5th and March 12th?

18   A.  Yes.

19   Q.  And did those notes cover topics for psychotherapy process

20   and relapse prevention?

21   A.  That's correct.

22   Q.  Okay.  We'll try to move through these quickly.

23        MR. STEWART:  Let's pull up that page 66.

24   BY MR. STEWART:

25   Q.  So is this the group therapy note for March 5th for

34

1    psychotherapy process?

2    A.  Yes.

3    Q.  Again, let's take a look at the patient response/benefit

4    section.  Would you mind reading that for the members of the

5    jury, the quotation specifically?

6    A.  No problem.  "Many people are against me.  I don't know

7    what I can do to avoid that."

8    Q.  All right.  Let's look next at page 46.  And is that the

9    same topic, psychotherapy process, but this time for March

10    12th?

11    A.  Yes.

12    Q.  All right.  The quotation, what does it say?

13    A.  "Many people are against me.  I don't know what I can do to

14    avoid that."

15    Q.  Notes from different days, but identical quotations.

16    A.  Correct.

17    Q.  Is that entire section, patient response/benefit, also the

18    same?

19    A.  Yes, it is.

20    Q.  All right.  Let's move on to the next one.  Is this a note

21    from relapse prevention on March 5th, 2010?

22    A.  Yes.

23    Q.  Again, Steven Abbott.

24    A.  Correct.

25    Q.  Would you read that quotation, please, to the jury?

1    A.  It says:  "I have been hospitalized many times because I

2    lose contact with reality."

3    Q.  Let's take a look next at the -- page 45, I believe.  Is

4    this relapse prevention, this time from March 12, 2010?

5    A.  That's correct.

6    Q.  Okay.  Let's take a look again as well at the quotation

7    there.  Would you read it?

8    A.  "I have been hospitalized many times because I lose contact

9    with reality."

10   Q.  Once again, different notes, but the same quotation.

11   A.  Correct.

12   Q.  Now, did you review these portions of those specific notes

13   with Ms. Marks during her interview?

14   A.  Yes.

15   Q.  What did she say about this?

16   A.  She said that she was not proud of this.

17   Q.  Her exact words were "not proud of this"?

18   A.  Yes.

19   Q.  I'd like to show you what's been not previously admitted

20   into evidence, but marked as Government Exhibit 1010.

21          MR. PRIETO:  Judge, I have no objection to the

22   government admitting.

23          THE COURT:  All right.  So 1010, does that also apply

24   to 1011?

25          MR. PRIETO:  Yes, sir.

1     THE COURT:  So those two exhibits will be received in

2 evidence.  You can show them to the jury.

3 BY MR. STEWART:

4 Q.  So Special Agent Cox, just briefly, does this chart show

5 identical quotations that were found in the patient files that

6 we were just reviewing for Steven Abbott?

7 A.  This chart is not correct.

8 Q.  And the quotes, do they appear --

9     THE COURT:  Did you say this chart is not correct?

10     THE WITNESS:  Yes, I did.

11     THE COURT:  Okay.

12 A.  The date is incorrect in the red portion of the chart.

13 BY MR. STEWART:

14 Q.  My question isn't whether these are the same that we were

15 just looking at a moment ago, but whether or not these

16 particular group therapy notes were also found in the same

17 patient file for Steven Abbott.

18 A.  That's correct.

19 Q.  So these patients, this information, just to clarify one

20 more time so there's no confusion, the information contained on

21 this chart is identical to information that is found in Steven

22 Abbott's patient file?

23 A.  Yes, that is correct.

24     THE COURT:  Well, since the summary charts are merely

25 a summary of the actual underlying evidence, so where did the

1    underlying evidence come from for the red?  Since it's not what

2    was just shown to the jury.  Because they should be relying on

3    the actual evidence, not the summary charts, when they

4    deliberate, so where are they going to be looking?

5            MR. STEWART:  Your Honor, this is a portion of the

6    same exhibit that we were just looking at a moment ago --

7            THE COURT:  I know --

8            MR. STEWART:  -- Government Exhibit --

9            THE COURT:  -- but there's 160 pages in some of these

10   exhibits.  So I'm allowing the summary charts, which are really

11   an aid to the jurors to figure out the underlying evidence.  So

12   what is the underlying evidence, what page number is it, so

13   they can review it if they want?

14           MR. STEWART:  Certainly, Your Honor.

15   BY MR. STEWART:

16   Q.  So the first portion that appears on the top left-hand

17   side, it covers a group therapy topic on treatment goals, and I

18   believe that is found on page 67 of the document that we were

19   just reviewing, GX-110; is that correct?

20   A.  Yes.

21   Q.  Now, the portion from the bottom right-hand side to

22   identify the actual page, it might make sense to look at the

23   actual original.

24           MR. STEWART:  So if you could give me just a moment,

25   Your Honor, and I'll put it up on the ELMO.

```
1    BY MR. STEWART:

2    Q.  So Special Agent Cox, does the information that appears in

3    the red on the bottom right-hand portion --

4          MR. STEWART:  I'm sorry, just a moment, Your Honor.

5          (Off-the-record discussion.)

6    BY MR. STEWART:

7    Q.  So Special Agent Cox, the portion of the chart that we were

8    just looking at, that appears in red in the bottom right-hand

9    corner, does it contain information that is found here on this

10   page of the patient file which I'm showing you now?

11   A.  Yes.

12   Q.  All right.  Now, this page of the patient file --

13          THE COURT:  And that's Exhibit?

14          MR. STEWART:  This is Exhibit 110.

15          THE COURT:  And what page?

16          MR. STEWART:  And it appears on a page that is Bates

17   stamped 799, which can be seen in the bottom right-hand corner.

18          THE COURT:  I just want to make sure.

19          I don't want to put too much emphasize on this piece

20   of evidence compared to everything else, ladies and gentlemen,

21   so please, the fact that I'm asking these questions doesn't

22   mean it has any particular meaning.

23          But when the jurors go back to deliberate, are they

24   going to have in like a disc form the evidence to look on a

25   computer?  Because when you show it on the computer, it has
```

1    page numbers versus when in the hard copy, it may not have the

2    same page numbers.

3              MR. STEWART:  They will have the hard copy.  It will

4    say Exhibit 110.

5              THE COURT:  So they're not going to have the disc.

6              MR. STEWART:  They will have actually, I think, both a

7    hard copy as well as an electronic copy.

8              THE COURT:  Okay.  So my question is, when it has a

9    hard copy, the numbering, the Bates numbering, may not be the

10   same as the page number in the disc version; is that correct?

11             MR. STEWART:  Yes.  They are different page numbering,

12   but in the hard copy, this information can be found at the very

13   bottom of a page that's marked 799, which you can see there.

14             THE COURT:  That answers it for this particular

15   document.  But throughout the trial, there have been documents

16   that say we're going to go to Government Exhibit 100, page 68,

17   because we're showing it to them, just so the record is clear,

18   in digital format.

19             MR. STEWART:  Correct.

20             THE COURT:  So how are they going to correlate between

21   that exhibit and the Bates stamp and the other exhibits and the

22   page numbers?

23             MR. STEWART:  Understood.  And yes, we can provide

24   both in hard copy and as well as electronic form so that they

25   can move between either one.

1        THE COURT:  Okay.  All right.  Go ahead.

2        MR. STEWART:  Thank you.

3        So can we next pull up Government Exhibit 1011.

4   BY MR. STEWART:

5   Q.  Special Agent Cox, is the information contained here also

6   contained in Government Exhibit 110?

7   A.  Yes.

8   Q.  It's the same patient file for Steven Abbott.

9   A.  Yes.

10  Q.  All right.  Now, the portion on the top left-hand corner,

11  is that something we were just reviewing with the jury in

12  digital form a moment ago?

13  A.  That's correct, yes.

14  Q.  And does the quotation that appears there say:  "I want to

15  be who I used to be"?

16  A.  Yes.

17  Q.  All right.  Let's take a look now in hard copy form.  So

18  the information that you see here in this patient file, is it

19  what's found on the chart on the bottom right-hand side in red?

20  A.  Yes.

21  Q.  Treatment goals for February 26, 2010.

22  A.  Yes.

23  Q.  And the quotation that you see here, does it say:  "I want

24  to be who I used to be"?

25  A.  Yes, it does.

1    Q.   Okay.  And for the jury's reference later on, can this

2    patient file that we're looking at here be found in the hard

3    copy document at page 799 -- or excuse me, 779?

4    A.   779.

5    Q.   So Special Agent Cox, back to your discussion during the

6    interview with Ms. Marks.  Did you ask her whether she had ever

7    written therapy notes for patients who were not in her group?

8    A.   Yes.

9    Q.   And what did she say?

10   A.   That she did in fact create group therapy notes for people

11   who were not present in her group.

12   Q.   Did she explain how she did this?

13   A.   Yes.

14   Q.   What did she say?

15   A.   She said that Ms. Feas would approach her with patient

16   rosters that were dated with patients' names, either days or

17   weeks before -- beforehand, and would be asked to have -- to

18   create notes for these patients because notes were missing.  So

19   Ms. Marks would explain to us that she would go to a network --

20   sorry, excuse me, network drive that contained previously

21   uploaded notes, and that she would pull up notes for that

22   patient that was requested of her from a previous date and she

23   would simply just change the date, print out a previously

24   existing note, sign it, and turn it in to Ms. Feas.

25   Q.   After changing the date on the notes, did she say that she

1   changed anything else before signing it?

2   A.  No.

3   Q.  Now, in recent weeks, have you had a chance to review the

4   handwritten notes from your interview with Ms. Marks?

5   A.  Yes, I have reviewed the handwritten notes.

6   Q.  The handwritten notes, do they also contain a statement

7   attributed to Ms. Marks which says:  "Never wrote notes for

8   absent patients"?

9   A.  Yes.

10  Q.  Now, sitting here today, do you remember her saying that in

11  the interview?

12  A.  I can't recall her saying that.

13  Q.  Okay.  The handwritten notes for the interview, did you

14  write them?

15  A.  No, I did not write them.

16  Q.  Who did?

17  A.  Special Agent Reilly.

18  Q.  And the report for this interview, did you write it?

19  A.  No.

20  Q.  Who did?

21  A.  Special Agent Reilly.

22  Q.  All right.  Let's move on.  Did you review any additional

23  documents in this same patient file that we've been talking

24  about, Steven Abbott's patient file?

25  A.  Yes, I did.

1    Q.   Did you find any other instances where group therapy notes

2    for different days contained identical quotations?

3    A.   Yes.

4    Q.   So what's a cloned group therapy note?

5    A.   A cloned group therapy note is, it's a note in its earliest

6    version in a patient file that has been taken and duplicated

7    throughout the file.  The only difference in our case, in this

8    case, was the changing of the dates.

9              MR. STEWART:  Let's pull up Government's Exhibit 1022.

10   This has not been previously admitted into evidence.

11   BY MR. STEWART:

12   Q.   Special Agent Cox, what is this?

13   A.   This is a chart that basically allows people to

14   cross-reference the cloned notes within the patient file for

15   Steven Abbott.  So if you look at this chart and you go to the

16   earliest version section, the date and the time, if you were to

17   look at that note and then you could go straight across to the

18   duplicated note, and for whatever date and time is in that

19   section, if you pulled up those two notes and compared them,

20   the patient response/benefit section is completely identical.

21   Q.   So the comparison you were just describing, is this a

22   comparison that you conducted of information that's contained

23   in this patient file for Steven Abbott?

24   A.   Yes.

25   Q.   Patient file 110?

1  A.  Yes.

2  Q.  Did you actually create this chart yourself?

3  A.  Yes, I did.

4  Q.  Okay.  And in preparing it, was the information that you

5  had to work through voluminous?

6  A.  Very.

7        MR. STEWART:  Now, at this time, Your Honor, we'd like

8  to move again to admit this into evidence and publish it to the

9  jury.

10        THE COURT:  All right.  Exhibit 1022 will be received

11  in evidence.

12  BY MR. STEWART:

13  Q.  Now, in preparing this chart, did you review every group

14  therapy note that is contained in the patient file here for

15  Steven Abbott?

16  A.  Yes, I did.

17  Q.  Was Ms. Marks listed as the therapist for a significant

18  number of those notes?

19  A.  Yes, many of those notes.

20  Q.  The chart, can you walk us through what each of the columns

21  describes?

22  A.  Sure.  So the first column under the duplicated note

23  section is the date of a note that was a duplicate of another

24  note.  So you have the date, the time, which is the group

25  session, and then beside that, the second -- excuse me, the

1  third and fourth columns are under the earliest version.  So

2  what that would be would be the note that was -- basically for

3  that chart, the original one that was duplicated.

4       So like I said, if you were to look at February 9, 2010, at

5  9:15, that would be the earliest version of that note in the

6  chart.  And then if you look to the date to the left of it,

7  that would be a duplicate of that note.  And some of those,

8  like as you see, February 9th, 2010 at 9:15 a.m., that note

9  appears to be duplicated at least four times.

10  Q.  Let's give an example of that.  Let's stay on that first

11  one.  February 9, 2010.  The note, right, for that date and

12  time, 9:15, was it identical to the ones that you found for

13  February 16, 2010, February 23, March 2nd, and March 9, again

14  at the 9:15 session?

15  A.  The -- yes, the patient response/benefit section was

16  identical.

17  Q.  Now, this chart here, does it go on for four pages?

18  A.  I believe so.  Yes.  I see it now.

19  Q.  And the box that you see back on the first page, in the

20  bottom right-hand corner, does that summarize how many

21  duplicate notes you found in Steven Abbott's patient file?

22  A.  Yes, there were 55 duplicate notes.

23          MR. STEWART:  Just a moment, Your Honor.

24      (Off-the-record discussion.)

25  BY MR. STEWART:

1   Q.  So Special Agent Cox, I'd like to show you another

2   document, this time GX-1021, which has not been previously

3   admitted into evidence.  So the chart that you have there in

4   front of you, is this essentially the same analysis that you

5   performed to prepare the chart that we were just looking at a

6   moment ago?

7   A.  Yes.

8   Q.  This time, is it for a patient, Reinaldo Rodriguez, patient

9   file already admitted into evidence, GX-108?

10   A.  Yes.

11   Q.  Did you prepare this?

12   A.  With the help of Special Agent Rivera.

13   Q.  And the information that's contained here, is that

14   information that you pulled from the patient file for the group

15   therapy notes that you found on the dates that are listed in

16   the chart?

17   A.  Yes.

18   Q.  The information that you had to review to create it, was

19   this voluminous?

20   A.  Yes.

21        MR. STEWART:  So Your Honor, at this time, we'd move

22   to admit this into evidence and publish it to the jury.

23        THE COURT:  All right.  Exhibit 1021 will be received

24   in evidence and you can publish it.

25   BY MR. STEWART:

1  Q.  So very briefly, since we've walked through a similar

2  chart, would you describe what this chart here shows?

3  A.  Sure.  It's the same basis as the other chart where you

4  have the duplicated notes listed on the left and the

5  corresponding earliest version of that note on the right.  So

6  for this example, the note that was on September 28, 2009, at

7  11:15 a.m. was a duplicate of a note that was created on

8  August 31st, 2009, at 11:15 a.m.

9  Q.  Again, were a significant number of the notes that were

10  contained in this chart, did they appear to be prepared by

11  Ms. Salafia?

12  A.  Yes.

13  Q.  This goes on for five pages, does it not?

14  A.  Yes, that's correct.

15  Q.  And the box that we see there at the bottom of the first

16  page, does that summarize how many duplicated notes you found

17  in this patient chart?

18  A.  Yes, 60.

19  Q.  Did you say 60?

20  A.  Six-zero notes were duplicated.

21       MR. STEWART:  Let's pull up next Government

22  Exhibit 1008, which has also not been previously admitted into

23  evidence.

24  BY MR. STEWART:

25  Q.  What is this chart?

1  A.  This is a chart that relates to Count 8 for Ms. Salafia and

2  what it shows is for the group of stress management on the

3  dates of November 10, 2009 and November 17, 2009, that the

4  patient response/benefit sections for both of those notes are

5  duplicated and contain the same quotes.

6  Q.  The information contained here on this chart, is it pulled

7  directly from the patient file that we were just discussing,

8  GX-108, for Mr. Rodriguez?

9  A.  Yes.

10       MR. STEWART:  Your Honor, at this time, we'd move to

11  admit this into evidence and publish it to the jury as well.

12  It's GX-1008.

13       THE COURT:  All right.  That will be received in

14  evidence.

15       MR. STEWART:  Thank you.

16  BY MR. STEWART:

17  Q.  Let's take a brief look at this.  The information in blue

18  in the top left-hand portion, does that show that the group

19  therapy note for stress management from November 10, 2009

20  contains the quote that is found there in the box on the

21  right-hand side?

22  A.  Yes.

23  Q.  And was that same quotation found in a group therapy note,

24  again for stress management, but this time from November 17,

25  2009?

1    A.  Yes, that's correct.

2           MR. STEWART:  I'd like to pull up now Government

3    Exhibit 1009, also not previously admitted into evidence.

4    BY MR. STEWART:

5    Q.  Special Agent Cox, do you recognize this?

6    A.  Yes, I do.

7    Q.  What information is contained here in this chart?

8    A.  It's a similar chart to the one before.  It's for patient

9    Divina Garcia, and it's for the group psychotherapy process.

10   One of them is for July 8th, 2009 and one of them is for

11   July 17th, 2009, and it's --

12   Q.  Okay.  Go ahead, I'm sorry.

13   A.  And it's identical patient response/benefit sections with

14   the same quotes.

15   Q.  The information that's contained here, was that pulled

16   directly from the patient file for Ms. Garcia, which was

17   previously admitted into evidence Government Exhibit 109?

18   A.  Yes.

19          MR. STEWART:  Your Honor, we'd move to admit this into

20   evidence as well.  That is Government's Exhibit 1009.

21          THE COURT:  All right.  That will be received in

22   evidence.

23   BY MR. STEWART:

24   Q.  So Special Agent Cox, very quickly, does this chart show

25   that the same quotation appeared in the group therapy notes for

1  psychotherapy process for Ms. Garcia from July 8, 2009, as well

2  as from July 17, 2009?

3  A.  Yes.

4  Q.  Thank you.  Special Agent Cox, your interview of Ms. Fonts,

5  when did it take place?

6  A.  The interview of Ms. Fonts took place in July of 2013 as

7  well.

8  Q.  And this interview, where did it take place?

9  A.  At the Miami field office after her arrest.

10  Q.  Who else was there with you?

11  A.  It was myself and Special Agent Corey Hopwood.

12  Q.  Also of the FBI?

13  A.  Yes.

14  Q.  Before agreeing to speak with you, did you provide

15  Ms. Fonts with an advice of rights form?

16  A.  Yes, I did.

17  Q.  And does this form describe the rights that she has to

18  consider before deciding whether or not to speak with federal

19  agents?

20  A.  Yes, that's correct.

21  Q.  Did she review the form?

22  A.  Yes, she did.  I read it out loud to her, explained it to

23  her, and then allowed her to read it herself.

24  Q.  Did she sign, date, waive her rights, and agree to speak

25  with you?

1    A.  Yes, she did.

2    Q.  Now, did she speak with you in English or Spanish?

3    A.  English.

4    Q.  At any point in time, did she ask to speak with you in

5    Spanish?

6    A.  No.

7    Q.  The advice of rights form that you gave her, was that in

8    English?

9    A.  It was English.

10   Q.  And at any point in time, did she request a Spanish advice

11   of rights form?

12   A.  No.

13   Q.  Did you have any difficulty at all communicating with her

14   in English?

15   A.  None at all.

16   Q.  All right.  So who took the lead in asking questions of

17   Ms. Fonts?

18   A.  I did.

19   Q.  And who prepared a report after your interview?

20   A.  I did.

21   Q.  So what, if anything, did Ms. Fonts say about the patients

22   that she had seen at Health Care Solutions Network?

23   A.  She explained that at one location, she did not recall

24   seeing any patients that suffered from any type of abnormal

25   mental health, and then later explained that at a different

1  location, that she in fact had seen people that could not

2  benefit from therapy.  And when those people -- she had those

3  people in her group at the other location, she would remove

4  them from her group and assume that they were being placed in

5  another group.

6  Q.  So I couldn't hear you there just because of some noise,

7  that last portion.  The person who she saw who could not

8  benefit from therapy, did she say to you that she removed them

9  from her group and assumed that they were placed in another

10  group at Health Care Solutions Network?

11  A.  Yes.

12  Q.  Did you ask her whether she had ever been asked to sign

13  group therapy notes for patients who were absent from group?

14  A.  Yes.

15  Q.  And what did she say?

16  A.  She said that she was asked by Ms. Wondera Eason to create

17  notes for absent patients and she refused.

18  Q.  Did you review any patient files with Ms. Fonts during her

19  interview?

20  A.  Yes.

21  Q.  Were those patient files for group sessions for patient

22  Petrona de la Torre held on March 25th, 2009 and April 1st,

23  2009?

24  A.  Yes.

25  Q.  Did those group therapy notes contain identical quotations

1    attributed to that patient?

2    A.  Yes.

3    Q.  Did you also review patient files containing group therapy

4    notes for patient Isabel Guzman, again from March 25, 2009, as

5    well as from April 1st, 2009?

6    A.  Yes.

7    Q.  Again, did those different group therapy notes contain

8    identical quotations attributable to the patient?

9    A.  Yes.

10   Q.  Did you confront Ms. Fonts about this?

11   A.  Yes.  I presented the files to her for her to review

12   herself.

13   Q.  And what did she say?

14   A.  That she didn't recognize the patients' names and she also

15   said the signatures didn't appear to be hers.

16   Q.  Did you also review some checks with her written from the

17   Health Care Solutions bank accounts?

18   A.  Yes.

19   Q.  Were those checks checks that were actually written to her

20   as payee?

21   A.  Yes.

22   Q.  Now, did some of those checks contain the word "notes" in

23   their memo line?

24   A.  Yes.

25   Q.  Did you ask Ms. Fonts about these checks?

54

1    A.  Yes.

2    Q.  Did you ask Ms. Fonts whether she had ever been paid

3    separately for preparing notes at Health Care Solutions

4    Network?

5    A.  Yes, I did.

6    Q.  What did she say?

7    A.  She said she'd never recalled seeing "notes" written in the

8    memo line and that she was never paid extra for notes.

9    Q.  Let's switch gears.  Ms. Ruiz, where did you interview

10   Blanca Ruiz?

11   A.  We interviewed Ms. Ruiz at her home in Homestead, Florida.

12   Q.  When did this interview take place?

13   A.  This was May of 2013.

14   Q.  Who was there with you?

15   A.  Special Agent Terence Reilly.

16   Q.  And who took the lead in asking questions of Ms. Ruiz?

17   A.  I did.

18   Q.  And who prepared a report after the interview?

19   A.  Special Agent Reilly.

20   Q.  Now, what, if anything, did Ms. Ruiz tell you about how she

21   came to work at Health Care Solutions Network?

22   A.  She was also interviewed by Armando Gonzalez and hired to

23   run -- she told us that she was hired to run group therapy to

24   produce or generate group therapy notes and that she also

25   worked on intake assessments.

1  Q.  Did she say whether or not she was a licensed mental health

2  counselor at the time that she was hired to work?

3  A.  She told us that she was a registered mental health intern

4  counselor.  It was an internship.

5  Q.  Did she say at which group -- excuse me, at which location

6  she was hired to -- or excuse me, strike that.

7      Did she say which location at Health Care Solutions Network

8  she first worked?

9  A.  Yes.  She said that she first worked at the Health Care

10  Solutions East location near U.S. 1.

11  Q.  And did she tell you who her supervisor was when she worked

12  there?

13  A.  Yes.  Ms. Alina Feas.

14  Q.  Did she describe whether or not Ms. Feas was actually

15  supervising her when she conducted her group sessions?

16  A.  The way she described it to us is Ms. Feas would not

17  actually supervise her groups as she was providing therapy, but

18  on the notes, it would reflect that Ms. Feas was providing

19  supervision when in fact she was not actually providing

20  supervision.

21  Q.  Now, did Ms. Ruiz tell that you she later moved to another

22  Health Care Solutions Network location?

23  A.  Yes.

24  Q.  Which location?

25  A.  The Health Care Solutions West.

1    Q.  When she was at the West location, did she say whether or

2    not she continued to provide group therapy sessions without

3    supervision?

4    A.  Yes, that's correct.  She told us that she was not being

5    supervised, but yet her notes would reflect her having

6    supervision.

7    Q.  Did Ms. Ruiz say anything to you during the course of this

8    interview about the payment of kickbacks for patient referrals

9    at Health Care Solutions Network?

10   A.  Yes.  She was not aware of kickbacks being paid for

11   patients being referred to Health Care Solutions.

12   Q.  Let's switch gears.

13          MR. STEWART:  Just a moment, Your Honor.

14          THE WITNESS:  I -- Your Honor, I misstated.

15          THE COURT:  Yeah.

16   A.  I misstated that comment.

17   BY MR. STEWART:

18   Q.  Sorry, go ahead.

19   A.  Ms. Ruiz told us that she was aware of kickbacks being

20   paid.  I apologize.  I misstated that.

21   Q.  I may not have actually caught that.  Did you originally

22   say that she was not aware?

23   A.  Yes.

24   Q.  Okay.  But that's not accurate.  What you do remember now

25   is she said she was aware.

```
 1    A.  That's correct.

 2    Q.  Okay, good.  I just wanted to clarify that.  Thank you.

 3             THE COURT:  Don't make comments.

 4             MR. STEWART:  Yes, Your Honor.

 5    BY MR. STEWART:

 6    Q.  So let's switch gears now and talk about your interview of

 7    Dr. Rousseau.

 8    A.  Okay.

 9             THE COURT:  Since you're moving on to another topic,

10    let's take our morning recess.  I know we haven't been here for

11    quite an hour and a half, but the court reporter and I have

12    been here since 8:30, so let's come back at 11:03.  All right?

13    See everybody in 15 minutes.

14        (Recess, 10:47 a.m. to 11:04 a.m.)

15             THE COURT:  All right.  Everybody is here.  Let's

16    bring in the jury, please.

17        (Jury Present.)

18             THE COURT:  All right.  Welcome back and please be

19    seated.

20             All right.  Go ahead.

21             MR. STEWART:  Thank you.

22    BY MR. STEWART:

23    Q.  Special Agent Cox, before we took a break, we were shifting

24    over to your interview of Dr. Rousseau.  Where did you meet

25    with Dr. Rousseau when you interviewed him?
```

1  A.  We interviewed Mr. -- Dr. Rousseau at his house, in his

2  home.

3  Q.  And when did that take place?

4  A.  This was in June of 2013.

5  Q.  Who else was there with you during the interview?

6  A.  Special Agent Ian Perafuy was there and then also in the

7  house was Dr. Rousseau's wife and, from what I understand, his

8  daughter.

9  Q.  Who took the lead in asking questions of Dr. Rousseau?

10  A.  I did.

11  Q.  And who wrote a report on that interview?

12  A.  Special Agent Perafuy.

13  Q.  What, if anything, did Dr. Rousseau tell you about how he

14  came to work at Health Care Solutions Network?

15  A.  He said he was approached and met with Armando Gonzalez to

16  be the medical director of Health Care Solutions.

17  Q.  Did he describe for you his responsibilities?

18  A.  Yes, he did.  He told us that his responsibilities would

19  include evaluating patients, supervising staff, meeting with

20  staff.

21  Q.  Did he ultimately take the job as medical director of

22  Health Care Solutions?

23  A.  Yes, he did.

24  Q.  Did he say, when he was in that position, how often he

25  would come to the Health Care Solutions office?

1  A.  Yes.  He explained to us that he would come to Health Care

2  Solutions twice a week, usually in the mornings.

3  Q.  And when he visited the office, did he say on average how

4  many patients he saw?

5  A.  Yes.  He told us five to eight patients each visit.

6  Q.  Did you discuss with him whether he had worked as a medical

7  director at any other clinics?

8  A.  Yes.

9  Q.  What other clinics did he name for you?

10  A.  He named New Era, which is another community mental health

11  center, New Horizons, and also Las Brisas.

12  Q.  Back to Health Care Solutions, did he say at which Health

13  Care Solutions Network location he primarily worked?

14  A.  Yes.  He told us that he primarily was the medical director

15  of the Health Care Solutions East location.

16  Q.  Did he say whether he ever worked at the West location?

17  A.  Yes, he did.

18  Q.  What did he say?

19  A.  He said he worked there for a period of about a year, from

20  2009 to 2010.

21  Q.  And why was he there temporarily for a period of about a

22  year at the West location, did he say?

23  A.  He told us that the medical director that was there prior

24  to that had gotten in trouble with Medicaid.

25  Q.  I'm sorry, I couldn't hear you there for a moment.  Could

1   you repeat that?

2   A.   Yes.  He said that the prior medical director at that

3   location was not there anymore because he had got in trouble

4   with Medicaid.

5   Q.   Dr. Rousseau, did he say when he himself had left Health

6   Care Solutions?

7   A.   Yes.  He told us that he resigned in 2010.

8   Q.   Did he describe for you during the interview how much he

9   was paid in salary while at Health Care Solutions?

10  A.   Yes.

11  Q.   What did he say?

12  A.   He told us that at the Health Care Solutions East location,

13  he was paid approximately $5,000 per month, and then that year

14  at Health Care Solutions West, he was paid approximately $2500

15  per month.

16  Q.   Had you brought a calculator with you to this interview?

17  A.   Yes.  The notepad, the book I had with me, had a calculator

18  built into it.

19  Q.   So using this calculator, did you add up there with

20  Dr. Rousseau what he would have made in total during his time

21  at Health Care Solutions Network, based on the information he

22  had provided you about his salary?

23  A.   Yes.

24  Q.   And what did you calculate there?

25  A.   Approximately $330,000.

1    Q.  Did you ask Dr. Rousseau whether this amount, approximately

2    $330,000, matched what Dr. Rousseau recalled actually making

3    while he was there at Health Care Solutions Network?

4    A.  Yes, and he said that that was right.

5    Q.  Now, before you had come to this interview, had you

6    reviewed bank records showing monies that had been earned by

7    Dr. Rousseau from Health Care Solutions Network?

8    A.  Yes.

9    Q.  Did those bank records show that in fact Dr. Rousseau had

10   made more than $330,000 during his time there?

11   A.  Yes.

12   Q.  How much more?

13   A.  Approximately 545,000, $546,000 more than what he told us

14   he was making there.

15   Q.  Now, did you ask Dr. Rousseau how he could account for this

16   additional five hundred and approximately forty-five thousand

17   dollars which he had not previously mentioned that he made --

18              MR. RABIN:  Objection to the commentary.

19              THE COURT:  Overruled.

20   BY MR. STEWART:

21   Q.  So let me ask that again.  Did you ask Dr. Rousseau how he

22   could account for this additional $545,000 which he had not

23   previously mentioned making while at Health Care Solutions

24   Network?

25   A.  Yes.  He said he must have -- that must have been from

1    bonuses.

2    Q.  What, if anything, did Dr. Rousseau say about his

3    experiences at the Health Care Solutions Network location in

4    North Carolina?

5    A.  He said he had traveled to North Carolina on two different

6    occasions and that Armando -- excuse me, Mr. Armando Gonzalez

7    asked him to become the medical director for Health Care

8    Solutions North Carolina, but he declined that offer.

9    Q.  Did he say what he did on those two occasions that he

10   traveled there?

11   A.  Yes.  I believe he gave lectures regarding mental health,

12   and one of the other trips, he said he gave lectures and it was

13   also a combined family vacation.

14   Q.  Did he say who he had traveled with?

15   A.  On one of the occasions, he traveled with John Thoen and

16   Tom Layman.

17   Q.  During the interview, what, if anything, did Dr. Rousseau

18   say about an individual named Frank Pabon?

19   A.  He said that he knew Frank Pabon from Jackson South

20   hospital and that Frank would refer patients to Health Care

21   Solutions.

22   Q.  Did you ask Dr. Rousseau if he knew whether Frank Pabon was

23   being paid kickbacks for these patient referrals?

24   A.  Yes, I did ask him that.

25   Q.  And what did he say?

1  A.  He said he was not aware of Frank Pabon being paid

2  kickbacks.

3  Q.  During this interview, did you discuss with Dr. Rousseau a

4  stamp of his signature?

5  A.  Yes.

6  Q.  Did he acknowledge that he had a stamp of his signature at

7  Health Care Solutions Network?

8  A.  Yes, he did.

9  Q.  Did he acknowledge that this stamp of his signature was

10  kept at the Health Care Solutions Network offices?

11  A.  Yes.

12  Q.  What, if anything, did he say about whether he had

13  permitted people to use this stamp of his signature at Health

14  Care Solutions Network?

15  A.  Initially he told us that he didn't allow anybody to use

16  the stamp.  Later in the interview, he did tell us that he did

17  allow someone to use the stamp.

18  Q.  And what did he say he allowed people to do with that

19  stamp?

20  A.  Stamp his signature.

21  Q.  Did Dr. Rousseau, at any point in time in this interview,

22  say whether he had ever given permission for someone at Health

23  Care Solutions to sign his name?

24  A.  He told us he had no agreement with anyone at Health Care

25  Solutions to sign his name.

1    Q.  Did you also discuss with Dr. Rousseau whether he was aware

2    that people at Health Care Solutions were forging his name?

3    A.  Yes.  He told us that he wished he would have resigned

4    sooner, because his name was being forged.

5    Q.  Did you discuss with Dr. Rousseau whether, during his time

6    at Health Care Solutions Network, he had ever signed documents

7    indicating that he was working at Health Care Solutions Network

8    on dates when in fact he was outside of the country?

9    A.  Yes.

10   Q.  And what did he tell you?

11   A.  That he did sign documents when he was in fact out of the

12   country.

13   Q.  Did you review documents with Dr. Rousseau during this

14   interview?

15   A.  Yes, we did.

16        MR. STEWART:  I'd like to pull up Government

17   Exhibit 184, which has been previously admitted.

18   BY MR. STEWART:

19   Q.  Do you recognize this?

20   A.  Yes, I do.

21   Q.  Is this a fake sheet for a patient, the last name Gemma,

22   covering the dates May 5th -- excuse me, May 3rd, 2010 through

23   July 6, 2010?

24   A.  Yes.

25   Q.  Is it part of a larger patient file for this same patient?

1    A.  Yes, it is.

2    Q.  Did you discuss this file with Dr. Rousseau during your

3    interview with him?

4    A.  Yes.

5    Q.  Did he review the signatures in this patient file that

6    purported to be his signature?

7    A.  Yes.

8    Q.  Did he tell you that some of those signatures looked like

9    his genuine signature?

10   A.  Yes.

11   Q.  Did he also say that some of those signatures did not

12   appear to be his signature?

13   A.  Yes.

14   Q.  When he said that, that he saw signatures which did not

15   appear to be his signature, did he express any surprise?

16   A.  No.

17   Q.  Let's look at page ending in Bates number 18, I think it's

18   page 18 of this PDF.

19       Special Agent Cox, what is this?

20   A.  This is a discharge summary for patient Peterssen Gemma

21   dated July 6, 2010.

22   Q.  Did you review this document with Dr. Rousseau during his

23   interview?

24   A.  Yes.

25   Q.  This document, does it appear to be signed?

1   A.  Yes.

2   Q.  Did Dr. Rousseau acknowledge that that signature was in

3   fact his?

4   A.  Yes.

5   Q.  Now, thinking back to the travel records that we had

6   discussed earlier today, where was Dr. Rousseau on the date of

7   this document, July 6, 2010?

8   A.  He was traveling outside of the United States.

9   Q.  Let's discuss what else you spoke to Dr. Rousseau about

10  during his interview.  Did you discuss with him whether or not

11  he had ever signed documents without reviewing them first?

12  A.  Yes.

13  Q.  And what did he tell you?

14  A.  He initially told us that he never signed documents

15  without -- blindly signing documents without reviewing them,

16  and then he later told us that -- in fact, that on numerous

17  occasions, he did sign documents without reviewing them and

18  reading them.

19  Q.  And did he say that he signed documents without reviewing

20  them first while he was working at Health Care Solutions

21  Network?

22  A.  Yes.

23  Q.  Did you ask Dr. Rousseau whether he thought it was right or

24  wrong for him to sign documents without reviewing them first

25  while working at Health Care Solutions Network?

1    A.  Yes, I did.

2    Q.  And what did he say?

3    A.  He told us that that was his mistake and his sin.

4    Q.  And those were his exact words?

5    A.  Yes.

6    Q.  Did you also discuss with Dr. Rousseau what his

7    responsibilities were as medical director at Health Care

8    Solutions?

9    A.  Yes.

10   Q.  And what did he tell you?

11   A.  He told us that he was responsible for reviewing and

12   knowing what he was signing.

13            MR. STEWART:  No further questions.

14                      *   *   *   *   *

1    UNITED STATES OF AMERICA                    )
                                                 ) ss:
2    SOUTHERN DISTRICT OF FLORIDA                )

3

4                    C E R T I F I C A T E

5        I, Carly L. Horenkamp, Certified Shorthand

6    Reporter in and for the United States District Court for the

7    Southern District of Florida, do hereby certify that I was

8    present at and reported in machine shorthand the proceedings

9    had the 17th day of November, 2014, in the above-mentioned

10   court; and that the foregoing transcript is a true, correct,

11   and complete transcript of my stenographic notes.

12       I further certify that this transcript contains

13   pages 1 - 68.

14       IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15   Florida, this 9th day of February, 2015.

16

17

                    /s/ Carly Horenkamp
18
                    Carly L. Horenkamp, RMR, CRR
19                  Certified Shorthand Reporter

20

21

22

23

24

25