```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF FLORIDA
                       MIAMI DIVISION
                 CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,              NOVEMBER 17, 2014
                                       3:55 P.M.
                    Plaintiff,



        vs.


ROGER ROUSSEAU, et al.,

                    Defendants.        PAGES 1 THROUGH 37
_____
```

```
                          DAY 9
              EXCERPT OF CRIMINAL JURY TRIAL
     (DIRECT EXAMINATION OF TERENCE REILLY BY MR. MEDINA)
          BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:     Mr. Allan J. Medina, AUSA
                       Mr. A. Brendan Stewart, AUSA
                       Mr. Justin Goodyear, AUSA
                       U.S. DEPARTMENT OF JUSTICE
                       Criminal Division
                       Fraud Section
                       1400 New York Avenue NW
                       Washington, DC 20530


FOR THE DEFENDANT:     Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)       LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                       800 Brickell Avenue
                       Suite 1400
                       Miami, Florida  33131


FOR THE DEFENDANT:     Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)       LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                       1221 Brickell Avenue # 900
                       Miami, Florida  33131
```

```
APPEARANCES (continued):


FOR THE DEFENDANT:        Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)          LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                          55 Merrick Way
                          Suite 212
                          Coral Gables, Florida  33134


FOR THE DEFENDANT:        Mr. Frank A. Prieto, Esq.
(Liliana Marks)           LAW OFFICE OF FRANK A. PRIETO, P.A.
                          One Northeast 2nd Avenue
                          Suite 200
                          Miami, Florida  33132


FOR THE DEFENDANT:        Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)             LAW OFFICES OF JUAN DE JESUS GONZALEZ
                          10631 N. Kendall Drive
                          Suite 150
                          Miami, Florida  33176


FOR THE DEFENDANT:        Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)             LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                          Courthouse Tower
                          40 NW 3rd Street
                          Suite 200
                          Miami, Florida  33128


COURT REPORTER:           Carly L. Horenkamp, RMR, CRR
                          U.S. DISTRICT COURT
                          400 N. Miami Avenue, Room 12-3
                          Miami, Florida  33128
                          (305) 523-5138
```

# I N D E X

*Certificate* ------------------------------------------------ 37

## W I T N E S S

ON BEHALF OF THE GOVERNMENT:                              PAGE
TERENCE REILLY
DIRECT EXAMINATION BY MR. MEDINA                              4

## E X H I B I T S

| GOVERNMENT EX. NO.: | OFFERED | ADMITTED |
|---|---|---|
| 67   - | 11 | 11 |
| 1000 - | 14 | 14 |
| 1001 - | 17 | 17 |
| 1012 - | 23 | 23 |
| 1013 - | 25 | 25 |

```
 1        (Before Jury, 3:55 p.m.)
 2             THE COURT:  Who is your next witness?
 3             MR. MEDINA:  The United States calls Special Agent
 4    Terence Reilly.
 5             TERENCE REILLY, GOVERNMENT WITNESS, SWORN
 6             COURT REPORTER:  Please be seated.  Please state your
 7    full name, spell your last name for the record, and please use
 8    the microphone.
 9             THE WITNESS:  My first name is Terence and my last
10    name is Reilly, R-E-I-L-L-Y.
11             MR. MEDINA:  May I proceed, Your Honor?
12             THE COURT:  Yes.
13                         DIRECT EXAMINATION
14    BY MR. MEDINA:
15    Q.  Special Agent Reilly, where do you work?
16    A.  I work for the FBI.
17    Q.  And what position do you have at the FBI?
18    A.  I'm a special agent.
19    Q.  How long have you been a special agent?
20    A.  Four and a half years.
21    Q.  And what is your duty station?
22    A.  Miami.
23    Q.  Now, what are your job responsibilities as a special agent
24    with the FBI?
25    A.  I work on the health care fraud squad, which is a complex
```

1    white collar crime squad, and we also deal with money

2    laundering and other health care fraud violations.

3    Q.   Now, prior to joining the FBI, what did you do?

4    A.   I'm a certified public accountant.

5    Q.   And where did you work?

6    A.   I worked for Deloitte & Touche.

7    Q.   Is Deloitte & Touche a public accounting firm?

8    A.   Yes, it is.

9    Q.   Now, how long were you a certified public accountant at

10   Deloitte & Touche?

11   A.   I worked for Deloitte & Touche for six and a half years and

12   I probably got my first license about two years into it.

13   Q.   Are you currently licensed?

14   A.   Yeah, I'm an active CPA in New York and New Jersey.

15   Q.   Now, Special Agent Reilly, during the course of this

16   investigation into Health Care Solutions Network, did you learn

17   who was running the partial hospitalization program at HCSN or

18   Health Care Solutions West from January 1st, 2009 to July 1st,

19   2009?

20   A.   Yeah.   In 2009, the de facto clinical director was Alina

21   Fonts.

22   Q.   Why do you say that?

23   A.   Because on paper, John Thoen was the clinical director, but

24   he was in North Carolina for most of that time, and Alina Fonts

25   and her son Wilson Lopez were running the partial

1    hospitalization program.

2    Q.   Special Agent Reilly, did you conduct interviews as part of

3    your investigation into Health Care Solutions Network?

4    A.   Yes, I did.

5    Q.   Please describe to the jury what steps you take to prepare

6    for interviews.

7    A.   Generally, when we identify someone we want to interview,

8    we'll run their name in our system to see if they have a

9    background -- any background hits, a criminal history, and then

10   also we'll run a public source research and see where they

11   work, if we can find that out.  Also, we'll refer to them in

12   our case files to see if there's any open investigations

13   against them.  And then we'll also refer to our evidence and

14   see if there's any questions we want to ask them about the

15   evidence we've obtained or what their role was in putting

16   together that evidence.

17   Q.   Why, in general, do you gather evidence for a particular

18   individual prior to meeting them during an interview?

19   A.   We want to be prepared and we want to know what we want to

20   talk about and what questions we want to ask them and what

21   questions we want them to clear up for us.

22   Q.   Now, did you participate in an interview of Defendant

23   Liliana Marks?

24   A.   Yes, I did.

25   Q.   Was Defendant Marks alert during the interview?

1  A.  Yes, she was.

2  Q.  And where did it take place?

3  A.  At Larkin Hospital.

4  Q.  Is that where she was working at the time?

5  A.  Yes, it was.

6  Q.  And who participated in this interview?

7  A.  Myself, Ms. Marks, and Special Agent Cox.

8  Q.  And did you memorialize a summary of the substance of the

9  interview with Defendant Marks?

10  A.  Yes, I did.

11  Q.  Now, focusing on the beginning of the interview itself, did

12  Defendant Liliana Marks indicate that she knew what a partial

13  hospitalization program was?

14  A.  Yes, she did.  She --

15  Q.  And what did she say?

16  A.  Excuse me.  She explained this step up and step down nature

17  of how patients get admitted into a partial hospitalization

18  program.

19  Q.  Now, at the beginning of the interview with Defendant

20  Liliana Marks, did she deny writing group therapy notes for

21  absent patients at Health Care Solutions Network?

22  A.  Yes, she did.

23  Q.  Did your notes reflect Defendant Marks' denial?

24  A.  Yes, they did.

25  Q.  What about your final interview report, did it reflect the

1   fact that she initially denied writing group notes for absent

2   patients?

3   A.   No, it did not.

4   Q.   Why not?

5   A.   Well, after she initially denied it, we presented her with

6   the patient files that we've discussed with her, and at that

7   point, she opened up to us and told us exactly how she

8   fabricated group therapy notes for patients that weren't in her

9   sessions.

10  Q.   Do you recall the patient file that you showed her?

11  A.   Yes.  It was Steven Abbott.

12  Q.   Now, once you showed Defendant Marks the Steven Abbott

13  patient file and once Defendant Marks admitted to creating

14  group notes for absent patients, what, if anything, did she

15  describe as far as the procedure that she used to write notes

16  for absent patients at Health Care Solutions Network?

17  A.   Yeah, she explained the whole process.  She said that she

18  would bring in a USB drive from home, load the group therapy

19  notes onto the computer at Health Care Solutions, and when

20  asked to produce a note for a patient that wasn't in her group,

21  she would simply go to the network drive, access the network on

22  her own, print the group therapy note, and then sign it and

23  give it to Ms. Feas.

24  Q.   Now, prior to admitting that she wrote group therapy notes

25  for absent patients, did she say she possibly wrote group

1    therapy notes for absent patients?

2    A.   No.

3    Q.   Did she in fact describe the procedure she used to write

4    group therapy notes for absent patients at Health Care

5    Solutions Network?

6    A.   Yes, she did.

7    Q.   Now, what does it mean to clone group therapy notes,

8    Special Agent Reilly?

9    A.   A cloned group therapy note essentially is a previously

10   written group therapy note with the date changed at the top of

11   the note and just print out the rest.

12   Q.   Did Defendant Marks say anything to you, Special Agent Cox,

13   about cloning group therapy notes at Health Care Solutions

14   Network?

15   A.   Yes, she said she would change the date.

16   Q.   Anything else she said?

17   A.   She would print them and sign them.

18   Q.   Did she say she was not proud of this?

19   A.   Oh, yes.  She also, when she described this to us, she said

20   that she was not proud of doing this.

21   Q.   Now, over the course of your investigation, Special Agent

22   Reilly, did you obtain documents from a consensual search?

23   A.   Yes.

24   Q.   Now, I'm showing you what's been marked as Government

25   Exhibit 67, which is not yet in evidence.  Do you recognize

1    Government Exhibit 67?

2    A.  Yes, I do.

3    Q.  What is it?

4    A.  It's pages from a coloring book.

5    Q.  Now, can you please describe to the jury how you obtained

6    this document?

7    A.  Well, when Armando Gonzalez, after we arrested him and he

8    decided to cooperate with the government, he gave us access to

9    where his files were at.  They were in a storage facility

10   located in Miami.  So we contacted the owner of the storage

11   facility and we interviewed him and he gave us access, a

12   consent to seize those documents.

13   Q.  Did you talk to an individual by the name of Jon Piniero?

14   A.  Yeah, Jon Piniero was the individual who was renting out

15   the storage facility that had previously been rented by Armando

16   Gonzalez, and Mr. Piniero told us that he had received a

17   reduced rate to -- from the owner of that storage facility to

18   preserve those documents because they looked important.  So

19   Mr. Piniero told us that he had moved the documents inside the

20   facility to the second floor and did not touch them or disturb

21   them at all.

22   Q.  Approximately how many boxes were contained in the storage

23   unit?

24   A.  I'd say approximately 80 to 100 boxes.

25   Q.  Now, once law enforcement obtained these documents, what

1  did you do with them?

2  A.  We brought them to the Health and Human Services office in

3  Miami Lakes.

4  Q.  Now, did these files eventually move out of the office of

5  the Department of Health and Human Services?

6  A.  Yeah.  The HHS office could not sustain holding these files

7  for that long, and we have a big off-site in Miramar where we

8  store tons of -- we have a warehouse full of evidence, but that

9  facility was also full of other investigative materials.  So we

10  rented out a storage facility as well in the same Miramar

11  location, just a different -- just an off-site.

12  Q.  Now, was this facility in Miramar under lock and key?

13  A.  Yes, it was.  FBI security gave us our own key that only we

14  had access to, so the access to that facility was controlled

15  and monitored by the agents.

16        MR. MEDINA:  The government at this time moves into

17  evidence Government Exhibit 67 and requests permission to

18  publish.

19        THE COURT:  All right.  That will be received in

20  evidence.

21  BY MR. MEDINA:

22  Q.  Now, Special Agent Reilly, I want to focus your attention

23  to the bottom right-hand side.  There's a numerical indication

24  there.  Do you see that?

25  A.  Yes, I do.

1    Q.   What box number was this excerpt from a coloring book

2    located in?

3    A.   Yeah, this was from box 59.  The first -- to the left where

4    it says HCSN3FL is just the third indictment in this case and

5    then 059 is the box number, then the four zeros 972 would be

6    the page number of the scanned document.

7    Q.   And what other documents, in general, were stored in box

8    59?

9    A.   Employee files.

10   Q.   Are there two pages to this document?

11   A.   Yes, there are.

12          MR. MEDINA:  Ms. Zaferis, can you please show the

13   second page?

14          MS. ZAFERIS:  (Complies.)

15          MR. MEDINA:  Ms. Zaferis, you can take it down.  Thank

16   you.

17   BY MR. MEDINA:

18   Q.   Now, Special Agent Reilly, did you review and analyze bank

19   records in this case?

20   A.   Yes, I did.

21   Q.   How did you obtain these records?

22   A.   Grand jury subpoena.

23   Q.   And were the bank records that you reviewed and analyzed

24   voluminous?

25   A.   Yes, they were.  I would say there was over 20,000

1    financial transactions.

2    Q.  Now, as a criminal investigator, Special Agent Reilly,

3    please describe to the jury why you would want to obtain bank

4    records to review and analyze.

5    A.  Well, most specifically in this case, this is a white

6    collar case, so there was $28 million stolen, so we wanted to

7    see where the funds went, who received the funds, and who else

8    was getting payment from the Health Care Solutions Network bank

9    accounts.

10   Q.  Now, did you perform an analysis of the bank records

11   identifying the total compensation for Health Care Solutions

12   Network employees?

13   A.  Yes, I did.

14   Q.  I want to show you what's been marked as Government

15   Exhibit 1000, which is not yet in evidence.  Special Agent

16   Reilly, do you recognize this exhibit?

17   A.  Yes.  It's a chart I prepared, detailing the employee total

18   compensation at Health Care Solutions.

19   Q.  And what information did you use to create this chart?

20   A.  I used the analysis of the bank accounts that we subpoenaed

21   to document or to analyze and figure out how much each employee

22   was paid.

23   Q.  Now, are these the same voluminous bank records you

24   testified about a moment ago?

25   A.  Yes.

1  Q.  And is Government Exhibit 1000 a fair and accurate

2  representation of your analysis of these bank records?

3  A.  Yes.

4       MR. MEDINA:  Your Honor, the government moves at this

5  time into evidence Government Exhibit 1000 and requests

6  permission to publish.

7       THE COURT:  All right.  That will be received in

8  evidence and you can publish it.

9  BY MR. MEDINA:

10  Q.  Now, Special Agent Reilly, can you please describe to the

11  jury, in general terms, what you did to create what's shown in

12  Government Exhibit 1000?

13  A.  Yeah, we scheduled the whole financial -- all of the bank

14  accounts from Health Care Solutions and then we were able to

15  determine the years that people were employed there, based upon

16  the years that they received the checks from Health Care

17  Solutions.  So Armando Gonzalez started receiving checks in

18  2004 and that ended in 2011.  Then we simply added up their

19  total compensation over that time to get the total earned.

20  Q.  Now, to use an example, do you see the name Liliana Marks?

21  A.  Yes, I do.

22  Q.  Now, in the years employed column, it says 2005; 2007-2010.

23  What does that mean?

24  A.  Yeah, upon our analysis of the accounts, Ms. Marks was paid

25  for a couple of months in 2005.  Then there was no checks

1   issued to her in 2006.  Then in March of 2007, she started back

2   working at Health Care Solutions through 2010 -- through

3   September of 2010.

4   Q.  And is that similar to what's shown for Alina Feas?

5   A.  Yes.

6   Q.  Now, you mentioned the name Armando Gonzalez and the

7   compensation earned as shown on Government Exhibit 1000.  It

8   says that he earned approximately $1.5 million.  Do you see

9   that?

10  A.  Yes, I do.

11  Q.  Did you learn that Armando Gonzalez was drawing additional

12  funds or monies from Health Care Solutions Network accounts?

13  A.  Yeah.  He was using the Health Care Solutions account as

14  his own personal slush fund as well.  Generally, what this

15  represents is the money that he withdrew to himself as part of

16  a salary or checks that he wrote to Armando Gonzalez.  But in

17  addition, he had about $1.1 million in American Express

18  payments.  He had $600,000 in cash withdrawals, some of which

19  were to pay kickbacks to ALF owners.  Then he had about

20  $260,000 to builders in North Carolina.

21  Q.  Did the FBI or the government seize any of Armando

22  Gonzalez's accounts?

23  A.  Yeah.  And when we arrested Armando Gonzalez, we seized

24  about 985 grand.

25  Q.  Now, I want to show you what's been marked as Government

 1    Exhibit 1001, which is not in evidence.  Do you recognize this

 2    chart?

 3    A.  Yes, I do.

 4    Q.  What is it?

 5    A.  It's an annualized salary comparison that I created based

 6    upon the records from the total compensation.

 7    Q.  Now, Special Agent Reilly, Government Exhibit 1000 was a

 8    chart showing total compensation for Health Care Solutions

 9    Network employees.  Why then did you create a second chart

10    annualizing the salaries?

11    A.  Well, it was hard to gauge -- or to gain a comparison to --

12    or gauge a comparison based upon the total compensation because

13    certain employees only worked there for one or two years so

14    their compensation would be significantly lower on the total

15    compensation chart versus someone who worked there for five,

16    six, seven years.

17         So what I did was, upon my analysis of the accounts, I

18    noted that the Health Care Solutions employees were paid

19    biweekly, so essentially, they were paid once every two weeks,

20    and using the total payments that they earned over the course

21    of their time there, I created an average from the analysis and

22    multiplied that by 26, which is the 26 biweekly pay periods in

23    a year.

24    Q.  So by doing an annualized salary comparison, it shows what

25    the person on the chart made in a given year?

1    A.  It would be a rough estimate, because their wages went up

2    and down, but it's a very conservative estimate and, yeah, it

3    would be a weighted average.

4    Q.  Now, was the information used to create this chart

5    voluminous?

6    A.  Yes, it was.

7    Q.  And is the chart a fair and accurate representation of your

8    analysis of the bank records?

9    A.  Yes.

10         MR. MEDINA:  At this time, the government moves into

11   evidence Government Exhibit 1001 and requests permission to

12   publish.

13         THE COURT:  Okay.

14   BY MR. MEDINA:

15   Q.  Now, a moment ago, you testified that you noticed in the

16   analysis of the bank records that most of the employees at

17   Health Care Solutions were paid biweekly; is that right?

18   A.  That's correct.

19   Q.  And you testified that you made an average based on 26

20   biweekly periods in a year?

21   A.  Yeah.  In a 52-week year, there would be 26 biweekly pay

22   periods.

23   Q.  Okay.  Now, I want to walk through for a moment from the

24   bottom to the top.

25   A.  Actually, I'd like to make one clarification upon that.

1  For Dr. Roger Rousseau, he was paid once a month, so to create

2  his projected annualized salary, we multiplied his average

3  payments by 12 to represent the 12 months of the year.

4  Q.  Okay.  Now, with respect to Liliana Marks, approximately

5  how much did she make at Health Care Solutions per year?

6  A.  Her annualized salary was $46,822.32.

7  Q.  Now, was that more or less than Wondera Eason?

8  A.  Less.

9  Q.  And who is Wondera Eason?

10  A.  She was the director of medical records.

11  Q.  Was that more or less than Lisset Palmero?

12  A.  That was less -- I mean, that was more than Lisset Palmero.

13        THE COURT:  But you said it was less than Wondera.

14  Isn't it more than Wondera?

15  A.  Excuse me, sorry, I misinterpreted the question.  Wondera

16  Eason made less than Ms. Marks.

17  BY MR. MEDINA:

18  Q.  Now, with respect to Angela Salafia, what was her

19  annualized salary?

20  A.  $49,251.43.

21  Q.  Now, did Angela Salafia make more or less than Alexandra

22  Haynes?

23  A.  She made more.

24  Q.  And focusing your attention to Doris Crabtree, what was

25  Doris Crabtree's annualized salary?

1  A.  $58,178.23.

2  Q.  Now, Ms. Crabtree's annualized salary, was that more or

3  less than what Paul Layman made annually?

4  A.  That was more.

5  Q.  And with respect to Blanca Ruiz, what was her annualized

6  salary?

7  A.  $61,546.26.

8  Q.  Was that more or less than Paul Layman?

9  A.  That was more.

10  Q.  What about Alexandra Haynes?

11  A.  That was more than Ms. Haynes.

12  Q.  And what about the director of medical records, Wondera

13  Eason?

14  A.  That was more than Ms. Eason.

15  Q.  Now, I want to go further up the chart shown on Government

16  Exhibit 1001 and focus your attention to Alina Fonts.  What was

17  Alina Fonts' annualized salary?

18  A.  $71,135.49.

19  Q.  Was Alina Fonts' annualized salary more or less than Dana

20  Gonzalez?

21  A.  More.

22  Q.  Was it more or less than Gema Pampin?

23  A.  More.

24  Q.  Was Alina Fonts' annualized salary more or less than Paul

25  Layman?

1    A.   More.

2    Q.   Special Agent Reilly, what was Dr. Roger Rousseau's

3    annualized salary?

4    A.   $113,161.29.

5    Q.   Was Dr. Rousseau's annualized salary more or less than

6    Alina Feas?

7    A.   More.

8    Q.   Now, Special Agent Reilly, I want to show you what's

9    already been admitted into evidence as Government Exhibit 18

10   and 75.

11        MR. MEDINA:  Ms. Zaferis, can you please pull up

12   Government Exhibit 18 first?

13   BY MR. MEDINA:

14   Q.   Now, Special Agent Reilly, what is Government Exhibit 18?

15   A.   It's a check written from Psychiatric Consulting Network,

16   Inc. to Roger Rousseau in the amount of $80,000.

17   Q.   Now, what is Psychiatric Consulting Network?

18   A.   It was a shell company created by Armando Gonzalez to

19   launder money from Health Care Solutions to Psychiatric

20   Consulting for his own benefit.

21   Q.   Now, with respect to check 1004 dated October 20th, 2005 on

22   the check, who is the payee?

23   A.   Roger Rousseau.

24   Q.   And you testified a moment ago that this is for $80,000,

25   correct?

1    A.  That's correct.

2         MR. MEDINA:  Ms. Zaferis, can you please turn to the

3    next page of Government Exhibit 18?

4    BY MR. MEDINA:

5    Q.  Special Agent Reilly, do you see the second page of

6    Government Exhibit 18, which is Check No. 1013?

7    A.  I do.

8    Q.  And who is the payee on this check?

9    A.  Roger Rousseau.

10   Q.  And how much is the check for?

11   A.  $95,000.

12   Q.  Are the funds coming from the Psychiatric Consulting

13   Network account?

14   A.  Yes, they are.

15   Q.  And what is the date?

16   A.  December 22nd, 2005.

17   Q.  Now, Special Agent Reilly, from approximately October 2005

18   to approximately June 2007, how much money did Dr. Rousseau

19   receive from this same Psychiatric Consulting Network account?

20   A.  He received eight checks totaling $380,000.

21   Q.  That's less than two years, approximately, correct?

22   A.  That's correct.

23        MR. MEDINA:  Now, Ms. Zaferis, can you please pull up

24   Government Exhibit 75, which is already in evidence.

25   BY MR. MEDINA:

1   Q.   Now, Special Agent Reilly, what is the check number shown

2   on your screen in front of you?

3   A.   3296.

4   Q.   And who is the payee on Check No. 3296 from Government

5   Exhibit 75?

6   A.   Roger Rousseau.

7   Q.   And what is the date of the check?

8   A.   April 29th, 2011.

9   Q.   And how much is the check for?

10  A.   $2,000.

11  Q.   And what account are the monies, $2,000, on April 29, 2011,

12  what account is it coming from?

13  A.   Healthcare Solutions Network of North Carolina, Inc.

14          MR. MEDINA:   Thank you, Ms. Zaferis.

15  BY MR. MEDINA:

16  Q.   Now, Special Agent Reilly, I want to show you what's been

17  marked as Government Exhibit 1012, which is not yet in

18  evidence.   Do you recognize Government Exhibit 1012?

19  A.   Yes, I do.

20  Q.   What is it?

21  A.   It's a chart I created documenting payments that Doris

22  Crabtree received from Health Care Solutions Network and

23  another PHP named American Therapeutic over 43 days in 2010.

24  Q.   And what information did you use to create the chart

25  showing the compensation for Doris Crabtree from American

1    Therapeutic Corporation and Health Care Solutions Network

2    during that 43-day period?

3    A.   Yeah, I used the same Health Care Solutions Network bank

4    accounts that we were referring to earlier, and I also had

5    access to the American Therapeutic Corporation bank accounts as

6    well.

7    Q.   Were the documents or the records you used to create this

8    chart voluminous?

9    A.   Yes.

10   Q.   And is this chart, Government Exhibit 1012, a fair and

11   accurate representation of your analysis?

12   A.   Yes, it is.

13            MR. MEDINA:   Your Honor, at this time, the government

14   moves into evidence Government Exhibit 1012 and requests

15   permission to publish.

16            THE COURT:   All right.   That will be received in

17   evidence.   You can publish.

18   BY MR. MEDINA:

19   Q.   Now, Special Agent Reilly, you testified a moment ago that

20   this chart shows a 43-day period; is that correct?

21   A.   Yes, it does.

22   Q.   Please, for the record, state what date range you have

23   shown on this chart.

24   A.   It's from January 25th, 2010, which is the first Health

25   Care Solutions payment, which is in the second box, through

1  March 8th, 2010.

2  Q.  And how many pay periods are reflected on this chart,

3  Government Exhibit 1012?

4  A.  Four pay periods.

5  Q.  Now, looking at the bottom of the chart, it says a grand

6  total over 43 days that Doris Crabtree earned from Health Care

7  Solutions Network and American Therapeutic Corporation.  What

8  was the grand total?

9  A.  $20,220.

10  Q.  And that's for a 43-day period?

11  A.  That's correct.

12  Q.  Now, I want to show you a different chart which is not yet

13  in evidence, Government Exhibit 1013.  Do you recognize

14  Government Exhibit 1013?

15  A.  Yes, I do.  It's another chart I created.

16  Q.  And what is it?

17  A.  It's a chart of compensation that Liliana Marks received

18  from American -- payments that she received from American

19  Therapeutic and Health Care Solutions from 2006 through 2010.

20  Q.  And did you use the same voluminous records that you used

21  to create the chart, Government Exhibit 1012?

22  A.  Yes, the same exact records.

23  Q.  And is this chart, Government Exhibit 1013, a fair and

24  accurate representation of your analysis?

25  A.  Yes, it is.

1      MR. MEDINA:  Your Honor, the government moves into

2  evidence Government Exhibit 1013 and requests permission to

3  publish.

4      THE COURT:  All right.  That will be received in

5  evidence.

6  BY MR. MEDINA:

7  Q.  Now, Special Agent Reilly, what is the date range shown in

8  this chart?

9  A.  2006 through 2010.

10  Q.  Now, focusing your attention to the 2007 line item,

11  approximately when, Special Agent Reilly, did Defendant Marks

12  start working for Health Care Solutions Network in 2007?

13  A.  Her first check came in March of 2007.

14  Q.  So the $35,185 is not reflective of a full year; is that

15  correct?

16  A.  That's correct.

17  Q.  Now, looking at the 2010 line item, approximately when did

18  Defendant Marks stop working at ATC and Health Care Solutions

19  Network?

20  A.  According to her paycheck, she stopped working at American

21  Therapeutic in August of 2010 and Health Care Solutions in

22  September of 2010.

23  Q.  So it does not reflect a full year of compensation,

24  correct?

25  A.  That's correct.

1    Q.   Now, looking at the totals at the bottom of the chart, what

2    was the total compensation earned by Defendant Marks from

3    American Therapeutic Corporation from the years 2006 to 2010?

4    A.   $223,794.

5    Q.   And what was the total compensation earned from Health Care

6    Solutions Network from the years 2006 to 2010?

7    A.   $169,705.

8    Q.   And with respect to the total amount earned from both

9    facilities, from 2006 to 2010, what is that amount?

10   A.   $393,499.

11   Q.   Now, Special Agent Reilly, I want to show you what's been

12   admitted into evidence as Government Exhibit 19, and focusing

13   your attention to page 11.

14          MR. MEDINA:   Ms. Zaferis, can you please zoom in to

15   Check No. 2442?

16   BY MR. MEDINA:

17   Q.   Special Agent Reilly, who is the payee of Check No. 2442?

18   A.   The payee is Alina Fonts.

19   Q.   And what is the date of this check?

20   A.   December 28, 2007.

21   Q.   And what account is this Check No. 2442 coming from?

22   A.   It's coming from the Health Care Solutions Network West

23   account.

24   Q.   And over the course of your investigation, did you learn

25   that Alina Fonts primarily worked out of the West location?

1  A.  Yes.

2  Q.  Special Agent Reilly, what does it say in the memo line of

3  Check No. 2442?

4  A.  "Notes."

5       MR. MEDINA:  Now, Ms. Zaferis, can you please pull up

6  Check No. 2443, which I believe is right under the check we

7  recently saw.

8  BY MR. MEDINA:

9  Q.  Now, Special Agent Reilly, who is the payee on Check

10  No. 2443?

11  A.  Blanca Ruiz.

12  Q.  And is Check No. -- is the date on Check No. 2443 the same

13  as Check No. 2442 for Alina Fonts?

14  A.  Yes, December 28, 2007.

15  Q.  And what is the amount?

16  A.  $1,300.

17  Q.  And what account, Special Agent Reilly, were the funds

18  drawn from for Blanca Ruiz's Check No. 2443?

19  A.  Once again, it was the Health Care Solutions Network West

20  bank account.

21  Q.  The same account used to draw funds for Alina Fonts?

22  A.  That's correct.

23  Q.  What does it say in the memo line, Special Agent Reilly, on

24  Check No. 2443?

25  A.  It says "notes."

1       MR. MEDINA:  Now, Ms. Zaferis, can you please pull up

2    both checks at the same time?

3    BY MR. MEDINA:

4    Q.  Now, Special Agent Reilly, during the course of your

5    investigation and analysis of the Health Care Solutions bank

6    records, did you determine how many Health Care Solutions

7    Network employees received similar checks with "notes" on the

8    memo line?

9    A.  Yes, I did.

10   Q.  Who were the employees that received "notes" on the memo

11   line?

12   A.  At the Health Care Solutions Network East location and from

13   the East bank account, those employees were Dana Gonzalez and

14   Gema Pampin.  And from the West bank account, which is right

15   here, it's Alina Fonts and Blanca Ruiz.

16   Q.  What about Paul Layman?

17   A.  No, Paul Layman did not.

18   Q.  What about Alexandra Haynes?

19   A.  Ms. Haynes did not.

20   Q.  What about Lisset Palmero?

21   A.  Ms. Palmero did not.

22   Q.  So Dana Gonzalez, Alina Fonts, Blanca Ruiz, and Gema Pampin

23   were the only Health Care Solutions employees with checks

24   notating "notes" in the memo line?

25   A.  That's correct.

```
 1           THE COURT:  All right.  Let's take our last recess,
 2    take ten minutes and come back.
 3          (Recess, 4:28 p.m. to 4:40 p.m.)
 4           THE COURT:  All right.  Everybody is here.  Let's
 5    bring in the jury, please.
 6          (Jury Present.)
 7           THE COURT:  All right.  Please be seated, everyone.
 8    Welcome back.
 9              All right.  Mr. Medina.
10    BY MR. MEDINA:
11    Q.  Special Agent Reilly, before we broke, you testified about
12    checks as part of Government Exhibit 19, specifically checks
13    2442 and 2443 to Alina Fonts and Blanca Ruiz, respectively.  Do
14    you recall that?
15    A.  Yes.
16    Q.  Do you recall that the only four individuals who received
17    checks with "notes" in the memo lines were Alina Fonts, Blanca
18    Ruiz, Dana Gonzalez, and Gema Pampin, correct?
19    A.  That's correct.
20    Q.  Now, did you learn over the course of your investigation
21    that Blanca Ruiz was also paid checks to a company called
22    Health Care Professional Services?
23    A.  Yes, I did.
24           MR. MEDINA:  Now, Ms. Zaferis, can you please pull up
25    Government Exhibit 23, which is already in evidence?
```

1    BY MR. MEDINA:

2    Q.   Special Agent Reilly, what is shown in Government

3    Exhibit 23?

4    A.   It's account opening documents.

5    Q.   And in general terms, what are account opening documents?

6    A.   It's documents that you would fill out to open any bank

7    account.

8    Q.   Now, do you see the account owner name and address at the

9    top right-hand side of this document?

10   A.   Yes, I do.

11   Q.   And what is the account name?

12   A.   The name of the account is in the name of the company,

13   which is Health Care Professional Services, Inc.

14   Q.   Now, I want to focus your attention to the business purpose

15   box, which is going to be blown up in a moment.  What type of

16   business is indicated on account -- on Government Exhibit 23?

17   A.   It indicates a corporate -- a for-profit corporation and

18   the business is going to be psychotherapist.

19            MR. MEDINA:   Now, Ms. Zaferis, zooming out.

20   BY MR. MEDINA:

21   Q.   Who is the loan signatory on the account for Health Care

22   Professional Services?

23   A.   Blanca Ruiz.

24            MR. MEDINA:   Ms. Zaferis, can you please turn to

25   page 3 of Government Exhibit 23.

BY MR. MEDINA:

Q.  Who is listed as the owner for Health Care Professional

Services?

A.  Blanca Ruiz.

Q.  And at the bottom of the blown-up portion of Government

Exhibit 23, page 3, what is the occupation listed?

A.  Psychotherapist.

Q.  And what about the employer name listed in this blown-up

box?

A.  Health Care Solutions Network.

Q.  Now, focusing your attention to the top right-hand corner,

which is blown up in front of you, of page 3 of Government

Exhibit 23, what does the highlighted portion of the document

say?  Well, what does it say underneath the company and

address?

A.  Yeah, underneath the company and address it says REF:

Armando Gonzalez.

        MR. MEDINA:  Ms. Zaferis, can you please turn to the

next page of Government Exhibit 23?

BY MR. MEDINA:

Q.  Now, looking at the bottom portion of this page, does it --

this document indicate the source of funds used to open the

account?

A.  Yes.  It's a Check No. 1925.

Q.  And does it also say earnings from employer?

1  A.  Yes, it does.

2  Q.  And what is the opening amount?

3  A.  $2,676.54.

4       MR. MEDINA:  Now, Ms. Zaferis, please turn to page 16

5  of Government Exhibit 23.

6  BY MR. MEDINA:

7  Q.  What is shown on the -- on 16 -- page 16 of Government

8  Exhibit 23?

9  A.  It's the source of funds that we just looked at.  It's the

10  check 1925 in the amount of $2,676.54.

11  Q.  Is that a check from Health Care Solutions Network

12  account 7094?

13  A.  Yes, which is the West account.

14       MR. MEDINA:  Now, Ms. Zaferis, please turn to page 20

15  of Government Exhibit 23.

16  BY MR. MEDINA:

17  Q.  And who does Blanca Ruiz list as a reference to open this

18  bank account?

19  A.  It says references by existing customer, Mr. Armando

20  Gonzalez, from Health Care Solutions, Account No. 10007094.

21       MR. MEDINA:  Now, Ms. Zaferis, can you please pull up

22  page 32 of Government Exhibit 21 side by side with the first

23  page of Government Exhibit 23?  Actually, I'm sorry, my

24  mistake.  Please pull up Government Exhibit 21, page 32.

25  BY MR. MEDINA:

1  Q.  And focusing your attention to Check Nos. 2075 and 2076,

2  Special Agent Reilly, who are the payees on these checks?

3  A.  For check 2075, which is the top check listed above, it's

4  Health Care Professional Services.

5  Q.  And what about check 2076?

6  A.  Again, it's Health Care Professional Services.

7  Q.  Is Health Care Professional Services the account that

8  Blanca Ruiz opened?

9  A.  Yes.

10  Q.  Now, what are the dates for both of these checks that are

11  actually shown on the date itself -- on the check itself?

12  A.  August 10, 2007.

13  Q.  And for check 2075 and 2076, are they the same exact dates?

14  A.  Yes.

15  Q.  What is the amount listed on 2075?

16  A.  $2,676.55.

17  Q.  And what about Check No. 2076, which was written on the

18  same date?

19  A.  The amount is $2,000.

20  Q.  Now, these checks have the same date, but what, if any,

21  differences do you see with respect to the memo lines for each

22  check?

23  A.  The first check, 2075, lists a pay period of 7 --

24  July 23rd, 2007 through August 3rd, 2007, and an amount of

25  insurance payment.

1    Q.   Now, what about Check No. 2075 -- 2076?  I apologize.

2    A.   It lists "notes" from a period of -- I'm not a hundred

3    percent sure of -- if that's June 11, 2007 to August 3rd, 2007.

4    Q.   But the check 2076 has the word "notes" in the memo line?

5    A.   Yes, it does.

6    Q.   And check 2075, which is written on the same date, does not

7    have the "notes" indicated?

8    A.   That's correct.

9              MR. MEDINA:  Ms. Zaferis, can you please pull up Page

10   No. 4 of Government Exhibit No. 19.  Can you blow up, please,

11   Check Nos. 2302 and 2303.

12   BY MR. MEDINA:

13   Q.   Now, Special Agent Reilly, who are payees on Check

14   Nos. 2302 and 2303?

15   A.   The payee is the same.  It's Alina Fonts.

16   Q.   And what about the dates for both of these checks?

17   A.   The dates of the checks are November 16, 2007.

18   Q.   The same for each check?

19   A.   Yes.

20   Q.   Now, focusing on the top check, 2302, what is the amount

21   listed?

22   A.   $2,100.

23   Q.   And with respect to the funds, is that coming out of the

24   Health Care Solutions Network West account?

25   A.   Yes.

1   Q.  And what is written in the memo line?

2   A.  10-27-07/11-09-07.

3   Q.  Now, focusing your attention on the bottom check, 2303,

4   which has the same date as 2302, how much money is listed

5   there?

6   A.  $200.

7   Q.  And are the funds coming from the same Health Care

8   Solutions Network West account?

9   A.  Yes, they are.

10  Q.  What's written on the memo line?

11  A.  "Notes."

12  Q.  Now, Special Agent Reilly, earlier you testified that Gema

13  Pampin, Dana Gonzalez, Alina Fonts, and Blanca Ruiz were the

14  only Health Care Solutions Network employees who received

15  checks with "notes" written in the memo line; is that right?

16  A.  That's correct.

17  Q.  Did the funds for the "notes" checks come from the same

18  accounts for all of the individuals?

19  A.  No.  Dana and Gema's funds with the "notes" checks came

20  from the Health Care Solutions Network East account, and Blanca

21  and Alina's came from the Health Care Solutions Network West

22  accounts, which is where they worked.

23  Q.  Now, Special Agent Reilly, did you learn, over the course

24  of your investigation, that Alina Fonts was an officer for a

25  company incorporated in the state of Florida?

1    A.  Yes.

2    Q.  And what was the name of that company?

3    A.  Fonts Psychotherapy.

4         MR. MEDINA:  Ms. Zaferis, can you please pull up

5    what's been admitted into evidence as Government Exhibit 30.

6    BY MR. MEDINA:

7    Q.  What is Government Exhibit 30?

8    A.  These are the certified records from the state of Florida

9    incorporating her company.

10   Q.  Now, during your bank analysis, did you learn that Alina

11   Fonts was paid -- paid through her company, Fonts Psychotherapy

12   business?

13   A.  Yes, I did.

14        MR. MEDINA:  Ms. Zaferis, please turn to page 3 of

15   Government Exhibit 30.

16   BY MR. MEDINA:

17   Q.  Who are the officers listed for Fonts Psychotherapy

18   clinician?

19   A.  The title P indicates president, and that's Alina Fonts,

20   and the title VP, vice-president, is Wilson Lopez, Jr.

21        MR. MEDINA:  No further questions, Your Honor.

22             *   *   *   *   *

```
 1   UNITED STATES OF AMERICA                        )
                                                     ) ss:
 2   SOUTHERN DISTRICT OF FLORIDA                     )

 3

 4                    C E R T I F I C A T E

 5        I, Carly L. Horenkamp, Certified Shorthand

 6   Reporter in and for the United States District Court for the

 7   Southern District of Florida, do hereby certify that I was

 8   present at and reported in machine shorthand the proceedings

 9   had the 17th day of November, 2014, in the above-mentioned

10   court; and that the foregoing transcript is a true, correct,

11   and complete transcript of my stenographic notes.

12        I further certify that this transcript contains

13   pages 1 - 37.

14        IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15   Florida, this 9th day of February, 2015.

16

17

                      /s/ Carly Horenkamp
18
                      Carly L. Horenkamp, RMR, CRR
19                    Certified Shorthand Reporter

20

21

22

23

24

25
```